# Progress Notes

Printed On Aug 08, 2014

```
   LOCAL TITLE: EMERGENCY DEPT TRIAGE NOTE
STANDARD TITLE: EMERGENCY DEPT TRIAGE NOTE
DATE OF NOTE: AUG 02, 2014@20:50    ENTRY DATE: AUG 02, 2014@23:07:14
     AUTHOR: WHITLEY,ELIZABETH A  EXP COSIGNER:
     URGENCY:                             STATUS: COMPLETED

   *** EMERGENCY DEPT TRIAGE NOTE Has ADDENDA ***

Arrived via:
   POV
     Wheelchair

CHIEF COMPLAINT: Pt dc'd home, was walking out to POV with ride home on
crutches,  lost footing and fell forward into bike rack, going between
bars  and hitting head on ground.  Lacerations, skin abrasions to rt
forehead, bump to rt forehead. No LOC, minimal bleeding to  forehead.  Pt
alert and oriented, denis pain, just scrape to  head, requesting to go
home now.

 VITALS:
   TEMP: 97.5 F [36.4 C] (07/08/2014 11:15)
   RESP: 14 (08/02/2014 20:50)
   PULSE: 81 (08/02/2014 20:50)
   BP: 113/64 (08/02/2014 20:50)
   WT: 276.8 lb [125.8 kg] (07/08/2014 11:15)
   HEIGHT: 70 in [177.8 cm] (02/27/2014 10:12)
   PAIN: 1 (08/02/2014 20:50)
   PULSE OXIMETRY:
Measurement DT    POx
                  (L/MIN)(%)
08/02/2014 20:50  92

 Medication:

Active Outpatient Medications (including Supplies):
```

| | Outpatient Medications | Status |
|---|---|---|
| 1) | ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN | ACTIVE |
| 2) | ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1 PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE NOTE NEW FORMULATION AND NEW DIRECTIONS*** | ACTIVE |
| 3) | ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY DAY FOR HEART AND CIRCULATION | ACTIVE |
| 4) | BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5 | ACTIVE |

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 17
McManus Ex 1

# Progress Notes

Printed On Aug 08, 2014

SECONDS) BEFORE EACH USE.

5)  BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS      ACTIVE
    BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR
    DEPRESSION, ANXIETY, SMOKING.

6)  CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT       ACTIVE
    TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO
    NOT APPLY TO FACE, GROIN, ARMPITS

7)  DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT             ACTIVE
    BEDTIME

8)  DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY        ACTIVE
    MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD
    IF PULSE IS LESS THAN 50.

9)  DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR         ACTIVE
    TABLETS BY MOUTH AT BEDTIME  - START WITH ONE
    TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE
    DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR
    TABLETS DAILY FOR MOOD STABILIZATION, ANGER,
    ANXIETY.

10) HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH          ACTIVE
    TWICE A DAY FOR BLOOD PRESSURE CONTROL

11) HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET      ACTIVE
    BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF.

12) HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET      PENDING
    BY MOUTH EVERY 6 HOURS AS NEEDED

13) LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY        ACTIVE
    TWO TIMES DAILY AS NEEDED

14) LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY         ACTIVE
    DAY FOR BLOOD PRESSURE CONTROL

15) MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL          ACTIVE
    AMOUNT TOPICALLY EVERY DAY

16) MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL          PENDING
    AMOUNT TOPICALLY EVERY DAY

17) PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY          ACTIVE
    MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN
    AND BURNING

18) SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT            ACTIVE
    TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON
    SKIN SORE UNTIL HEALED

19) SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT      ACTIVE
    BEDTIME FOR CHOLESTEROL

20) TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY       ACTIVE
    6 HOURS AS NEEDED FOR PAIN

21) WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS        ACTIVE
    BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY
    AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY
    AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO
    PREVENT CLOTS

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 18

# Progress Notes

Printed On Aug 08, 2014

```
   Allergy:
    Patient has answered NKA
    C/O:
ESI LEVEL 4.
DISPOSITION:
   Outpatient to be seen immediately, Charge nurse notified.

Patient positively identified using two identifiers prior to placing
wristband on patient. Patient advised and understands that the wristband
should be destroyed upon discharge because it contains sensitive patient
identification information.

   Veteran declares they are SENSITIVE to latex: No
Medication list reviewed with veteran.
   No changes required in medication list after review.
   When asked, veteran states they feel home is a safe enviroment.
   No readily apparent signs of abuse or neglect.
Alcohol use assessment
   Veteran uses Alcohol. How much per day? occ
   Veteran reported level of alcohol consumption is within safe limits.
   Currently using tobacco products. Type:
      Counseled to quit use of tobacco products. Informed Veteran about
      support for quiting at tobacco hotline at 1-800-QUIT-NOW.
Behavioral Health Assessment
Suicide/Violence Risk Assessment:
  1. Veteran feels hopeless about the present or future.   No
  2. Has Veteran ever had a suicide attempt?               No
  3. Has Veteran had thoughts about taking his/her life
     or harming others in the past 12 months?
Answers "NO" to having thoughts of suicide or harming others.
Nursing interventions completed:
       Dr. cashion ot bedside to assess pt.


   /es/ ELIZABETH A WHITLEY
Registered Nurse
Signed: 08/02/2014 23:16

08/02/2014 ADDENDUM                     STATUS: COMPLETED
ER NURSE ASSESSMENT 2050
Veteran to bed 118 via Wheelchair,
 transfered with assist to gurney.
Veteran in no distress.
Veteran alert and oriented X 3.
PERRL
Lungs CTA, all fields
Abdomen soft, non-tender to light palpation, bowel sounds present in all 4 Quad.
Heart: Regular rate and rhythm
```

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WRIGHT, STEVEN O<br>110 E 7TH<br>PO BOX 174<br>ROSALIA, WASHINGTON   99170 | Printed at SPOKANE VAMC |

EXHIBIT 1 - 19

# Progress Notes

```
Skin: Pink, warm and dry
Skin: abrasion to rt forehead, bump to rt forehead
Extremities: WNL, moves against gravity, pulses, grip, pedal push WNL.
Other information:
abrasions cleaned with normal saline, bacitracin and gauze dressing placed to
site.

/es/ ELIZABETH A WHITLEY
Registered Nurse
Signed: 08/02/2014 23:18
```

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 20

# Progress Notes

```
    LOCAL TITLE: IMMUNIZATIONS
STANDARD TITLE: IMMUNIZATION NOTE
DATE OF NOTE: AUG 02, 2014@23:04    ENTRY DATE: AUG 02, 2014@23:04:11
     AUTHOR: WHITLEY,ELIZABETH A  EXP COSIGNER:
     URGENCY:                    ,    STATUS: COMPLETED

     *** IMMUNIZATIONS Has ADDENDA ***

Immunization information documented for WRIGHT,STEVEN O
Please see immunization health summary.
Procedure explained to patient. Patient stated name and birthdate to
provider for identification purposes. Allowed to ask questions.  Patient
indicated understanding of the information.
Vaccine Information Sheet given to patient.  Date of VIS: HepA 25OCT11,
HepB 02FEB12, Shingles 06OCT09, Td/TDap 09May13, Influenza 02JUL12,
Pnemococcal 06OCT09.
Written consent obtained from patient.

  TDAP (TETANUS-DIPHTHERIA-and-PERTUSSIS), 0.5cc given
Manufacturer: adacel
     Lot #:  U4853AA
Expiration:   12Sep16

Site Given: left deltoid IM


/es/ ELIZABETH A WHITLEY
Registered Nurse
Signed: 08/02/2014 23:05

08/02/2014 ADDENDUM                STATUS: COMPLETED
immunization actually injected at 2050

/es/ ELIZABETH A WHITLEY
Registered Nurse
Signed: 08/02/2014 23:18
```

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 21

# Progress Notes

Printed On Aug 08, 2014

```
LOCAL TITLE: EMERGENCY DEPT LEVEL 1/2 DISCHARGE NOTE
STANDARD TITLE: URGENT CARE EDUCATION DISCHARGE NOTE
DATE OF NOTE: AUG 02, 2014@20:50    ENTRY DATE: AUG 02, 2014@20:50:20
    AUTHOR: CASHION,MEDFORD    EXP COSIGNER:
    URGENCY:                   STATUS: COMPLETED
```

Instructions:
  DX:  HEAD INJURY, WITHOUT CONCUSSION, CONTUSION FOREHEAD, ON WARFARIN
PLAN:  SEE CARENOTE.  FOLLOWUP URGENT CARE AUG 4 FOR THIS INJURY.

Released to:
  Home

Follow up (by patient):
  other:
--Scheduled Appointments:
08/04/2014 14:00  DERM FOLLOW UP
08/06/2014 11:20  SPO PHARMACIST CLINIC 3
08/06/2014 13:30  POD FOOT TECH
08/15/2014 11:30  URO HEATON
08/27/2014 11:30  MHC LOCUMS-A
09/04/2014 11:00  SPO CPAP B
10/09/2014 13:00  URO HEATON

Condition:
  stable

Medication Reconciliation:
  No medication changes made during this visit. Medication reconciliation
  done with patient/caregiver. List of current medications:
  Active Outpatient Medications (including Supplies):

| | Outpatient Medications | Status |
|---|---|---|
| 1) | ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN | ACTIVE |
| 2) | ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1 PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE NOTE NEW FORMULATION AND NEW DIRECTIONS*** | ACTIVE |
| 3) | ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY DAY FOR HEART AND CIRCULATION | ACTIVE |
| 4) | BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5 SECONDS) BEFORE EACH USE. | ACTIVE |
| 5) | BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR | ACTIVE |

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

Page 6

EXHIBIT 1 - 22

# Progress Notes

Printed On Aug 08, 2014

DEPRESSION, ANXIETY, SMOKING.

6)  CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT      ACTIVE
     TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO
     NOT APPLY TO FACE, GROIN, ARMPITS
7)  DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT           ACTIVE
     BEDTIME
8)  DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY      ACTIVE
     MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD
     IF PULSE IS LESS THAN 50.
9)  DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR       ACTIVE
     TABLETS BY MOUTH AT BEDTIME  - START WITH ONE
     TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE
     DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR
     TABLETS DAILY FOR MOOD STABILIZATION, ANGER,
     ANXIETY.
10) HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH        ACTIVE
     TWICE A DAY FOR BLOOD PRESSURE CONTROL
11) HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET    ACTIVE
     BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF.
12) HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET    PENDING
     BY MOUTH EVERY 6 HOURS AS NEEDED
13) LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY      ACTIVE
     TWO TIMES DAILY AS NEEDED
14) LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY       ACTIVE
     DAY FOR BLOOD PRESSURE CONTROL
15) MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL        ACTIVE
     AMOUNT TOPICALLY EVERY DAY
16) MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL        PENDING
     AMOUNT TOPICALLY EVERY DAY
17) PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY        ACTIVE
     MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN
     AND BURNING
18) SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT          ACTIVE
     TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON
     SKIN SORE UNTIL HEALED
19) SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT    ACTIVE
     BEDTIME FOR CHOLESTEROL
20) TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY     ACTIVE
     6 HOURS AS NEEDED FOR PAIN
21) WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS      ACTIVE
     BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY
     AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY
     AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO
     PREVENT CLOTS

Patient/Relative or patients representative has received a copy of these
instructions and indicates understanding of these instructions.

/es/ Medford Cashion

---

**PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)**

WRIGHT, STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 23

# Progress Notes

```
M.D.
Signed: 08/02/2014 20:52
```

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)**

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170
```

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 24

# Progress Notes

Printed On Aug 08, 2014

```
     LOCAL TITLE: EMERGENCY DEPT LEVEL 1/2 NOTE
  STANDARD TITLE: URGENT CARE NOTE
  DATE OF NOTE: AUG 02, 2014@20:43      ENTRY DATE: AUG 02, 2014@20:43:49
       AUTHOR: CASHION,MEDFORD      EXP COSIGNER:
      URGENCY:                          STATUS: COMPLETED
```

SUBJECTIVE:  70m c/o head injury.  He was just discharged from this ER, and was
using his crutches, when he fell into the bike rack out in our parking lot
having tripped.  A witness says his head went through the bike rack.  Pt states
his head hit the pavement but he wasn't knocked out.  He has no headache and no
neck or back pain, in fact no new pain.  .


Emergency Room nurses note reviewed.
Most recent Primary Care provider's notes reviewed.
Objective:
Computerized Problem List is the source for the following:

1. CA URETER
2. Blood in urine (SNOMED CT 34436003)
3. Spontaneous ecchymosis (SNOMED CT 302228007)
4. VENOUS INSUFFICIENCY
5. Encounter for Therapeutic Drug Monitoring
(ICD-9-CM V58.83)
6. Long Term (current) use of Anticoagulants
(ICD-9-CM V58.61)
7. MILLIUM
8. Atrial Fibrillation * (ICD-9-CM 427.31)
9. Chronic Obstructive Pulmonary Disease *
(ICD-9-CM 496.)
10. Hypertension * (ICD-9-CM 401.9)
11. Obstructive Sleep Apnea (Adult) (Pediatric)
(ICD-9-CM 327.23)
12. NEURODEMATITIS
13. Hyperlipidemia * (ICD-9-CM 272.4)
14. Heartburn * (ICD-9-CM 787.1)
15. Hypertrophy (Benign) of Prostate without
Urinary obstruction (ICD-9-CM 600.00)
16. BIPOLAR I, UNSPECIFIED
17. Posttraumatic Stress Disorder
18. Osteoarthrosis, generalized
      Bilateral hip hemiarthroplasty with replacements
      Severe AO glenohumeral joints bilaterally
19. Tobacco Use Disorder

RECENT OUTPATIENT MEDICATIONS:
  Active and Recently Expired Outpatient Medications (including Supplies):

      Active Outpatient Medications                    Status
```

---

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WRIGHT,STEVEN O<br>110 E 7TH<br>PO BOX 174<br>ROSALIA, WASHINGTON  99170 | Printed at SPOKANE VAMC |

EXHIBIT 1 - 25

# Progress Notes

Printed On Aug 08, 2014

1)  ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH          ACTIVE
    EVERY 6 HOURS AS NEEDED FOR PAIN
2)  ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1          ACTIVE
    PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE
    NOTE NEW FORMULATION AND NEW DIRECTIONS***
3)  ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY         ACTIVE
    DAY FOR HEART AND CIRCULATION
4)  BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS      ACTIVE
    VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH
    WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5
    SECONDS) BEFORE EACH USE.
5)  BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS      ACTIVE
    BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR
    DEPRESSION, ANXIETY, SMOKING.
6)  CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT       ACTIVE
    TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO
    NOT APPLY TO FACE, GROIN, ARMPITS
7)  DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT            ACTIVE
    BEDTIME
8)  DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY        ACTIVE
    MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD
    IF PULSE IS LESS THAN 50.
9)  DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR         ACTIVE
    TABLETS BY MOUTH AT BEDTIME  - START WITH ONE
    TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE
    DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR
    TABLETS DAILY FOR MOOD STABILIZATION, ANGER,
    ANXIETY.
10) HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH         ACTIVE
    TWICE A DAY FOR BLOOD PRESSURE CONTROL
11) HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET     ACTIVE
    BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF.
12) LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY       ACTIVE
    TWO TIMES DAILY AS NEEDED
13) LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY        ACTIVE
    DAY FOR BLOOD PRESSURE CONTROL
14) MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL         ACTIVE
    AMOUNT TOPICALLY EVERY DAY
15) PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY         ACTIVE
    MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN
    AND BURNING
16) SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT           ACTIVE
    TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON
    SKIN SORE UNTIL HEALED
17) SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT     ACTIVE
    BEDTIME FOR CHOLESTEROL
18) TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY      ACTIVE

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)    **VISTA Electronic Medical Documentation**

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

Printed at SPOKANE VAMC

EXHIBIT 1 - 26

# Progress Notes

Printed On Aug 08, 2014

```
                6 HOURS AS NEEDED FOR PAIN
    19)    WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS      ACTIVE
                BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY
                AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY
                AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO
                PREVENT CLOTS

            Pending Outpatient Medications                       Status
========================================================================
1)     HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET     PENDING
            BY MOUTH EVERY 6 HOURS AS NEEDED
2)     MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL         PENDING
            AMOUNT TOPICALLY EVERY DAY

REVIEW OF SYSTEMS:
  Gen- no pain,no headache
  HEENT -No recent change in vision/hearing
  Resp - No SOB, cough, wheezing
  CV - No CP/syncope
  GI -No abdominal pain
  MS -No neck pain
  Neuro -  no LOC, remembers falling

OBJECTIVE:
  Temperature: 97.5 F [36.4 C] (07/08/2014 11:15)
  Pulse:83 (08/02/2014 11:03)
  Respiratory rate: 14 (08/02/2014 11:03)
  Blood Pressure: 116/80 (08/02/2014 11:03)
  Pulse Oximetry:
        Measurement DT     POx
                    (L/MIN)(%)
08/02/2014 11:03   92

  Weight: 276.8 lb [125.8 kg] (07/08/2014 11:15)
  Height: 70 in [177.8 cm] (02/27/2014 10:12)

  Exam:
  Gen - no apparent distress
  HEENT - 3x4cm fresh abrasion, mild swelling left upper forehead
  Neck - good ROM, no midline tenderness
  Skin -  no other injury
  Chest - nontender
  Lungs -Clear to auscultation
  CV - Reg, no M/G/R, no carotid bruits
  Abd -Normal BS, benign, no masses/organomegaly
  Back - Straight, non-tender
  Extremities - no sign injury
  Neuro - Mental status normal for age; PERRL, moving all 4 extr well
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 27

# Progress Notes

Printed On Aug 08, 2014

EMERGENCY ROOM COURSE: Tdap im.

Discussed c pt and his friend

  ASSESSMENT & PLAN:
  1.  Abrasion and contusion forehead, without concussion, on warfarin, today's
INR 1.5.  Pt and friend comfortable with home observation.  Instruction sheet.
Followup urgent care Aug 4.

/es/ Medford Cashion
M.D.
Signed: 08/06/2014 06:38

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 28

# Progress Notes

Printed On Aug 08, 2014

```
      LOCAL TITLE: EMERGENCY DEPT LEVEL 1/2 DISCHARGE NOTE
   STANDARD TITLE: URGENT CARE EDUCATION DISCHARGE NOTE
   DATE OF NOTE: AUG 02, 2014@19:27     ENTRY DATE: AUG 02, 2014@19:27:10
        AUTHOR: CASHION,MEDFORD     EXP COSIGNER:
        URGENCY:                         STATUS: COMPLETED

Instructions:
   DX:  STRAIN AND CONTUSION LEFT KNEE    PLAN:  RX NORCO 5 #6 TAKEHOME AND #
16 AT WINDOW.  MUST USE YOUR KNEE IMMOBILIZER AND CRUTCHES.  CONTINUE TO
ICE AND ELEVATE.  ORTHO CONSULT FOR AUG 4.


Released to:
   Home

Follow up (by patient):
   other:
--Scheduled Appointments:
08/04/2014 14:00  DERM FOLLOW UP
08/06/2014 11:20  SPO PHARMACIST CLINIC 3
08/06/2014 13:30  POD FOOT TECH
08/15/2014 11:30  URO HEATON
08/27/2014 11:30  MHC LOCUMS-A
09/04/2014 11:00  SPO CPAP B
10/09/2014 13:00  URO HEATON


Condition:
   stable

Medication Reconciliation:
   Below is list of current medications. Patient/caregiver will notify any
   other health care provider(s) of changes.  Medications reconciled with
   patient/caregiver and patient given this updated list.
   Active Outpatient Medications (including Supplies):


      Outpatient Medications                          Status
   ============================================================================
   =
   1)    ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH      ACTIVE
            EVERY 6 HOURS AS NEEDED FOR PAIN
   2)    ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1      ACTIVE
            PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE
            NOTE NEW FORMULATION AND NEW DIRECTIONS***
   3)    ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY     ACTIVE
            DAY FOR HEART AND CIRCULATION
   4)    BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS  ACTIVE
            VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH
            WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5
            SECONDS) BEFORE EACH USE.
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 29

# Progress Notes

Printed On Aug 08, 2014

```
   5)   BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS    ACTIVE
        BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR
        DEPRESSION, ANXIETY, SMOKING.
   6)   CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT     ACTIVE
        TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO
        NOT APPLY TO FACE, GROIN, ARMPITS
   7)   DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT          ACTIVE
        BEDTIME
   8)   DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY     ACTIVE
        MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD
        IF PULSE IS LESS THAN 50.
   9)   DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR      ACTIVE
        TABLETS BY MOUTH AT BEDTIME  - START WITH ONE
        TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE
        DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR
        TABLETS DAILY FOR MOOD STABILIZATION, ANGER,
        ANXIETY.
  10)   HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH       ACTIVE
        TWICE A DAY FOR BLOOD PRESSURE CONTROL
  11)   HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET   ACTIVE
        BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF.
  12)   HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET   PENDING
        BY MOUTH EVERY 6 HOURS AS NEEDED
  13)   LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY     ACTIVE
        TWO TIMES DAILY AS NEEDED
  14)   LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY      ACTIVE
        DAY FOR BLOOD PRESSURE CONTROL
  15)   MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL       ACTIVE
        AMOUNT TOPICALLY EVERY DAY
  16)   MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL       PENDING
        AMOUNT TOPICALLY EVERY DAY
  17)   PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY       ACTIVE
        MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN
        AND BURNING
  18)   SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT         ACTIVE
        TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON
        SKIN SORE UNTIL HEALED
  19)   SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT   ACTIVE
        BEDTIME FOR CHOLESTEROL
  20)   TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY    ACTIVE
        6 HOURS AS NEEDED FOR PAIN
  21)   WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS     ACTIVE
        BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY
        AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY
        AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO
        PREVENT CLOTS
```

Patient/Relative or patients representative has received a copy of these
instructions and indicates understanding of these instructions.

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, If available)**

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 30

# Progress Notes

Printed On Aug 08, 2014

```
/es/ Medford Cashion
M.D.
Signed: 08/02/2014 19:29
```

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170
```

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 31

# Progress Notes

```
LOCAL TITLE: PROGRESS NOTE
STANDARD TITLE: COMMUNICATION NOTE
DATE OF NOTE: AUG 02, 2014@19:11      ENTRY DATE: AUG 02, 2014@19:11:39
     AUTHOR: CASHION,MEDFORD       EXP COSIGNER:
     URGENCY:                           STATUS: COMPLETED
     SUBJECT: ED Progress
```

S: 70m fell onto left knee from 2 steps high on July 27. Has been using
crutches, painful to touch down, lots of swelling and bruising. Denies f/c.

O: Swelling purplish discoloration distal L thigh to foot, esp post. No red
streak but there is reddish poss chronic discoloration ant leg. L knee shows
mod effusion, flexes to ~80, extends to 0, tender med joint line but not lat,
medial and ant lig stress painful.

xray l knee neg for fx. US LLE done at HF neg for dvt.

A/P:  Strain and  contusion left knee, extensive ecchymosis due to warfarin.  Pt
has crutches with him and knee immobilizer at home.  He has reasonable
transportation and assist from nearby friends in hometown of Rosalia.  Can get
to bathroom he says, and has been  up in ER walking with one crutch.

rx hc/apap 5/325 #6 takehome, #12 at window. use crutches and knee immobilizer.
consult to ortho.  pt wants to see Aug 4 when he is here for derm.

/es/ Medford Cashion
M.D.
Signed: 08/02/2014 19:21

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

Printed at SPOKANE VAMC

EXHIBIT 1 - 32

# Progress Notes

<div align="right">Printed On Aug 08, 2014</div>

```
    LOCAL TITLE: NURSE MEDICATION MANAGEMENT-OUTPT
STANDARD TITLE: NURSING MEDICATION MGT NOTE
DATE OF NOTE: AUG 02, 2014@13:03   ENTRY DATE: AUG 02, 2014@13:03:46
    AUTHOR: PALMER,JILL R        EXP COSIGNER:
    URGENCY:                      STATUS: COMPLETED

   *** NURSE MEDICATION MANAGEMENT-OUTPT Has ADDENDA ***

1300 lasix 80mg given po

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 13:04

08/02/2014 ADDENDUM                 STATUS: COMPLETED
1530 urine output 700ml
1535 warfarin 5mg po given. enoxaparin 100mg Sub Q to L side of abd given.

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 15:51

08/02/2014 ADDENDUM                 STATUS: COMPLETED
1930    Hydrocodone/APAP 5/325mg PO #6 given for vet's take home use per Dr.
Cashion order.

/es/ KARLA S LINTON
LPN
Signed: 08/02/2014 19:45
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 33    Page 17

# Progress Notes

Printed On Aug 08, 2014

```
    LOCAL TITLE: EMERGENCY DEPT LEVEL 1/2 NOTE
STANDARD TITLE: URGENT CARE NOTE
DATE OF NOTE: AUG 02, 2014@12:40      ENTRY DATE: AUG 02, 2014@12:40:55
      AUTHOR: MCMANUS,SHEA E      EXP COSIGNER:
      URGENCY:                    STATUS: COMPLETED


S:PT C/O FALLING APPROX 2 FT OFF OF STAIRS LAST WEEK ONTO KNEES WITH LEFT KNEE
PAIN
AND SWELLING INCREASING OVER THE LAST FEW DAYS. PT ON COUMADIN FOR CHRONIC
ATRIAL
FIBRILLATION WITH LAST INR 7/21/14 OF 3.8. PT DENIES ANY OTHER SXS.
  Emergency Dept. nurses note reviewed.
  Most recent Primary Care provider's note reviewed.
PROBLEM LIST / MEDICATIONS:
=================================================

   Computerized Problem List is the source for the following:


1. CA URETER
2. Blood in urine (SNOMED CT 34436003)
3. Spontaneous ecchymosis (SNOMED CT 302228007)
4. VENOUS INSUFFICIENCY
5. Encounter for Therapeutic Drug Monitoring
(ICD-9-CM V58.83)
6. Long Term (current) use of Anticoagulants
(ICD-9-CM V58.61)
7. MILLIUM
8. Atrial Fibrillation * (ICD-9-CM 427.31)
9. Chronic Obstructive Pulmonary Disease *
(ICD-9-CM 496.)
10. Hypertension * (ICD-9-CM 401.9)
11. Obstructive Sleep Apnea (Adult) (Pediatric)
(ICD-9-CM 327.23)
12. NEURODEMATITIS
13. Hyperlipidemia * (ICD-9-CM 272.4)
14. Heartburn * (ICD-9-CM 787.1)
15. Hypertrophy (Benign) of Prostate without
Urinary obstruction (ICD-9-CM 600.00)
16. BIPOLAR I, UNSPECIFIED
17. Posttraumatic Stress Disorder
18. Osteoarthrosis, generalized
      Bilateral hip hemiarthroplasty with replacements
      Severe AO glenohumeral joints bilaterally
19. Tobacco Use Disorder
=================================================
RECENT OUTPATIENT MEDS:
  Active and Recently Expired Outpatient Medications (including Supplies):
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 34

# Progress Notes

Printed On Aug 08, 2014

| | Active Outpatient Medications | Status |
|---|---|---|
| 1) | ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN | ACTIVE |
| 2) | ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1 PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE NOTE NEW FORMULATION AND NEW DIRECTIONS*** | ACTIVE |
| 3) | ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY DAY FOR HEART AND CIRCULATION | ACTIVE |
| 4) | BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5 SECONDS) BEFORE EACH USE. | ACTIVE |
| 5) | BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR DEPRESSION, ANXIETY, SMOKING. | ACTIVE |
| 6) | CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO NOT APPLY TO FACE, GROIN, ARMPITS | ACTIVE |
| 7) | DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT BEDTIME | ACTIVE |
| 8) | DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD IF PULSE IS LESS THAN 50. | ACTIVE |
| 9) | DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR TABLETS BY MOUTH AT BEDTIME  – START WITH ONE TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR TABLETS DAILY FOR MOOD STABILIZATION, ANGER, ANXIETY. | ACTIVE |
| 10) | HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL | ACTIVE |
| 11) | HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF. | ACTIVE |
| 12) | LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY TWO TIMES DAILY AS NEEDED | ACTIVE |
| 13) | LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY DAY FOR BLOOD PRESSURE CONTROL | ACTIVE |
| 14) | MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL AMOUNT TOPICALLY EVERY DAY | ACTIVE |
| 15) | PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN AND BURNING | ACTIVE |
| 16) | SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON SKIN SORE UNTIL HEALED | ACTIVE |
| 17) | SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT BEDTIME FOR CHOLESTEROL | ACTIVE |

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 35 Page 11

# Progress Notes

| | | |
|---|---|---|
| 18) | TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN | ACTIVE |
| 19) | WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO PREVENT CLOTS | ACTIVE |

| Pending Outpatient Medications | | Status |
|---|---|---|
| 1) | MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL AMOUNT TOPICALLY EVERY DAY | PENDING |

| Inactive Outpatient Medications | | Status |
|---|---|---|
| 1) | ALBUTEROL 90/IPRATROP 18MCG 200D PO INHL INHALE 2 PUFFS ORAL INHALATION FOUR TIMES DAILY | DISCONTINUED (EDIT) |
| 2) | CEPHALEXIN 500MG CAP TAKE ONE CAPSULE BY MOUTH THREE TIMES A DAY UNTIL GONE FOR INFECTION | DISCONTINUED |
| 3) | DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR TABLET BY MOUTH AT BEDTIME | DISCONTINUED (EDIT) |
| 4) | DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR TABLETS BY MOUTH AT BEDTIME | DISCONTINUED (EDIT) |
| 5) | FUROSEMIDE 40MG TAB TAKE ONE TABLET BY MOUTH DAILY AS NEEDED | DISCONTINUED |
| 6) | HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL | DISCONTINUED |
| 7) | LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY TWO TIMES DAILY AS NEEDED | DISCONTINUED |
| 8) | MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL AMOUNT TOPICALLY EVERY DAY | DISCONTINUED |
| 9) | PAROXETINE HCL 30MG TAB TAKE ONE TABLET BY MOUTH AT BEDTIME | DISCONTINUED |
| 10) | PRAMOXINE HCL 1% LOTION APPLY SMALL AMOUNT TOPICALLY FIVE TIMES DAILY AS NEEDED | EXPIRED |
| 11) | SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON SKIN SORE UNTIL HEALED | DISCONTINUED |
| 12) | WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO PREVENT CLOTS | DISCONTINUED |
| 13) | WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS BY MOUTH AT BEDTIME EXCEPT TAKE ONE AND ONE-HALF TABLETS FRIDAYS OR AS DIRECTED BY ANTICOAG CLINIC TO PREVENT CLOTS | DISCONTINUED |

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT, STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 36

# Progress Notes

33 Total Medications

ALLERGIES: Patient has answered NKA
O:
 VITALS:
  TEMP: 97.5 F [36.4 C] (07/08/2014 11:15)
  RESP: 14 (08/02/2014 11:03)
  PULSE: 83 (08/02/2014 11:03)
  BP: 116/80 (08/02/2014 11:03)
  WT: 276.8 lb [125.8 kg] (07/08/2014 11:15)
  HEIGHT: 70 in [177.8 cm] (02/27/2014 10:12)
  PAIN: 9 (08/02/2014 11:03)
  PULSE OXIMETRY:
   Measurement DT    POx
                    (L/MIN)(%)
08/02/2014 11:03  92
  GEN: INAD

  HEENT:Normocephalic w/o masses or trauma, PERRLA, Sclerae and conjuctivae
normal, Nose, mouth, oropharynx normal

  CHEST:
   Equal expansion bilaterally
   Clear to ausculation
  CARDIOVASCULAR: palpation normal, irregular rhythm, no rub, gallop or murmur
      3+ EDEMA LEFT LEG UP TO PELVIS/ + ANASARCA
  ABDOMINAL:soft, positive bowel sounds, not tender, no fluid, without masses,
liver normal, spleen not palpable, no hernia


Fecal occult blood test (FOBT)
      Result was Not performed.
      Internal QC check (IQC) was OK.
  NEUROLOGICAL: CN II-XII grossly intact, Reflexes 2+ and symmetrical, Motor 5/5
upper extremities, motor 5/5 lower extremities

  MUSCULOSKELETAL:
      LEFT LEG WITH ECCYMOSIS AND SEVERE ANASARCA/EDEMA

  PSYCHIATRIC:
   Mood and affect appropriate. Patient oriented X 3.
  LABS: Report Released Date/Time: Aug 02, 2014@13:38
Provider: MCMANUS,SHEA E
   Specimen: BLOOD*.      CH 0802 28
      Specimen Collection Date: Aug 02, 2014@13:02
      Test name         Result    units     Ref.  range    Site Code
SODIUM                  139       mmol/L    135 - 145       [668]
POTASSIUM               3.7       mmol/L    3.6 - 5.4       [668]

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 37 Page 21

# Progress Notes

Printed On Aug 08, 2014

| | | | | |
|---|---|---|---|---|
| CHLORIDE | 105 | mmol/L | 98 - 107 | [668] |
| CARBON DIOXIDE | 26 | mmol/L | 22 - 30 | [668] |
| CREATININE SER - | 0.7 | mg/dL | 0.7 - 1.5 | [668] |
| ESTGLO | >60 | mL/mn/1.73 | | [668] |
| BUN/UREA | 17 | mg/dL | 7 - 23 | [668] |
| CALCIUM | 8.6 | mg/dL | 8.4 - 10.3 | [668] |
| GLUCOSE | 112 H | mg/dL | 75 - 100 | [668] |
| ALKALINE PHOSPHATASE | 79 | U/L | 45 - 129 | [668] |
| ASPARTATE AMINO-TRANSFERASE | 14 | U/L | 14 - 44 | [668] |
| ALANINE AMINO-TRANSFERASE | 9 | U/L | 9 - 57 | [668] |
| TOTAL BILIRUBIN | 0.6 | mg/dL | 0.1 - 1.1 | [668] |
| DIRECT BILIRUBIN | <0.2 | mg/dL | 0.00 - 0.20 | [668] |
| ALBUMIN | 3.9 | g/dL | 3.5 - 5.0 | [668] |
| TOTAL PROTEIN | 7.6 | g/dL | 6.5 - 8.2 | [668] |
| GLOBULIN | 3.8 | | | [668] |
| NT-proBNP | 680 | pg/mL | 0 - <125 | [668] |

```
     Eval: Reference Range High:
     Eval:    <75 years          < or = 125 pg/mL
     Eval:    >/= 75 years       < 450 pg/mL
```

```
Report Released Date/Time: Aug 02, 2014@13:36
Provider: MCMANUS,SHEA E
   Specimen: BLOOD.        HEM 0802 19
      Specimen Collection Date: Aug 02, 2014@13:02
```

| Test name | Result | units | Ref. range | Site Code |
|---|---|---|---|---|
| WBC | 7.0 | K/uL | 4.5 - 10.0 | [668] |
| RBC | 4.0 L | M/uL | 4.6 - 5.5 | [668] |
| HGB | 12.9 L | g/dL | 13.5 - 18 | [668] |
| HCT | 37.2 L | % | 40 - 53 | [668] |
| MCV | 93.1 | fL | 80 - 100 | [668] |
| MCH | 32.2 H | pg | 26 - 32 | [668] |
| MCHC | 34.6 | g/dL | 32 - 36 | [668] |
| RDW | 15.4 H | % | 11 - 15 | [668] |
| PLATELET COUNT - | 184 | K/uL | 150 - 400 | [668] |
| LYMPHS % - | 17.7 | % | 10 - 45 | [668] |
| MONOS % - | 21.1 H | % | 2 - 14 | [668] |
| NEUTROPHILS % - | 59.2 | % | 40 - 74 | [668] |
| EOSINOPHILS % - | 0.8 | % | 0 - 5 | [668] |
| BASOPHILS % - | 1.2 | % | 0 - 2 | [668] |

```
     Eval: PRIOR TO 1.19.2010 REF RANGE WAS 0-3.  EFFECTIVE 1.19.2010 REF RANGE
IS
     Eval: 0-2.
```

| | | | | |
|---|---|---|---|---|
| LYMPHS # - | 1.2 | K/uL | 1.2 - 3.5 | [668] |

```
     Eval: Reference ranges prior to 1.19.2010 was 1.0-4.0.  Effective
1.19.2010 the
     Eval: reference ranges are 1.2-3.5.
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 38

# Progress Notes

Printed On Aug 08, 2014

```
MONOS #    -                    1.5 H    K/uL      0.0 - 0.5       [668]
        Eval: PRIOR TO 1.19.2010 REF RANGES WERE 0.2 - 0.8.  EFFECTIVE 1.19.2010
REF
        Eval: RANGES ARE 0.0 - 0.5
NEUTROPHILS #  -               4.1      K/uL      1.0 - 8.0       [668]
EOSINOPHILS #  -               0.1      K/uL      0 - 0.5         [668]
BASOPHILS #   -                0.1      K/uL      0 - 0.2         [668]
SEGS                           59       %         40 - 74         [668]
BANDS                          6 H      %         0 - 5           [668]
LYMPHS                         12       %         10 - 45         [668]
MONOS                          21 H     %         2 - 14          [668]
EOSINO                         2        %         0 - 5           [668]
NUCLEATED RBC/100WBC           1 H      %/WBC     0 - 0           [668]
PLATCNT             CONFIRMED                                     [668]
ANISOCYTOSIS                   1        0-4+                      [668]
ROULEAUX                       1        0-4+                      [668]
Comment: OCCASIONAL POLYMACROCYTES PRESENT
         20 % Toxic Granulation Seen in PMN'S.
         PLATELET CLUMPING PRESENT--NUMBER OF PLATELETS APPEAR ADEQUATE.
```

```
Report Released Date/Time: Aug 02, 2014@13:25
Provider: MCMANUS,SHEA E
   Specimen: BLOOD.            COAG 0802 4
      Specimen Collection Date: Aug 02, 2014@13:02
      Test name            Result    units      Ref.  range   Site Code
aPTT    -                   28.2      Sec      23.8 - 42.3     [668]
        Eval: Heparin therapeutic range: 45.9 to 67.3 Sec.
INR    -                    1.5 H     Sec      0.8 - 1.14      [668]
        Eval: The International Normalized Ratio (INR) is recommended in
        Eval: monitoring oral anticoagulant therapy.  The recommended adult
        Eval: therapeutic range for INR is:  2.0-3.0
        Eval:
        Eval: Interpretive comments changed 2-18-10.
PROTIME  -                  18.0 H    Sec     11.4 - 14.3      [668]
        Eval: Prior to 11-20-13:
        Eval: Reference ranges were 12.0-14.9
        Eval:
        Eval: Prior to 2/18/10:
        Eval: Reference Ranges were 11.7-14.4 &
        Eval: Adult therapeutic range:  23.2 to 32.0 Sec
```

```
 X-RAYS: LEFT KNEE WITH MEDIAL JOINT SPACE NARROWING, SUPRA AND INFRA PATELLA
EFFUSIONS WITH SOFT TISSUE SWELLING/EDEMA. NO EVIDENCE OF FRACTURES OR
DISLOCATIONS.
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 39

# Progress Notes

```
EKG: ATRIAL FIBRILLATION VR 97 NS ST/TW CHANGES


ASSESSMENT:
LEFT LEG EDEMA/ECCYMOSIS/ANASARCA
SUBTHERAPTIC WARFARIN

PLAN:
SEND OUT FOR LEFT LEG DVT EVALUATION WITH PT TO RETURN FOR ADMISSION


/es/ SHEA E MCMANUS
MD
Signed: 08/02/2014 18:03

Receipt Acknowledged By:
08/02/2014 19:11          /es/ Medford Cashion
                              M.D.
```

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 40

# Progress Notes

Printed On Aug 08, 2014

```
    LOCAL TITLE: EMERGENCY DEPT TRIAGE NOTE
    STANDARD TITLE: EMERGENCY DEPT TRIAGE NOTE
    DATE OF NOTE: AUG 02, 2014@11:04    ENTRY DATE: AUG 02, 2014@11:04:25
        AUTHOR: PALMER,JILL R      EXP COSIGNER:
        URGENCY:                    STATUS: COMPLETED

    *** EMERGENCY DEPT TRIAGE NOTE Has ADDENDA ***

  Arrived via:
    POV
        Walking

  CHIEF COMPLAINT:  pt fell 1 wk ago, approx 2 ft from deck. c/o L knee, L lower
  leg, and L ankle pain. presents with swelling to mentioned areas and lateral
  ankle bruising. rates pain 9/10. pt arrives walking with crutches, transfered to
  w/c without difficulty. pt escorted to xray by friend.

    VITALS:
    TEMP: 97.5 F [36.4 C] (07/08/2014 11:15)
    RESP: 14 (08/02/2014 11:03)
    PULSE: 83 (08/02/2014 11:03)
    BP: 116/80 (08/02/2014 11:03)
    WT: 276.8 lb [125.8 kg] (07/08/2014 11:15)
    HEIGHT: 70 in [177.8 cm] (02/27/2014 10:12)
    PAIN: 9 (08/02/2014 11:03)
    PULSE OXIMETRY:
  Measurement DT       POx
                      (L/MIN)(%)
  08/02/2014 11:03   92

  Medication:

  Active Outpatient Medications (including Supplies):

      Outpatient Medications                              Status
  ================================================================
  1)   ACETAMINOPHEN 325MG TAB TAKE TWO TABLETS BY MOUTH    ACTIVE
       EVERY 6 HOURS AS NEEDED FOR PAIN
  2)   ALBUTEROL 100/IPRATRO 20MCG 120D PO INHL INHALE 1    ACTIVE
       PUFF ORAL INHALATION FOUR TIMES DAILY ***PLEASE
       NOTE NEW FORMULATION AND NEW DIRECTIONS***
  3)   ASPIRIN 81MG EC TAB TAKE ONE TABLET BY MOUTH EVERY   ACTIVE
       DAY FOR HEART AND CIRCULATION
  4)   BUDESONIDE 80/FORMOTER 4.5MCG 120D INH INHALE 2 PUFFS ACTIVE
       VIA ORAL INHALER DEVICE EVERY 12 HOURS RINSE MOUTH
       WITH WATER AND SPIT AFTER EVERY DOSE. SHAKE WELL (5
       SECONDS) BEFORE EACH USE.
  5)   BUPROPION HCL 100MG TAB TAKE ONE AND ONE-HALF TABLETS ACTIVE
```

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 41

# Progress Notes

Printed On Aug 08, 2014

BY MOUTH TWICE DAILY (AT 6 AM AND 2 PM) FOR
DEPRESSION, ANXIETY, SMOKING.

6)   CLOBETASOL PROPIONATE 0.05% CREAM APPLY SMALL AMOUNT    ACTIVE
      TOPICALLY TWO TIMES DAILY AS NEEDED FOR ITCHING. DO
      NOT APPLY TO FACE, GROIN, ARMPITS

7)   DIGOXIN 0.25MG TAB TAKE ONE TABLET BY MOUTH AT         ACTIVE
      BEDTIME

8)   DILTIAZEM (INWOOD) 240MG SA CAP TAKE ONE CAPSULE BY    ACTIVE
      MOUTH TWICE A DAY FOR BLOOD PRESSURE CONTROL. HOLD
      IF PULSE IS LESS THAN 50.

9)   DIVALPROEX 500MG SA(EXTENDED RELEASE)TAB TAKE FOUR     ACTIVE
      TABLETS BY MOUTH AT BEDTIME  - START WITH ONE
      TABLET FOR THREE DAYS, THEN TWO TABLETS FOR THREE
      DAYS, THEN THREE TABLETS FOR THREE DAYS, THEN FOUR
      TABLETS DAILY FOR MOOD STABILIZATION, ANGER,
      ANXIETY.

10)  HYDRALAZINE HCL 25MG TAB TAKE ONE TABLET BY MOUTH      ACTIVE
      TWICE A DAY FOR BLOOD PRESSURE CONTROL

11)  HYDROCODONE 5MG/ACETAMINOPHEN 325MG TAB TAKE 1 TABLET  ACTIVE
      BY MOUTH EVERY 6 HOURS AS NEEDED FOR PAIN RELIEF.

12)  LIDOCAINE 4% TOP CREAM APPLY SMALL AMOUNT TOPICALLY    ACTIVE
      TWO TIMES DAILY AS NEEDED

13)  LISINOPRIL 40MG TAB TAKE ONE TABLET BY MOUTH EVERY     ACTIVE
      DAY FOR BLOOD PRESSURE CONTROL

14)  MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL      ACTIVE
      AMOUNT TOPICALLY EVERY DAY

15)  MENTHOL/M-SALICYLATE 10-15% TOP CREAM APPLY SMALL      PENDING
      AMOUNT TOPICALLY EVERY DAY

16)  PHENAZOPYRIDINE HCL 100MG TAB TAKE TWO TABLETS BY      ACTIVE
      MOUTH TWO TIMES DAILY AS NEEDED FOR BLADDER PAIN
      AND BURNING

17)  SILVER SULFADIAZINE 1% CREAM APPLY SMALL AMOUNT        ACTIVE
      TOPICALLY TWO TIMES DAILY AS NEEDED FOR DOT/SPOT ON
      SKIN SORE UNTIL HEALED

18)  SIMVASTATIN 40MG TAB TAKE ONE-HALF TABLET BY MOUTH AT  ACTIVE
      BEDTIME FOR CHOLESTEROL

19)  TRAMADOL HCL 50MG TAB TAKE ONE TABLET BY MOUTH EVERY   ACTIVE
      6 HOURS AS NEEDED FOR PAIN

20)  WARFARIN NA (GOLDEN STATE) 5MG TAB TAKE TWO TABLETS    ACTIVE
      BY MOUTH SUNDAY, TUESDAY, THURSDAY, AND SATURDAY
      AND TAKE ONE AND ONE-HALF TABLETS MONDAY, WEDNESDAY
      AND FRIDAY OR AS DIRECTED BY ANTICOAG CLINIC TO
      PREVENT CLOTS

Allergy:
 Patient has answered NKA
 C/O:
ESI LEVEL 3

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 42

# Progress Notes

Printed On Aug 08, 2014

DISPOSITION:
  Outpatient to be seen by next available provider.

Patient positively identified using two identifiers prior to placing
wristband on patient. Patient advised and understands that the wristband
should be destroyed upon discharge because it contains sensitive patient
identification information.

  Veteran declares they are SENSITIVE to latex: No
Medication list reviewed with veteran.
  No changes required in medication list after review.
Alcohol use assessment
  Veteran doesn't use alcohol.
  Currently using tobacco products. Type: 1 pk/d
Behavioral Health Assessment
Suicide/Violence Risk Assessment:
  1. Veteran feels hopeless about the present or future.  No
  2. Has Veteran ever had a suicide attempt?              No
  3. Has Veteran had thoughts about taking his/her life
     or harming others in the past 12 months?
Answers "NO" to having thoughts of suicide or harming others.


/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 11:08

08/02/2014 ADDENDUM                    STATUS: COMPLETED
1225 pt escorted to ER room 117 via w/c. pt transferred to stretcher without
difficulty. L leg elevated.
1300 lab here to draw blood. EKG done by Craig, given to Dr Mc Manus.

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 13:03

08/02/2014 ADDENDUM                    STATUS: COMPLETED
1310 EKG done; handed to provider for review.

/es/ Craig S. Burton
ICT
Signed: 08/02/2014 13:36

08/02/2014 ADDENDUM                    STATUS: COMPLETED

1635 pt in waiting room, "i am waiting for the ambulance." explained to patient
importance of staying in bed with leg elevated. pt refused, stated "i am sorry
to give you a hard time but i do not want to." dr macmanus notified.

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

VISTA Electronic Medical Documentation

Printed at SPOKANE VAMC

EXHIBIT 1 - 43 Page 27

# Progress Notes

Printed On Aug 08, 2014

```
/es/ CHARINA B DELEON
RN, BSN
Signed: 08/02/2014 16:39

08/02/2014 ADDENDUM              STATUS: COMPLETED
1740 ambulance here to take pt to HFH for ultrasound of lower legs.

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 17:44

08/02/2014 ADDENDUM              STATUS: COMPLETED
1845 pt returned to ER via stretcher/ambulance to ER room 117.

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 19:05

08/02/2014 ADDENDUM              STATUS: COMPLETED
1915 IV dc'd, cath intact. report given to Karla.

/es/ JILL R PALMER
R.N.
Signed: 08/02/2014 19:20

08/02/2014 ADDENDUM              STATUS: COMPLETED
2005   Vet d/c'd ambulatory using crutches to home via POV accompanied by
friend with all personal belongings.  NAD noted at time of dc.  Verbalized
understanding of all discharge instructions.

/es/ KARLA S LINTON
LPN
Signed: 08/02/2014 20:13
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

**VISTA Electronic Medical Documentation**

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170
```

Printed at SPOKANE VAMC

EXHIBIT 1 - 44

# Consult Requests

Printed On Aug 08, 2014

```
Current Pat. Status:    Outpatient
Primary Eligibility:    SERVICE CONNECTED 50% to 100%(VERIFIED)
Patient Type:           SC VETERAN
OEF/OIF:                NO

Service Connection/Rated Disabilities
SC Percent:             70%
Rated Disabilities:     POST-TRAUMATIC STRESS DISORDER  (50%)
                        ECZEMA  (30%)

Order Information
To Service:             ORTHO OUTPATIENT
Attention:              FICKERT,MARK R
From Service:           WALK IN ER PROCEDURE
Requesting Provider:    CASHION,MEDFORD
Service is to be rendered on an OUTPATIENT basis
Place:                  Consultant's choice
Urgency:                Next available
Earliest Appr. Date:    Aug 04, 2014
Orderable Item:         ORTHO OUTPATIENT
Consult:                Consult Request
Provisional Diagnosis:  knee strain
Reason For Request:
pain, swelling, unable to bear weight after fall onto left knee July 27.

Inter-facility Information
This is not an inter-facility consult request.

Status:                 DISCONTINUED
Last Action:            PRINTED TO
```

```
Facility
  Activity              Date/Time/Zone      Responsible Person   Entered By
-----------------------------------------------------------------------------------
  CPRS RELEASED ORDER   08/02/14 19:26      CASHION,MEDFORD      CASHION,MEDFORD
  PRINTED TO PURPLE CLERK 08/02/14 19:26
  RECEIVED              08/04/14 09:12      FICKERT,MARK R       FICKERT,MARK R
next cons

  DISCONTINUED          08/04/14 15:22      MOSS,LINDSEY RENE    MOSS,LINDSEY RENE
Veteran deceased

  PRINTED TO PURPLE CLERK 08/04/14 15:22

Note: TIME ZONE is local if not indicated

No local TIU results or Medicine results available for this consult
================================ END ================================
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 45  Page 29

# Consult Requests

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 46    Page 30

# Consult Requests

Printed On Aug 08, 2014

```
Current Pat. Status:    Outpatient
Primary Eligibility:    SERVICE CONNECTED 50% to 100%(VERIFIED)
Patient Type:           SC VETERAN
OEF/OIF:                NO

Service Connection/Rated Disabilities
SC Percent:             70%
Rated Disabilities:     POST-TRAUMATIC STRESS DISORDER  (50%)
                        ECZEMA  (30%)

Order Information
To Service:             NON VA CARE ULTRASOUND
From Service:           WALK IN ER PROCEDURE
Requesting Provider:    MCMANUS,SHEA E
Service is to be rendered on an OUTPATIENT basis
Place:                  Consultant's choice
Urgency:                Stat
Earliest Appr. Date:    Aug 02, 2014
Orderable Item:         NON VA CARE ULTRASOUND
Consult:                Consult Request
Provisional Diagnosis: Pain in lower limb (SNOMED CT 10601006)(729.5)
Reason For Request:
Justification for Non VA Care:
VA facility does not provide the required service

Type of Service: Diagnostic

LEFT VENOUS DOPPLER


Chief Complaint: LEFT LEG EDEMA AND PAIN


Patient History / Clinical Findings / Diagnosis (Co-Morbidities):

PT WITH FALL X 1WK NOW WITH INCREASED LEFT LEG EDEMA AND PAIN


Third Party Liability:
No

History of Trauma:  Yes
FELL DOWN STAIRS APPROX 2 FT 1 WEEK AGO

Inter-facility Information
This is not an inter-facility consult request.

Status:                 DISCONTINUED
```

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)**

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 47    Page 31

# Consult Requests

Printed On Aug 08, 2014

```
Last Action:              DISCONTINUED
Significant Findings:  Unknown

Facility
Activity                    Date/Time/Zone        Responsible Person   Entered By
------------------------------------------------------------------------------
 CPRS RELEASED ORDER    08/02/14 16:36      MCMANUS,SHEA E      MCMANUS,SHEA E
 RECEIVED               08/04/14 09:25      KEMBEL,HOLLI LYNN   KEMBEL,HOLLI LYNN
Rec Admin Elig, Ver.

 SIG FINDING UPDATE     08/04/14 09:28                          KEMBEL,HOLLI LYNN
Dr Dubiel,  Please review and advise.

 ADDED COMMENT          08/04/14 09:46      DUBIEL,WILLIAM J    DUBIEL,WILLIAM J
This was done appropriately through the ED over the weekend as we do not
staff the US department on the weekend.

 ADDED COMMENT          08/04/14 10:16      KEMBEL,HOLLI LYNN   KEMBEL,HOLLI LYNN
Approved as written

Approved by Dubiel
```

Service Connected/Rated Disability:  NSC

JUSTIFICATION OF AUTHORIZATION: VA facility does not provide the required service

VETERAN AUTHORIZED FOR: Ultrasound - left leg venous Doppler study

VISIT: 1 visit

Patient History / Clinical Findings / Diagnosis (Co-Morbidities):  LEFT LEG EDEMA AND PAIN:  PT WITH FALL X 1WK NOW WITH INCREASED LEFT LEG EDEMA AND PAIN;  History of Trauma:  Yes    FELL DOWN STAIRS APPROX 2 FT 1 WEEK AGO

PROVISIONAL DIAGNOSIS:  Pain in lower limb

```
 DISCONTINUED           08/08/14 06:49      KUUSISTO,TAMMY L    KUUSISTO,TAMMY L
```

Note: TIME ZONE is local if not indicated

Significant Findings: Unknown
------------------------------------------------------------------------------
No local TIU results or Medicine results available for this consult
========================  END  ========================

---

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WRIGHT,STEVEN O<br>110 E 7TH<br>PO BOX 174<br>ROSALIA, WASHINGTON  99170 | Printed at SPOKANE VAMC |

EXHIBIT 1 - 48

# Radiology Reports

Printed On Aug 08, 2014

```
TIBIA-FIBULA 2 VIEWS

Exm Date: AUG 02, 2014@11:03
Req Phys: VINCENT,THOMAS M              Pat Loc: WALK IN ER PROCEDURE (Req'g Lo
                                        Img Loc: XRAY
                                        Service: Unknown


(Case 1039 COMPLETE) TIBIA-FIBULA 2 VIEWS          (RAD  Detailed) CPT:73590
      Proc Modifiers : LEFT
      Reason for Study: eval for fx

   Clinical History:
      fell last wk. pain to tibia. swelling

   Report Status: Verified              Date Reported: AUG 04, 2014
                                        Date Verified: AUG 04, 2014

   Verifier E-Sig:

   Report:
      Comparison: Knee radiographs from 2/5/2014

      Findings: Routine views of the left knee, left tibia and fibula,
      and left ankle were obtained in addition to an AP weight-bearing
      view of the right knee. Bony mineralization is normal. There is
      no radiographic evidence of acute fracture throughout the
      visualized left lower extremity. There is evidence of a previous,
      healed fracture of the distal tibial diaphysis. There is an
      exostosis from the proximal tibial metaphysis which likely
      reflects an osteochondroma and is unchanged over multiple prior
      knee radiographs. Ankle mortise is anatomic in alignment. There
      are no joint effusions at the ankle and knee. Corticated ossicles
      adjacent to the medial margin of the calcaneus likely sequela of
      previous injuries. There is generalized lower extremity edema.
      Platelike heterotopic ossification noted in the proximal dorsal
      calf musculature, compatible with previous muscular injury.



   Impression:
      1. Diffuse lower extremity edema without evidence of acute
      osseous injury.

      2. Unchanged appearance of proximal tibial osteochondroma and
      sequela of previous distal tibial fracture.

Primary Interpreting Staff:
```

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 49    Page 3:

# Radiology Reports

Printed On Aug 08, 2014

```
   JAMES PATRICK EATON, Radiologist
        (Verifier, no e-sig)
/JPE
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON   99170
```

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 50

# Radiology Reports

Printed On Aug 08, 2014

```
ANKLE COMPLETE

Exm Date: AUG 02, 2014@11:03
Req Phys: VINCENT,THOMAS M          Pat Loc: WALK IN ER PROCEDURE (Req'g Lo
                                    Img Loc: XRAY
                                    Service: Unknown


(Case 1038 COMPLETE) ANKLE COMPLETE              (RAD  Detailed) CPT:73610
    Proc Modifiers : LEFT
    Reason for Study: eval for fx

  Clinical History:
    fell last wk. swelling and brusing

  Report Status: Verified                Date Reported: AUG 04, 2014
                                         Date Verified: AUG 04, 2014
    Verifier E-Sig:

  Report:
    Comparison: Knee radiographs from 2/5/2014

    Findings: Routine views of the left knee, left tibia and fibula,
    and left ankle were obtained in addition to an AP weight-bearing
    view of the right knee. Bony mineralization is normal. There is
    no radiographic evidence of acute fracture throughout the
    visualized left lower extremity. There is evidence of a previous,
    healed fracture of the distal tibial diaphysis. There is an
    exostosis from the proximal tibial metaphysis which likely
    reflects an osteochondroma and is unchanged over multiple prior
    knee radiographs. Ankle mortise is anatomic in alignment. There
    are no joint effusions at the ankle and knee. Corticated ossicles
    adjacent to the medial margin of the calcaneus likely sequela of
    previous injuries. There is generalized lower extremity edema.
    Platelike heterotopic ossification noted in the proximal dorsal
    calf musculature, compatible with previous muscular injury.



  Impression:
    1. Diffuse lower extremity edema without evidence of acute
    osseous injury.

    2. Unchanged appearance of proximal tibial osteochondroma and
    sequela of previous distal tibial fracture.

Primary Interpreting Staff:
```

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 51    Page 35

# Radiology Reports

Printed On Aug 08, 2014

```
    JAMES PATRICK EATON, Radiologist
         (Verifier, no e-sig)
/JPE
```

PATIENT NAME AND ADDRESS (Mechanical Imprinting, If available)

WRIGHT, STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON   99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 52                    Page 3(

# Radiology Reports

Printed On Aug 08, 2014

```
KNEE 4 VIEWS COMPLETE

Proc Ord: KNEE 4 OR MORE VIEWS
Exm Date: AUG 02, 2014@11:04
Req Phys: VINCENT,THOMAS M           Pat Loc: WALK IN ER PROCEDURE (Req'g Lo
                                     Img Loc: XRAY
                                     Service: Unknown


(Case 1040 COMPLETE) KNEES BILATERAL WT BEARING AP ONL(RAD  Detailed) CPT:73565
        Proc Modifiers : LEFT
        Reason for Study: eval for fx

(Case 1041 COMPLETE) KNEE 4 VIEWS COMPLETE          (RAD  Detailed) CPT:73564
        Proc Modifiers : LEFT

    Clinical History:
        Weight Bearing. pt fell last wk. swelling

    Report Status: Verified              Date Reported: AUG 04, 2014
                                         Date Verified: AUG 04, 2014

    Verifier E-Sig:

    Report:
        Comparison: Knee radiographs from 2/5/2014

        Findings: Routine views of the left knee, left tibia and fibula;
        and left ankle were obtained in addition to an AP weight-bearing
        view of the right knee. Bony mineralization is normal. There is
        no radiographic evidence of acute fracture throughout the
        visualized left lower extremity. There is evidence of a previous,
        healed fracture of the distal tibial diaphysis. There is an
        exostosis from the proximal tibial metaphysis which likely
        reflects an osteochondroma and is unchanged over multiple prior
        knee radiographs. Ankle mortise is anatomic in alignment. There
        are no joint effusions at the ankle and knee. Corticated ossicles
        adjacent to the medial margin of the calcaneus likely sequela of
        previous injuries. There is generalized lower extremity edema.
        Platelike heterotopic ossification noted in the proximal dorsal
        calf musculature, compatible with previous muscular injury.



    Impression:
        1. Diffuse lower extremity edema without evidence of acute
        osseous injury.
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | **VISTA Electronic Medical Documentation**

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

Printed at SPOKANE VAMC

EXHIBIT 1 - 53 Page 3

# Radiology Reports

Printed On Aug 08, 2014

    2. Unchanged appearance of proximal tibial osteochondroma and
sequela of previous distal tibial fracture.

Primary Interpreting Staff:
  JAMES PATRICK EATON, Radiologist
       (Verifier, no e-sig)
/JPE

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 54  Page 3

# Radiology Reports

Printed On Aug 08, 2014

```
KNEES BILATERAL WT BEARING AP ONLY

Proc Ord: KNEE 4 OR MORE VIEWS
Exm Date: AUG 02, 2014@11:04
Req Phys: VINCENT,THOMAS M              Pat Loc: WALK IN ER PROCEDURE (Req'g Lo
                                        Img Loc: XRAY
                                        Service: Unknown


(Case 1040 COMPLETE) KNEES BILATERAL WT BEARING AP ONL(RAD  Detailed) CPT:73565
       Proc Modifiers : LEFT
       Reason for Study: eval for fx

(Case 1041 COMPLETE) KNEE 4 VIEWS COMPLETE              (RAD  Detailed) CPT:73564
       Proc Modifiers : LEFT

   Clinical History:
     Weight Bearing. pt fell last wk. swelling

   Report Status: Verified              Date Reported: AUG 04, 2014
                                        Date Verified: AUG 04, 2014
   Verifier E-Sig:

   Report:
      Comparison: Knee radiographs from 2/5/2014

      Findings: Routine views of the left knee, left tibia and fibula,
      and left ankle were obtained in addition to an AP weight-bearing
      view of the right knee. Bony mineralization is normal. There is
      no radiographic evidence of acute fracture throughout the
      visualized left lower extremity. There is evidence of a previous,
      healed fracture of the distal tibial diaphysis. There is an
      exostosis from the proximal tibial metaphysis which likely
      reflects an osteochondroma and is unchanged over multiple prior
      knee radiographs. Ankle mortise is anatomic in alignment. There
      are no joint effusions at the ankle and knee. Corticated ossicles
      adjacent to the medial margin of the calcaneus likely sequela of
      previous injuries. There is generalized lower extremity edema.
      Platelike heterotopic ossification noted in the proximal dorsal
      calf musculature, compatible with previous muscular injury.



      Impression:
       1. Diffuse lower extremity edema without evidence of acute
       osseous injury.
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | **VISTA Electronic Medical Documentation**

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170
```

Printed at SPOKANE VAMC

EXHIBIT 1 - 55 Page 39

# Radiology Reports

Printed On Aug 08, 2014

```
        2. Unchanged appearance of proximal tibial osteochondroma and
        sequela of previous distal tibial fracture.

Primary Interpreting Staff:
  JAMES PATRICK EATON, Radiologist
          (Verifier, no e-sig)
/JPE
```

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 56 Page 40

# Radiology Reports

Printed On Aug 08, 2014

CHEST-2 VIEW AP/PA-LAT

Exm Date: AUG 02, 2014@12:49
Req Phys: MCMANUS,SHEA E

Pat Loc: WALK IN ER PROCEDURE (Req'g Lo
Img Loc: XRAY
Service: Unknown

(Case 1045 COMPLETE) CHEST-2 VIEW AP/PA-LAT          (RAD  Detailed) CPT:71020
     Reason for Study: SHOTNESS OF BREATH

  Clinical History:
   Do in ER

  Report Status: Verified          Date Reported: AUG 04, 2014
                                    Date Verified: AUG 04, 2014
  Verifier E-Sig:

  Report:
   Indication: Shortness of breath

   Comparison: Chest exams dated January 7, 2013, January 4, 2013,
   and February 27, 2012

   Technique: 2 views of the chest

   Findings: There is partial visualization of a left humeral
   prosthesis.  A surgical clip overlies the left glenoid.

   The patient is slightly rotated. The trachea projects slightly
   left of midline. The cardiomediastinal silhouette is stable in
   appearance. The lungs are hyperexpanded, unchanged. There is
   prominence of the central vasculature, right greater than left,
   without overt changes of pulmonary edema. There is no focal
   consolidation, pneumothorax, or pleural effusion.

   The osseous structures are stable in appearance. Remote anterior
   fracture deformities are seen involving several right-sided ribs,
   unchanged.

  Impression:
   Mild prominence of the central vasculature without overt changes
   of pulmonary edema.

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 57 Page 41

# Radiology Reports

Printed On Aug 08, 2014

```
Primary Interpreting Staff:
  DANIEL SCOTT TUBBS, Radiologist
        (Verifier, no e-sig)
/DST
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON   99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 58 Page 4

# Lab Results

Printed On Aug 08, 2014

```
            ---- CHEMISTRY REPORT PAGE 1 ----

BLOOD*          Aug 02              Reference
                2014
                13:02     Units     Ranges
----------------------------------------------------------
NA              139       mmol/L    135 - 145
K+              3.7       mmol/L    3.6 - 5.4
CL              105       mmol/L    98 - 107
CO2             26        mmol/L    22 - 30
GLU             112 H     mg/dL     75 - 100
CREATI          0.7       mg/dL     .7 - 1.5
EGFR            >60       mL/mn/1.73
BUN/URE         17        mg/dL     7 - 23
TBIL            0.6       mg/dL     .1 - 1.1
DBILI           <0.2      mg/dL     0 - .2
ETOH                      mg/dL     0 - 99
ALKP            79        U/L       45 - 129
GGT                       U/L       22 - 68
AST             14        U/L       14 - 44
ALT             9         U/L       9 - 57
AMYL                      U/L       30 - 100
CPK                       U/L       55 - 170
LDH                       U/L       162 - 304
CPKMB                     ng/mL     0 - 5
CKMB/CK                   %         0 - 5
TROP                      ng/mL     0 - .04
MYOG                      ng/mL     0 - 123
CA              8.6       mg/dL     8.4 - 10.3
PHOS                      mg/dL     2.5 - 4.7
TP              7.6       g/dL      6.5 - 8.2
ALB             3.9       g/dL      3.5 - 5
GLOBU           3.8
URIC A                    mg/dL     3 - 8.3
CHOL                      mg/dL     Ref: <200
TRIG                      mg/dL     Ref: <=150
HDL C                     mg/dL     40 - 80
D-LDL                     mg/dL     30 - 100
CHL/HDL                             1.5 - 4.5
NONHDL                    mg/dL     0 - 130
MAG                       mg/dL     1.7 - 2.4
LIPAS                     U/L       26 - 66
IRON                      ug/dL     38 - 153
TIBC                      ug/dL     240 - 520
%FE SAT                   %         20 - 50
TRANSS                    mg/dL     188 - 341
NH3                       ummol/L   16 - 60
PREALB                    mg/dL     17.6 - 34.5
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

ViSTA Electronic Medical Documentation

Printed at SPOKANE VAMC

EXHIBIT 1 - 59  Page 43

# Lab Results

Printed On Aug 08, 2014

```
        HAPTG                      mg/dL    61 - 295
        CRPHS                      mg/L     <1 - 3
        proBNP            680      pg/mL    0 - <125
        RHFACT                     IU/mL    Ref: <20
        Comments:           a
    a.  Evaluation for PROBNP:
        Reference Range High:
            <75 years              < or = 125 pg/mL
            >/= 75 years           < 450 pg/mL

        Ordering Provider: Shea E Mcmanus MD
        Report Released..: Aug 02, 2014@13:38
        Performing Lab...: SPOKANE VAMC [CLIA# 50D0988115]
                           4815 N. ASSEMBLY SPOKANE, WA 99205-6185



                     ---- HEMATOLOGY REPORT ----

    BLOOD             Aug 02              Reference
                      2014
                      13:02      Units    Ranges
    ---------------------------------------------------------------
        WBC             7.0      K/uL     4.5 - 10
        RBC             4.0 L    M/uL     4.6 - 5.5
        HGB            12.9 L    g/dL     13.5 - 18
        HCT            37.2 L    %        40 - 53
        MCV            93.1      fL       80 - 100
        MCH            32.2 H    pg       26 - 32
        MCHC           34.6      g/dL     32 - 36
        RDW            15.4 H    %        11 - 15
        PLT             184      K/uL     150 - 400
        LYMPH %        17.7      %        10 - 45
        MONOS %        21.1 H    %        2 - 14
        NEUTR %        59.2      %        40 - 74
        EOS %           0.8      %        0 - 5
        BASOS %         1.2      %        0 - 2
        LYMPH #         1.2      K/uL     1.2 - 3.5
        MONOS #         1.5 H    K/uL     0 - .5
        NEUTR #         4.1      K/uL     1 - 8
        EOS #           0.1      K/uL     0 - .5
        BASOS #         0.1      K/uL     0 - .2
        RETIC                    %        .5 - 2.8
        RETIC #                  M/uL     .02 - .15
        SEGS             59      %        40 - 74
        BANDS           6 H      %        0 - 5
        LYMPHS          12       %        10 - 45
        MONOS           21 H     %        2 - 14
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

**VISTA Electronic Medical Documentation**

```
WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170
```

Printed at SPOKANE VAMC

EXHIBIT 1 - 60

# Lab Results

Printed On Aug 08, 2014

```
        EOSINO            2        %        0 - 5
        BASO                       %        0 - 2
        ATYPICA                    %        0 - 4
        META                       %        Ref: >=0
        MYELO                      %        Ref: >=0
        PROS                       %        Ref: >=0
        BLASTS                     %        0 - 0
        NRBC              1 H    %/WBC       0 - 0
        TEAR DP                    0-4+
        NORMRBC
        PLATCNT       CONFIRMED
        TOXIC G                    0-4+
        ROULEAX           1        0-4+
        POLYCHR                    0-4+
        HYPOCHR                    0-4+
        BASO ST                    0-4+
        ANISO             1        0-4+
        MACRO                      0-4+
        MICROCY                    0-4+
        POIKILO                    0-4+
        BURR C.                    0-4+
        OVALOCY                    0-4+
        TARGETS                    0-4+
        STOMATO                    0-4+
        ESR                      mm/hr      0 - 10
        Comments:            b
        b.    OCCASIONAL POLYMACROCYTES PRESENT
              20 % Toxic Granulation Seen in PMN'S.
              PLATELET CLUMPING PRESENT--NUMBER OF PLATELETS APPEAR ADEQUATE.
              Evaluation for MONOS #:
              PRIOR TO 1.19.2010 REF RANGES WERE 0.2 - 0.8.  EFFECTIVE 1.19.2010 REF
              RANGES ARE 0.0 - 0.5
              Evaluation for LYMPH #:
              Reference ranges prior to 1.19.2010 was 1.0-4.0.  Effective 1.19.2010 the
              reference ranges are 1.2-3.5.
              Evaluation for BASOS %:
              PRIOR TO 1.19.2010 REF RANGE WAS 0-3.  EFFECTIVE 1.19.2010 REF RANGE IS
              0-2.

              Ordering Provider: Shea E Mcmanus MD
              Report Released..: Aug 02, 2014@13:36
              Performing Lab...: SPOKANE VAMC [CLIA# 50D0988115]
                                 4815 N. ASSEMBLY SPOKANE, WA 99205-6185


                         ---- COAGULATION REPORT ----
```

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

WRIGHT,STEVEN O
110 E 7TH
PO BOX 174
ROSALIA, WASHINGTON  99170

**VISTA Electronic Medical Documentation**

Printed at SPOKANE VAMC

EXHIBIT 1 - 61   Page

# Lab Results

Printed On Aug 08, 2014

```
BLOOD              Aug 02            Reference
                   2014
                   13:02     Units   Ranges
------------------------------------------------------------
PRTIME             18.0 H    Sec     11.4 - 14.3
INR                1.50 H             .8 - 1.14
aPTT               28.2      Sec     23.8 - 42.3
DDIMQNT                      ug/mL FEU 0 - .49
FIBRI                        mg/dL   180 - 450
D-DIMTR                      ng/mL   0 - 400
Comments:                c
c.  Evaluation for INR:
    The International Normalized Ratio (INR) is recommended in
    monitoring oral anticoagulant therapy.  The recommended adult
    therapeutic range for INR is:  2.0-3.0

    Interpretive comments changed 2-18-10.
    Evaluation for PRTIME:
    Prior to 11-20-13:
    Reference ranges were 12.0-14.9

    Prior to 2/18/10:
    Reference Ranges were 11.7-14.4 &
    Adult therapeutic range:  23.2 to 32.0 Sec
    Evaluation for aPTT:
    Heparin therapeutic range:  45.9 to 67.3 Sec.

    Ordering Provider: Shea E Mcmanus MD
    Report Released..: Aug 02, 2014@13:25
    Performing Lab...: SPOKANE VAMC [CLIA# 50D0988115]
                       4815 N. ASSEMBLY SPOKANE, WA 99205-6185



               ---- BLOOD BANK ----



         *** [LEGACY VISTA BLOOD BANK REPORT] ***
    The following historical information comes from the Legacy VISTA Blood Bank S
ystem
    It represents data collected prior to the installation of VBECS. Some of the
information
    in this report may have been duplicated in the VBECS report above (if availab
le).
```

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| WRIGHT,STEVEN O<br>110 E 7TH<br>PO BOX 174<br>ROSALIA, WASHINGTON  99170 | Printed at SPOKANE VAMC |

EXHIBIT 1 - 62        Page 46

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                  EASTERN DISTRICT OF WASHINGTON

 3     _____

 4     ERIC WRIGHT, INDIVIDUALLY AND IN
       HIS CAPACITY AS PERSONAL
 5     REPRESENTATIVE OF THE ESTATE OF
       STEVEN O. WRIGHT; and AMY SHARP,
 6     INDIVIDUALLY,

 7                          Plaintiffs,

 8        vs.                             No.  2:15-cv-00305-TOR

 9     THE UNITED STATES OF AMERICA,
       D.B.A. THE DEPARTMENT OF VETERANS
10     AFFAIRS; MEDFORD CASHION, M.D.,
       SHEA MCMANUS, M.D.; ESKRIDGE
11     ENTERPRISES, LLC; and DOES 1-5,
       Inclusive,
12
                           Defendants.
13     _____

14             DEPOSITION OF SHEA McMANUS, M.D.
       _____
15

16             BE IT REMEMBERED that on the 3rd day of

17     October 2016, at the hour of 9:53 a.m., the deposition

18     of SHEA McMANUS, M.D. was taken at the request of the

19     Plaintiffs, before Caryn E. Winters, RPR, CCR, CSR,

20     Washington CCR No. 2496, Idaho CSR No. 237, at 2208 West

21     Second , Spokane, Washington, pursuant to the Washington

22     Rules of Civil Procedure.

23

24

25
```

EXHIBIT 2 - 63

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     FOR THE DEFENDANTS:
 7
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
 8   By:  Karin J. Mitchell
          Attorney at Law
 9   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
10
     UNITED STATES ATTORNEY'S OFFICE
11   By:  Rudy J. Verschoor
          Joseph Derrig
12        Attorneys at Law
     920 West Riverside Avenue, Suite 340
13   Spokane, Washington 99201

14   FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
          SPILLANE
15   By:  Scott M. O'Halloran
          Attorney at Law
16   1301 A Street, Suite 900
     Tacoma, Washington 98402
17

18

19

20

21

22

23

24                          * * * * *
25
```

EXHIBIT 2 - 64

```
 1                          I N D E X

 2
     WITNESS:   SHEA McMANUS, M.D.
 3

 4   EXAMINATION:

 5   By Mr. Eymann - Page No. 4

 6   By O'Halloran - Page No. 57

 7   By Mr. Verschoor - Page No. 60

 8   EXHIBITS MARKED:

 9   Exhibit No. 1 - Marked at Page No. 19
         Medical Records
10

11
                          *  *  *  *  *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

509-624-6255              SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com           Spokane, WA  99210

EXHIBIT 2 - 65

1    the areas of the left knee, left lower leg, and ankle, as

2    was stated by the nurse on the record on page 25?

3    A   I'm sorry, can you repeat the question?

4              MR. EYMANN:  The court reporter, please,

5    repeat the question for me.

6              (Record read back as requested.)

7    A   Yes.

8    Q   (By Mr. Eymann)  Do you know whose decision it was to

9    transfer Mr. Wright to a wheelchair to be escorted to the

10   x-ray room?

11   A   No.

12   Q   Did you order the x-rays?

13   A   Yes.

14   Q   What was the reason for you ordering the x-rays?

15   A   To evaluate for fracture or dislocation.

16   Q   Of the knee?

17   A   Knee, ankle, tibia, fibula.

18   Q   And so I presume from that, you would have ordered a,

19   what, lower leg series; is that correct?

20   A   No.

21   Q   Okay.  What did you order then?

22   A   I believe I ordered a three-way knee joint or knee

23   x-ray.  I ordered tib/fib x-ray and then an ankle x-ray.

24   Q   Did you order any x-rays of other parts of the body?

25   A   I don't recall.

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 2 - 66

1   risk?

2   A   Not that I see.

3   Q   The answer to this question may be quite obvious but

4   I just need to ask it.

5           Why was he transferred to Holy Family for

6   purposes of the additional radiology?

7   A   The VA did not provide that service at that time.

8   Q   Have they been providing them --

9           Did they start providing them at some point

10  after Mr. Wright was at the hospital?

11  A   I believe they only provide the service from certain

12  hours.  Eight a.m. to three p.m., I believe.  I'm not

13  certain of that, though.  It was not available at that

14  time.

15  Q   I note from the record on page one of Exhibit 1 that

16  there's a date of note which is at 20:50, which is 10:50

17  at night.

18           MS. MITCHELL:  10:50 or 8:50?

19           MR. EYMANN:  Excuse me.  You're right, 8:50.

20  Q   (By Mr. Eymann)  And then do you know what your shift

21  was, --

22  A   Six to six.

23  Q   -- or the hours that you were on duty that day?

24  A   Six to six, I believe.

25  Q   Okay.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 2 - 67

1   entries?

2   A    I choose to exit the room and use a separate computer

3   outside of the examination room.

4   Q    In looking at page 18 of Exhibit Number 1, did you

5   start your notes then approximately at 12:40 p.m.?

6   A    Yes.

7   Q    Is there any way of knowing when you completed your

8   dictation?

9   A    Yes.  You cannot addend an additional signer

10  electronically to your note until you have signed it.

11  And so at 6:03 I signed my note and attended Dr. Cashion

12  onto that note.

13  Q    Obviously you were seeing other patients in that

14  approximately five-and-a-half-hour time?

15  A    The odds are great.

16  Q    But you didn't see other patients during that time?

17  A    That I did see many other patients during that time.

18  Q    Did you enter a discharge order on Mr. Wright that

19  day?

20  A    No.

21  Q    Who decides when a person is to be admitted or

22  discharged out of the ER?

23  A    Who?

24  Q    Yes, who?  Assuming that you're the doctor who

25  initially does the evaluation of the patient or someone

509-624-6255                 SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 2 - 68

1    --

2    A    The admitting doctor would decide whether they were

3    admitted.

4    Q    Was Mr. Wright ever admitted to the hospital?

5    A    Not that I'm aware of.

6    Q    How does a patient such as Mr. Wright know that he

7    can leave the ER and go home?

8    A    He's told, I believe, that he can leave.  Or if he

9    wants to leave against medical advice, he can be told

10    that he has that right as well.

11    Q    At any time that you -- from the beginning of your

12    notes at approximately 12:40, through, as you said, some

13    time after six o'clock, did you tell him he was free to

14    go home?

15    A    No.

16    Q    Did you ever tell him he should be admitted?

17    A    Yes.

18    Q    Is that in your medical records, that you told him

19    that he should be admitted to the hospital?

20    A    It's implied in my plan that I spoke with the

21    patient.

22    Q    And you're referring to a page?

23    A    24.  "Send out for left leg DVT evaluation, with

24    patient to return for admission."

25    Q    With reference to page four, was that note --

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 2 - 69

1   A   24?

2   Q   On page 24.  As you just read, "Plan.  Send out for

3   left leg DVT evaluation, with patient to return for

4   admission," where was he to be sent out to?

5   A   Holy Family emergency room, Inland Imaging.

6   Q   Had he already been to Holy Family that day?

7   A   Not that I'm aware of.

8   Q   When did he go to Holy Family for the radiology?

9   A   I don't know the exact time, but I'm sure that Jill

10  marked it down in her notes.

11          He left the stretcher and went into the

12  waiting room at 16:35 and was noncompliant with

13  instructions to stay on the stretcher and elevate his

14  leg.

15          States -- Jill writes, quote, "I am waiting

16  for the ambulance," is what the patient said.

17          She explained the importance of staying in

18  bed with the leg elevated.  Patient refused.  Stated,

19  quote, I am sorry to give you a hard time, but I do not

20  want to, unquote.  And I was notified of that.

21          And the ambulance came at 17:40 to take

22  patient to the Holy Family Hospital for DVT eval.  So

23  17:40.

24  Q   He was compliant with regard to your request to send

25  him to Holy Family?

EXHIBIT 2 - 70

1   A    The patient went to Holy Family.

2   Q    Did you meet with him when he was returned from Holy

3   Family?

4   A    No.

5   Q    Do you remember having any discussion with him before

6   he went to Holy Family that when he came back he was

7   going to be admitted to the hospital?

8   A    Yes.

9   Q    Why didn't you admit him to the hospital before he

10  left to go to Holy Family?

11  A    Because if he has a DVT I need to know.  And the

12  hospitalist would not admit him to the hospital unless he

13  had that evaluation prior to the admission process.

14  Q    When he returned, was the DVT concern positive or

15  negative?

16  A    I don't know.  I was gone.

17  Q    I note that on the page 24 that Dr. Medford Cashion

18  acknowledged your entry above that; is that correct?

19  A    He acknowledged my whole note.

20  Q    All right.  At any time that day did you have any

21  verbal discussions with Dr. Cashion about what you wanted

22  to do with Mr. Wright insofar as admission or discharge?

23  A    Yes.  In addition to a written electronic note

24  transfer hand off, I had a verbal hand off with Dr.

25  Cashion as well, which is protocol for any ER physician

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 2 - 71

 1   or any physician in any hospital --

 2   Q    Do you remember --

 3   A    -- setting.

 4   Q    -- what you told Dr. Cashion?

 5           MS. MITCHELL:  Can you let him finish his

 6   answer?  If you were done.

 7   Q    (By Mr. Eymann)  I'm sorry.

 8   A    I told Dr. Cashion my findings, my concerns and my

 9   plan for admitting Dr. -- Mr. Wright to the hospital for

10   further evaluation and management.

11   Q    Was your plan to admit dependent upon the results

12   coming back from Holy Family for DVT concern?

13   A    No.

14   Q    So your plan was to admit him regardless; is that

15   correct?

16   A    Yes.

17   Q    And is it my understanding that as far as you knew

18   Dr. Cashion agreed with that plan?

19           MR. O'HALLORAN:  Object to the form.

20   A    Dr. Cashion made it clear that he understood what I

21   was telling him and accepted the patient's care from me.

22   Q    (By Mr. Eymann)  Did you have any discussions with

23   any of the nurses regarding these issues?

24   A    Which issues?

25   Q    Well, the issues of whether he would be admitted or

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 2 - 72

1   discharged upon return from Holy Family Hospital?

2   A   Yes.

3   Q   And what would have been -- well, do you remember --

4   I take it you don't remember the name of the nurse,

5   correct?

6   A   From reading it's Jim Palmer.  And I would have told

7   Jill that the plan was for the patient to go to Holy

8   Family, get the venous doppler and come back for

9   admission.  And then I was leaving shift, and Dr. Cashion

10  was assuming care.  But that was the plan.

11  Q   As far as you know, the nurse was an actual employee

12  of the hospital, correct?

13  A   As far as I know.

14  Q   And you were a contract doctor doing work at the

15  hospital, correct?

16  A   Correct.

17  Q   And you were not an employee of the hospital at that

18  time; is that correct?

19  A   I was a contract physician working for the VA.

20  Q   You are aware that in the pleadings in this matter

21  the hospital is taking the position that they take no

22  responsibility for anything you did or did not do with

23  regard to this incident?  Do you understand that?

24  A   If -- if that's what you're saying.  I understand

25  what you're telling me.  I don't know that that's the

EXHIBIT 2 - 73

1   something that you have to review annually?

2   A   Yes, I believe so.

3   Q   And then when you --

4           Is it a question and answer type of thing or

5   is it just your --

6   A   Videos, questions, answers, reading, listening,

7   demonstration, et cetera.

8   Q   Do you remember any portion of that for any

9   particular year that you have reviewed it or been online

10  with it that pertains to the safe transport of a patient

11  out of the hospital to their vehicle?

12  A   I don't recall.

13  Q   Mr. Wright was taken from --

14          Do I understand it correctly that Mr. Wright

15  was taken from the ER portion of the hospital to an

16  ambulance to be transported to Holy Family?

17  A   The ambulance crew came into the ER, or the waiting

18  room, I guess, and put him on the stretcher and took him

19  via ambulance to Holy Family.  He had his procedure and

20  then was transported via stretcher, via ambulance back to

21  the VA, is my understanding.  I wasn't there when he

22  arrived.

23  Q   Is that typical that they're always put on a

24  stretcher to be transported to Holy Family for x-rays?

25  A   It's one of the scenarios.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 2 - 74

```
 1              MS. MITCHELL:  Okay.  Are you okay?

 2              THE WITNESS:  Yeah, I'm good.

 3              MS. MITCHELL:  Okay.

 4   Q   (By Mr. Eymann)  And I understand it from your

 5   earlier testimony, you don't know when you were notified

 6   that Mr. Wright had passed away at home, correct?

 7   A   I think it was probably the day I got served.

 8   Q   So that was some time later, obviously?

 9   A   (Indicating).

10   Q   And as I understand it --

11              Well, correct me if I'm wrong, you had

12   nothing to do with Mr. Wright after you went off shift at

13   six p.m.?

14   A   Nothing.

15   Q   Did you receive any phone calls from Dr. Cashion or

16   any nurse after you went off shift?

17   A   No.

18   Q   To your knowledge, are wheelchairs available to

19   safely transport patients of the VA Hospital out the door

20   to their vehicles?

21   A   They're available.

22   Q   At the time that you departed at six p.m., you

23   considered Mr. Wright to be a fall risk, correct?

24              MR. VERSCHOOR:  Objection.  Asked and

25   answered.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 2 - 75

```
 1              MR. O'HALLORAN:  Object to the form.

 2   A   It was a concern.

 3   Q   (By Mr. Eymann)  And as you sit here today, you

 4   believe that you made that concern known to Dr. Cashion?

 5   A   I don't know if I specifically talked about fall risk

 6   with Dr. Cashion.  I was more concerned with the DVT

 7   evaluation and the -- the fact that he had severe

 8   anasarca, ecchymosis, and leg edema, and was

 9   subtherapeutic on his INR.

10              My plan was to admit to the hospital, and he

11   could be evaluated by PT/OT at that time.

12   Q   Do you have any idea why he was not admitted upon

13   return from Holy Family?

14   A   I don't.

15   Q   That's all I have.

16              EXAMINATION

17   Q   (By Mr. O'Halloran)  I have a couple of questions,

18   Dr. McManus.

19   A   Sure.

20   Q   In August of 2012, did the VA employ hospitalists?

21   A   They have hospitalists.

22   Q   And is it a hospitalist that you would have typically

23   spoken with to admit a patient like Mr. Wright?

24   A   It depends on what's the problem.  If there's a hip

25   fracture you talk to ortho.  Obviously if there's a
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 2 - 76

```
1   medical problem you would talk to the hospitalist.
2           In his situation it would have been the
3   hospitalist.
4   Q   And did you talk to a hospitalist at any time about
5   Mr. Wright?
6   A   I can't recall.  It's possible that I talked to
7   either the nursing supervisor or a hospitalist about a
8   potential admission coming their way, but I can't say for
9   sure.
10  Q   Okay.  In your review of the records, did you see any
11  indication that you had talked to a hospitalist?
12  A    No.  And usually I would put in there the time that I
13  called them.  Because throughput in the emergency room is
14  a big issue, and I would have probably documented that
15  time that I talked to someone.
16  Q   Okay.  And so the absence of your documentation of
17  talking to a hospitalist, does that make it like that you
18  had not talked to a hospitalist about admission?
19  A   You can infer that the lack, I guess, of
20  documentation, that I didn't state it, that I did not
21  probably talk to them.
22  Q   You probably did not talk to the hospitalist?
23  A    I probably did not, because the work-up was not
24  complete.
25  Q    Okay.  And the hospitalist would be the one that has
```

509-624-6255                 SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                      www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 2 - 77

1    the capability of admitting the patient, correct?

2    A    Yes.

3    Q    As the emergency room physician, you couldn't admit

4    the patient on your own, right?

5    A    Not without an accepting physician.

6    Q    And did you write any admission orders?

7    A    No.

8    Q    And then at the time that Mr. Wright returned to the

9    hospital you were off shift; is that right?

10    A    Gone.

11    Q    So at that point you had no opportunity to evaluate

12    his condition?

13    A    (Shakes head).

14    Q    Is that correct?

15    A    I was eating dinner.

16    Q    So is the answer to my question that you wouldn't

17    have been able to evaluate him at that time?

18    A    You're right.  I would not have been able to evaluate

19    at that time because I was not present.

20    Q    And when you have a plan in mind at the time of

21    transferring care to an oncoming physician, the oncoming

22    physician isn't bound by your plan, true?

23    A    He's not.  It is just a recommendation by me to him.

24    Q    And then he has the ability to make his own

25    evaluation based on the circumstances at that time and

EXHIBIT 2 - 78

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 EASTERN DISTRICT OF WASHINGTON

 3    _____

 4    ERIC WRIGHT, INDIVIDUALLY AND IN
      HIS CAPACITY AS PERSONAL
 5    REPRESENTATIVE OF THE ESTATE OF
      STEVEN O. WRIGHT; and AMY SHARP,
 6    INDIVIDUALLY,

 7                          Plaintiffs,

 8       vs.                            No.  2:15-cv-00305-TOR

 9    THE UNITED STATES OF AMERICA,
      D.B.A. THE DEPARTMENT OF VETERANS
10    AFFAIRS; MEDFORD CASHION, M.D.,
      SHEA MCMANUS, M.D.; ESKRIDGE
11    ENTERPRISES, LLC; and DOES 1-5,
      Inclusive,
12
                            Defendants.
13    _____

14          DEPOSITION OF MEDFORD CASHION, M.D.
      _____
15

16               BE IT REMEMBERED that on the 10th day of

17    October 2016, at the hour of 9:49 a.m., the deposition

18    of MEDFORD CASHION, M.D., was taken at the request of the

19    Plaintiffs, before Caryn E. Winters, RPR, CCR, CSR,

20    Washington CCR No. 2496, Idaho CSR No. 237, at 818 West

21    Riverside Avenue, Suite 250, Spokane, Washington,

22    pursuant to the Washington Rules of Civil Procedure.

23

24

25
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 79

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     LOWTHORP, RICHARDS, McMILLAN, MILLER & TEMPLEMAN
 7   By:  John H. Howard
          Attorney at Law
 8   300 East Esplanade Drive, Suite 850
     Oxnard, California 93036
 9
     FOR THE DEFENDANTS:
10
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
11   By:  Ketia Wick
          Attorney at Law
12   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
13
     UNITED STATES ATTORNEY'S OFFICE
14   By:  Rudy J. Verschoor
          Attorney at Law
15   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
16
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
17     SPILLANE
     By:  Scott M. O'Halloran
18        Attorney at Law
     1301 A Street, Suite 900
19   Tacoma, Washington 98402

20

21

22

23

24                      * * * * *

25
```

Exhibit 3 - 80

1                           I N D E X

2
      WITNESS:  MEDFORD CASHION, M.D.
3

4     EXAMINATION:

5     By Mr. Howard - Page No. 4

6     By Mr. Verschoor - Page No. 73

7     By Mr. Howard - Page No. 77

8     EXHIBITS MARKED:

9     Exhibit Number 3 - Marked at Page No. 4
           Curriculum vitae of Cashion
10
                         *  *  *  *  *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564              www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 81

1   A   No, sir.

2   Q   Good day?

3   A   Good day for me.

4   Q   Terrific.  You were kind enough before we went on the

5   record to provide me with a copy of your CV.  I just have

6   this one copy, but let me just show it to you, ask you if

7   it's up-to-date?

8   A   Yes, sir, it is.

9   Q   Okay.  We've marked that Exhibit 3.  Let me briefly

10  ask you, because I can read your CV, but when did you

11  begin working as a contract doctor at the VA?

12  A   It was 2010.

13  Q   And how did that come about, sir?  How did that

14  opportunity come your way?

15  A   I knew they had an ER.  I was wanting extra work at

16  that time.  It was convenient to my home, and so I just

17  started making phone calls and applied to work at the VA.

18  Q   And do you still work at the VA here in Spokane?

19  A   No, sir.

20  Q   When did you stop doing that?

21  A   December 2014.

22  Q   And any particular reason why you stopped working at

23  the VA?

24  A   My privileges were temporarily suspended, and I

25  simply moved on.

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564               www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 82

1    3rd.

2    Q    Which nurse?

3    A    I don't recall.

4    Q    What shift were you on on August 3rd?

5    A    It was another night shift.

6    Q    The night shift starts typically when -- or, started

7    -- strike that.

8              Back in 2014, when did the night shift start?

9    A    Six p.m.

10   Q    Do you know if it was a nurse Palmer that told you

11   that?

12   A    I don't recall.  I might try to remember -- I might

13   remember at some time, but I do not recall at this time.

14   Q    That's okay.  And from time to time I may prod like I

15   just did.  Just because I prod doesn't mean you have to

16   come up with an answer.  If you still don't know an

17   answer to a question despite prodding, you should stay

18   with your "Don't know" stuff.  But sometimes we prod to

19   see if we can refresh your recollection.

20   A    Yes, sir.

21   Q    How about a Nurse Linton?  Do you know if she was the

22   one?

23   A    I just do not recall which nurse.

24   Q    Okay.  What did the nurse say to you?

25   A    She said the patient had died overnight.

Exhibit 3 - 83

1   A    That is correct.

2   Q    Do you know why the veteran was placed in that bed in

3   the emergency room?

4   A    He had presented back to the ER for another

5   examination.

6   Q    Did you direct anyone to provide Mr. Wright with a

7   bed at about 20:50 that evening?

8   A    Well, no, sir.  The normal process is the nurse would

9   triage and place the patient according to her process and

10  then notify me that there was a patient in the room.

11  Q    Okay.  Very good.  Do we know when -- I said 20:50,

12  and I may have misspoken, even though the note talks

13  about 20:50.

14          Do you know when in relationship to

15  presenting himself for triage that the patient was placed

16  in that -- in bed 118?

17  A    No, I don't recall a specific time.

18  Q    Also looking under that addendum note it indicates

19  that "The veteran was alert and oriented times three,"

20  correct, sir?

21  A    That is what it says, sir.

22  Q    What does oriented times three mean?

23  A    Well, we use times three to mean the veteran can say

24  the time, at least the -- the day of the week at least,

25  and time, place and person, the location, the hospital,

Exhibit 3 - 84

1   and perhaps he can say his name.  Time, place, and

2   person.

3   Q   Very good.  Thank you, sir.

4               Going to the next page, page four, it

5   indicates that "There's an abrasion to the right

6   forehead, bump to right forehead."  Do you see that, sir?

7   A   Yes, sir.

8   Q   We're going to get into that in a little bit more

9   when we get into your notes, but I think --

10              Do you recall the patient having an abrasion

11  to the right forehead, and a bump to the right forehead

12  as well?

13  A   Yes, I do.

14  Q   What's the difference between an abrasion and a bump

15  in your lexicon?

16  A   Well, they're all degrees of severity.  And an

17  abrasion is -- is a change in the skin from a scrape or

18  some injury of that nature.  And a bump might be related

19  to the abrasion.  It might just be a small or big bump.

20  In other words, a swelling of the skin.

21  Q   Do you have an independent recollection of Mr. Wright

22  that night?

23  A   Yes, I do.

24  Q   Can you describe to us the bump when you first

25  observed it?

Exhibit 3 - 85

1    A    Well, there was an injury to the right forehead with

2    a minor abrasion.  And the bump was minor.  There was

3    slight swelling of the right forehead underneath the

4    abrasion.

5    Q    Have you read any depositions in this case yet?

6    A    No, sir.

7    Q    When you say "the bump was minor," can you quantify

8    its size?

9    A    I believe my note says three by four centimeters for

10   the abrasion, and the bump would have been no larger than

11   that and just slightly raised.  In other words, less than

12   a centimeter.

13   Q    Do you remember how close you had to get to Mr.

14   Wright to be able to see the bump?

15   A    I had his head in my hands.

16   Q    Could you see the bump at a distance of four or five

17   feet away from Mr. Wright?

18   A    Possibly.  But I would say from across the room you

19   probably couldn't notice the bump.

20   Q    Is there a door to this room, or is this just --

21   A    They all had doors, yes, sir.

22   Q    How many beds were in that room?

23   A    Just the one.

24   Q    Can you tell us approximately where that bed was --

25   where the head of the bed where Mr. Wright's head would

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 86

1  have been, where that was in relationship to the door?

2  A   Well, it was against the far wall.  Normal-sized exam

3  room.

4  Q   About how many feet away from the door would that bed

5  have been?  The head of the bed?

6  A   10 to 12 feet from the door, sir.

7  Q   Do you know if you yourself would have been able to

8  see that bump from 10 to 12 feet away from Mr. Wright

9  that night?

10  A   My memory tells me that I had to get close to Mr.

11  Wright to see the bump.

12  Q   Do you know, did anyone else report to you that they

13  saw the bump that night on Mr. Wright's head?

14  A   Well, I probably had a normal discussion with the

15  nurse about the patient and why he was in the room and

16  that he had a minor injury to his right forehead.

17  Q   Who indicated he had a minor injury to his forehead?

18  You or the nurse?

19  A   I would normally have spoken to the nurse about what

20  was going on with the patient.  In other words, a minor

21  injury to the right forehead.

22  Q   Is there -- is that your recollection?  You told the

23  --

24  A   That would be my normal practice.  I have no memory

25  of an actual discussion with the nurse.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 87

1  Q   Okay.  Let me just make sure I make the record clear

2  on that, because I didn't quite finish my question.

3            Do you recall telling the nurse that you felt

4  Mr. Wright had a minor injury to his right forehead?

5  A   No, sir, I don't recall details of the discussion

6  with the nurse.

7  Q   Do you recall how many nurses worked with you

8  treating Mr. Wright after eight o'clock on August 2nd,

9  2014?

10 A   I don't recall the number of nurses.  I see from the

11 record there were at least two nurses on duty that night.

12 Q   Who was the --

13           We know Ms. Whitley was on duty.  Who's the

14 other one?

15 A   I believe it's Miss Linton.

16 Q   Did the size of the bump change at all that night

17 before Mr. Wright was discharged, to your recollection?

18 A   No, sir.

19 Q   Was there any discoloration -- you talked about

20 abrasions -- other than possibly some redness, which I

21 usually think of when I think of an abrasion.  Were there

22 any -- was there any other discoloration?

23 A   No, sir, there was no discoloration.

24 Q   Getting back to reviewing the triage note.  If you

25 had been --

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 88

1               The night you're treating the patient, if you

2    read a triage note, and you believe the triage note is

3    inaccurate, do you usually approach the nurse and try to

4    make it accurate?

5    A    No, I may talk to her about it or I may not.  I try

6    to address all the issues related to the patient and the

7    nurse's note or any concern of the nurse.

8    Q    Either the night of the event or the most recent time

9    you read this nurse's note, which I think was earlier

10   today, right?

11   A    Yes, sir.

12   Q    Did you notice anything you thought was inaccurate

13   about the triage note?

14   A    No, sir, I thought it was just a normal, accurate

15   triage note.

16   Q    Staying on page four that talks about extremities,

17   extremities are the arms and legs; is that correct, sir?

18   A    Correct.

19   Q    What does WNL mean?

20   A    Within normal limits.

21   Q    So this note indicates that Mr. Wright could move

22   against gravity, push, and everything was within normal

23   limits with this particular patient at roughly --

24               Well, this says this was signed at 23:18.

25   But after eight o'clock the evening of August 2nd his

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 89

```
 1    lower extremities were within normal limits.
 2    A   Well, she's speaking in a general way about these
 3    extremities.  We may not have removed his trousers to
 4    look at his extremities at that point, but he'd already
 5    been there for many hours for this injury to his left
 6    knee area.
 7    Q   We're going to talk a little bit about his left leg
 8    in a little while.  But as you sit here right now, do you
 9    recall he had some difficulty ambulating on that left
10    leg?
11    A   Yes, I do.
12    Q   Did he have any -- did you have difficulty ambulating
13    on that left leg?
14    A   That was my history taking, that he had pain with
15    walking, and he did not walk for me because he was in
16    pain in that knee.
17    Q   Well, was it your understanding that he was
18    ambulating with crutches that day?
19    A   Yes.
20    Q   Did you have an understanding as to why he was
21    utilizing crutches that day?
22    A   Well, that had been my instruction for him as he went
23    home the first -- the first time.
24    Q   Did you have an understanding that he walked into the
25    hospital earlier in the day with crutches?
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 90

1    A    No, I don't recall how he arrived exactly to the ER.

2    Q    Is it your best recollection that despite some pain

3    in that left leg he was able to pedal push, move against

4    gravity, all of that, within normal limits as far as the

5    left leg was concerned?

6    A    Yes, sir.  He had normal use of that extremity other

7    than the injury.

8    Q    Very good.  Going to page six of Exhibit 1, now we're

9    getting to the discharge note, and I'm going in the order

10   in which these are in the exhibit.  I realize it's not

11   necessarily the order of things that happened that night.

12   But we're looking at your discharge note, are we not,

13   sir?

14   A    Yes.

15   Q    And go to the date of the note again.  It says 20:50,

16   and then the entry date it also says 20:50.  So the date

17   is August 2nd but the times are both 20:50?

18   A    Uh-huh.

19   Q    Can you explain to me what those times mean in

20   context of this discharge note?

21   A    It appears I finished the whole note in a short time

22   period as he was being discharged.

23   Q    It looks like about 20 seconds, if I'm reading this

24   right?  I mean, if the date of note is -- if the date of

25   the note is --

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 91

```
1                    If you're beginning to write the note and the

2        entry date at that time is when the note is completed,

3        there's not a lot of time.  And I'm assuming that you

4        didn't write this note in 20 seconds?

5        A   No, I did not.  As I look at my electronic signature,

6        it was actually two minutes later.  20:52.  So --

7        Q   So is it your recollection that you were able to

8        write this note -- and I don't care if it was two minutes

9        or four minutes or 10 minutes, but is it your

10       understanding that you wrote the discharge note at about

11       8:50 on August 2nd of -- strike that.

12                   Yeah, at 8:50 the evening of August 2nd?

13       A   Yes, sir.

14       Q   Okay.  Under the instructions it talks about first

15       the diagnosis.  Diagnosis is head injury, correct, sir?

16       A   That is correct.

17       Q   "Without concussion" it says, correct?

18       A   Correct.

19       Q   How did you determine that there was no concussion?

20       A   I examined Mr. Wright thoroughly and appropriately

21       for the situation, including asking him specific

22       questions about how he felt about his memory of the fall

23       and any symptoms or anything at all that might relate to

24       a head injury, and he simply had no symptoms or signs of

25       a concussion.
```

Exhibit 3 - 92

1   Q   When you examined him, I take it he showed no signs

2   of concussion, correct, sir?

3   A   Yes, sir.

4   Q   What history did you ask him about his memory of the

5   fall and so forth?

6   A   Well, one of the best ways to ask about memory is did

7   he remember the fall, remember hitting his head, and he

8   did.

9   Q   Okay.  Did you ask him anything else about the -- the

10  history of his fall up to the time you were examining him

11  other than whether or not he recalled the fall?

12  A   Well, my normal practice would be to get all the

13  details that are relevant.  Why was he there in the first

14  place, was he using his crutches, did he trip on his

15  crutches, why did he trip, why did he fall, what exactly

16  was he doing outside the ER at that time.  All those

17  details would have been related to this.

18  Q   Okay.  Other than trying to determine the mechanism

19  of the fall and the whys and wherefores for him being at

20  the location of the fall and how much of the fall he

21  actually -- he remembers, did you ask him any other

22  questions, sir?

23  A   Well, I think -- well, I take a normal history and

24  physical for this visit, yes.  Yes, I go through the

25  whole checklist and history and physical.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 93

1    Q    Sure.  This is an individual that you had seen

2    earlier in the evening, correct, sir?

3    A    Yes, I did.

4    Q    So did you go through his whole history again in

5    terms of what medications --

6              When you say "history," I assume you're

7    talking about medications he's on?

8    A    Correct.

9    Q    Illnesses and injuries he's had in the past, correct,

10   sir?

11   A    That is correct.

12   Q    What else do you explore when you ask him -- when you

13   go over that history?

14   A    Well, the main points are what is the severity of the

15   injury and his response to the injury.  And also related,

16   what caused it.  Just a normal, reasonable history and

17   physical that I would normally do.

18   Q    Okay.  So, again, I'm just trying to understand.  You

19   did ask him a series of questions about why he was at

20   that location and the mechanism of his fall, right?

21   A    That is correct.

22   Q    You asked if him he recalled actually falling, and he

23   responded he did, correct?

24   A    That's correct.

25   Q    I'm sure you asked him if he hit his head on

Exhibit 3 - 94

1   anything, and he responded that he did, correct?

2   A    Yes, sir.

3   Q    What did he say he hit his head on?

4   A    He said he hit his head on the pavement.

5   Q    Did he indicate whether or not he also made contact

6   with a wheelchair rack?

7   A    He may have said that.  He may have said that there

8   was a quick succession of falling and hitting his head,

9   hitting the rack, hitting the ground.  I asked him in

10   detail about all those memories.

11   Q    When you say "quick succession," are you talking

12   about he fell quickly, hit his head on the rack, and then

13   hit his head on the ground?  Is that what you're saying?

14   A    Yes, sir.

15   Q    Did he describe this quick succession in any other

16   way other than what I just said?

17   A    No, sir.

18   Q    Did he indicate to you how hard he hit the rack or

19   the ground?

20   A    Well, I would have tried to determine that from what

21   he told me, but he was able to say he hit the ground

22   without severe pain, without knocking himself out.

23   Q    Did he indicate to you whether or not he was able to

24   break his fall with any body part other than his head?

25   A    I asked him what came into play as he fell with his

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                      www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 95

1   extremities, and he was only partially able to break his

2   fall as I fell.

3   Q   Did he indicate to you how he was partially able to

4   break his fall with some body part other than his head?

5   A   He simply was not able to prevent his fall and

6   completely break his fall against the ground with his

7   arms or legs.

8   Q   Do you have an understanding that he was able to

9   break his fall to some degree with either his arm or arms

10  or a leg or both legs?

11  A   He simply could not break his fall with his arms and

12  legs.

13  Q   So the first body part to hit the rack and/or the

14  ground was his head, as far as you know?

15  A   As far as I know, that is correct.

16  Q   You asked him if he -- strike that.  I realize from

17  reading your records, and you recall too -- we'll get to

18  it at some point, I'm sure -- that he tripped, correct,

19  sir?

20             MR. O'HALLORAN:  Can he look at his notes?

21             MR. HOWARD  Yeah, I apologize.

22             MR. O'HALLORAN:  It's on page nine.

23  Q   (By Mr. Howard)  Do you see it on page nine under

24  "Subjective," sir?

25  A   Yes.

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 96

1   Q   My impression from your testimony is is that the

2   patient wasn't clear about all aspects of his fall, that

3   he wasn't able to give you a clear understanding of all

4   aspects of his fall; is that correct?

5   A   No, sir.  I asked him the details of his fall, and he

6   gave me enough detail that I was satisfied he knew what

7   happened at the time.

8   Q   Okay.  Okay.  So other than obtaining as much detail

9   as you could about the nature of the fall, and the fact

10  that he told you that he did not lose consciousness,

11  correct?

12  A   That's correct.

13  Q   I'm correct?  He told you that?

14  A   (Nods head).

15  Q   What else did he tell you about what his

16  recollections were of the fall and the aftermath of the

17  fall before presenting to you and nurse Whitley in the

18  ER?  What else did he tell you about the circumstances of

19  that fall and the -- and his reaction to the fall?

20  A   Uh-huh.  Well, as my note says, he wasn't knocked

21  out.  He didn't have a headache.  He had no neck or back

22  pain.  No pain at all.

23  Q   Did you ask him any other questions about his

24  physical or mental condition, other than whether he was

25  rendered unconscious or not, whether he had a headache or

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                 www.spokanereporting service.com            Spokane, WA  99210

Exhibit 3 - 97

1   neck pain, did you ask him any other questions about his

2   condition?

3   A   My note says I asked him about any problems with his

4   eyes, his ears, his breathing, his abdomen, and the other

5   details of his fall.

6   Q   And where are you reading from?

7   A   I'm reading from page 11, "Review of Systems."

8   Q   Okay.  The review of systems are happening while he's

9   in the emergency room being examined by you, correct,

10  sir?

11  A   Correct.

12  Q   So when you're asking about his abdomen and his ears,

13  et cetera, you're asking that in the present tense as

14  he's sitting there in your emergency room, correct, sir?

15  A   Correct.

16  Q   I'm still interested in questions you asked him

17  relating to the fall and the aftermath of the fall

18  between the time he hit the ground and the time he

19  presented to you in the emergency room.

20          Did you ask him any other questions about his

21  either mental or physical condition other than what

22  you've already told us this morning?

23  A   No, sir.  My note pretty well covers my questions.  I

24  probably asked him related questions of -- and in various

25  ways to make sure I got consistent answers.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 98

1   Q   Well, let me first off ask you, do you have a

2   recollection of asking him any other related questions

3   other than what you've already told us today between the

4   time he fell -- dealing with the time period from the

5   moment he fell to the moment he presented to you in the

6   emergency room?

7   A   Yes, sir.  I remember asking him more than once about

8   headaches, about any other pain, about how he felt, and

9   so forth.

10   Q   Okay.  Headache and pain I got.  You say "how he

11   felt."  How he felt in what respect, sir?

12   A   Well, anything that he might want to offer or any

13   normal question that I might ask, simply beginning with

14   "How are you feeling?"

15   Q   Okay.  When you say "How are you feeling," that's a

16   present-tense question, correct, sir?

17   A   Yes, sir.  That would be my normal practice to ask

18   that question.

19   Q   Do you have a recollection of asking Mr. Wright any

20   of these normal questions other than what you've already

21   described to us now?  In other words, I'm not asking what

22   you normally do.  I'm asking you do you have a

23   recollection of asking Mr. Wright any other questions

24   about his physical or mental condition between the time

25   he fell and the time he presented himself to you?  Did

Exhibit 3 - 99

1    you ask him anymore questions about that?

2    A    I'm sure I asked him many questions about his fall

3    and how he felt.

4    Q    What questions did you ask him other than what you've

5    already told us today?

6    A    Well, we had a reasonable diagnosis and plan.  We had

7    written instructions that we discussed, was he able on

8    use his crutches, was he able to get home without any

9    difficulty.

10    Q    I'm sorry, sir.  My question probably wasn't clear to

11    you.  We're going to get into that later.  Because

12    clearly you asked him more questions while he was in the

13    ER room under your care and observation, up to the time

14    he was discharged.  I get that.

15                I just want to know if you discussed with Mr.

16    Wright any of his symptoms or complaints from the moment

17    he fell to the moment he entered the emergency room?

18                In other words, when you saw him in the

19    emergency room did you ask him about that time period

20    between the moment he fell and the moment he presented

21    himself in the emergency room?  Did you ask him any

22    questions about his condition other than whether he was

23    knocked out or not, whether he had a headache or not,

24    whether he had any neck pain?  Did you ask him any other

25    questions about his physical or mental status?

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 100

```
 1              MR. O'HALLORAN:  Object to the form.
 2   A   Yes.
 3              MR. O'HALLORAN:  I don't think that was a
 4   complete list of the things he asked him about the fall.
 5   Q   (By Mr. Howard)  If I missed something, I apologize.
 6   And other than headaches, other than neck pain, other
 7   than loss of consciousness, did you ask him anything
 8   about his condition during the time period I'm interested
 9   in?
10              MR. O'HALLORAN:  He's just asking about
11   specifically between after the fall was over until he
12   came into the ER and you saw him.  And you've answered
13   that.  You don't have to repeat that.
14              But if there's anything that you remember
15   asking him about that specific period, you can tell him.
16   If you don't, if there was nothing else, then --
17   A   I have nothing else to add to the answer I've already
18   given.
19   Q   (By Mr. Howard)  Okay.  Do you know whether or not
20   for any period of time after Mr. Wright hit his head that
21   he was dazed or disoriented between the time he fell and
22   the time he presented himself to you in the emergency
23   room?
24   A   Well, my note says he wasn't knocked out.  My note
25   says no loss of consciousness.  So I would have asked him
```

509-624-6255                   SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                        www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 101

1   details of was he dizzy, was he disoriented, was he

2   altered like that at the time he fell or any time after

3   he fell.

4   Q   Did you ask him those questions?

5   A   Yes, I did.

6   Q   Is that reflected in your notes anywhere?

7   A   Of course it is.  It's right there.

8   Q   Where is it reflected in your notes you asked him

9   about being disoriented or dazed?

10   A   When it says "knocked out," that implies I asked all

11   the ways one can be knocked out.  In other words, dizzy

12   or daze.

13           And no loss of consciousness too also implies

14   I'm probing him specifically for those symptoms.

15   Q   Are you equating loss of consciousness with being

16   dazed and disoriented?

17   A   Yes, I am.

18   Q   So, in other words, in your lexicon the words loss of

19   consciousness include diminution in the level of

20   consciousness?  Is that what you're saying?

21   A   Yes, sir.

22   Q   Is that your custom and practice?

23   A   Yes, sir.

24   Q   Is that what you've always done?

25   A   Always.

Exhibit 3 - 102

1  three probably refers to some history of skin bleeding.

2  Q   Go to page 11, sir, under your examination --

3  A   (Complied).

4  Q   And I'm skipping down to there because we've already

5  talked about some of this other stuff.  Under

6  "Extremities" it says "No sign of injury."  Do you see

7  that, sir?

8  A   Yes, sir.

9  Q   Are you talking about both his arms and his legs?

10  A   Yes.

11  Q   What do you mean by "No sign of injury"?

12  A   Well, I -- I should have said "No sign of new

13  injury."  I was typing, so I committed a typing mistake

14  there.

15  Q   Because clearly his left leg was not functioning

16  properly, correct, sir?

17  A   Yes, correct.

18  Q   Okay.  Under the -- right below that it says "Neuro."

19  That's a neurological exam that you did?

20  A   Yes.

21  Q   You indicate "Mental status normal," correct?

22  A   Yes.

23  Q   You also say "Moving all four extremities well," do

24  you not?

25  A   Yes, sir.

Exhibit 3 - 103

1  Q   Is that another typo or was he moving them?

2  A   Well, that just simply refers that he had normal

3  power in his extremities, and taking into consideration

4  that the one was injured.

5  Q   What do you mean "normal power" with respect to his

6  left leg?  How did he have normal power with respect to

7  that left leg?

8  A   Well, I normally ask a person to either move their

9  extremity for me or just actually watch it being used to

10  make sure it was moving normally.

11  Q   So, in other words, you had him walk so you could

12  watch him walk?

13  A   Well, I didn't watch him walk because he was limping

14  and in pain.  But I knew he was able to use crutches, and

15  so I simply observed how his extremities worked as he lay

16  on the stretcher.

17  Q   Okay.  Let's go to page 12, sir.

18  A   (Complied).

19  Q   Under your "Assessment and Plan," again you repeat

20  the abrasion and contusion of the forehead, correct?

21  A   Yes, sir.

22  Q   And, again, in your lexicon contusion includes the

23  concept of a bump; is that right?

24  A   Yes, sir.

25  Q   You said "Without concussion," correct?

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 104

```
 1   A    Yes, sir.

 2   Q    You indicate he's on Warfarin?

 3   A    Yes.

 4   Q    And you indicate that his INR was 1.5, correct, sir?

 5   A    Yes.

 6   Q    What's the significance of 1.5?  An INR of 1.5?

 7   A    Well, he's a little under-controlled for the plan to

 8   thin his bleed.

 9   Q    Is 1.5 elevated but subtherapeutic?  Is that --

10   A    Correct.

11   Q    Okay.  Meaning he's on Warfarin, Warfarin's having an

12   effect, but it's not in the range that you would have

13   considered to be therapeutic for assuring there's no

14   clotting with respect to -- particularly with respect to

15   a history of an afib, correct?

16   A    Correct.

17   Q    Got it.  Now, the 1.5 INR, was that what he presented

18   with on August 2nd of 2014, or was that after he was

19   treated at the hospital that day with additional

20   anticoagulants?

21   A    That was the result of a blood test before the

22   injection of anticoagulant.

23   Q    Given his age, weight and height, in order for the

24   anticoagulant to be sufficiently therapeutic, what range

25   should it have been in?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 105

1    A    Between two and three.

2    Q    Okay.  You indicate also under "Assessment and Plan"

3    that "The patient and friend comfortable with home

4    observation."  Do you see that, sir?

5    A    Yes, sir.

6    Q    Do you recall he had a companion or a friend with him

7    on that occasion?

8    A    Yes, he did.

9    Q    Do you recall who the individual was?

10   A    No.

11   Q    Do you remember what this person looked like?

12   A    No, sir.

13   Q    Did you discuss things with this individual?

14   A    Yes, I did.

15   Q    What do you recall talking to this individual about?

16   A    The plan of going home and being under home

17   observation.

18   Q    Okay.  What did you mean "home observation"?  What

19   does that mean?

20   A    Well, he had an instruction sheet with specific

21   instructions about what to do in case something went

22   wrong.

23   Q    With respect to the head injury, sir?

24   A    Yes.  Yes, sir.

25   Q    It says "The patient and friend comfortable with home

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 106

1  observation."  So were you recommending that the patient

2  go home?

3  A   Yes, sir.

4  Q   Okay.  Did the patient agree with that

5  recommendation?

6  A   Yes, he did.

7  Q   He was comfortable with it?

8  A   Yes, he was.

9  Q   Did you recommend to him that he stay overnight for

10  observation?

11  A   No, sir.

12  Q   Did you recommend that he have a CT of his brain?

13  A   No, sir.

14  Q   Why did you not recommend that the patient stay

15  overnight?

16  A   It was a reasonable medical analysis of this

17  situation for this patient, that he was stable with

18  normal vital signs.  We had a reasonable plan that we all

19  agreed to.  We discussed the plan, and we were

20  comfortable with that situation.

21  Q   What time of day or night did you make that

22  recommendation that he go home, sir?

23  A   Well, the end of his visit was somewhere in the note

24  there.  I don't know where.  But it would have been

25  around 10:00 o'clock at night.

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 107

1  Q   When did you make the determination he did not need a

2  CAT scan?

3  A   Right up until the time we finished our discussion.

4  Q   And if we go -- I'm going to jump to page 17 real

5  quick.  This is the nurse's -- Nursing Medication

6  Management Note.  Do you see that, sir?

7  A   Yes, sir.

8  Q   This is prepared by Jill Palmer, is it not, sir?

9  A   Yes, sir.

10  Q   And this actually relates to earlier in the day when

11  Dr. McManus, before you took over the care and treatment,

12  apparently was concerned about a DVT.  Do you remember

13  reading about all that, sir?

14  A   Yes, sir.

15  Q   There was a concern that possibly the symptomatology

16  that Dr. McManus observed in that left leg could be

17  related to a deep venous thrombosis?  That was a concern,

18  correct?

19  A   Yes, sir.

20  Q   And Dr. McManus wanted to rule it out by doing an

21  ultrasound, true?

22  A   That is correct.

23  Q   Unfortunately, the ultrasound couldn't be done at the

24  VA because apparently the ultrasound machine doesn't

25  operate or something after four p.m., I believe; is that

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 108

```
 1   this anasarca?

 2   A    No, sir.  Our hand-off discussion would have covered

 3   the general situation, not the exact details of his

 4   evaluation.

 5   Q    Was it your impression that Dr. McManus was utilizing

 6   or using the term anasarca synonymously with the concept

 7   of ecchymosis?

 8   A    No, sir.

 9   Q    Those are two separate things, correct?

10   A    Yes, they are.

11   Q    This left leg, according to Dr. McManus, had

12   ecchymosis and severe anasarca/edema, correct?  I'm on

13   page 21 under "Musculoskeletal."

14   A    Yes, sir.

15   Q    Did Dr. McManus tell you that it was his

16   recommendation the patient stay overnight in the

17   hospital?

18   A    No, sir.  He had no -- he had not made a decision to

19   admit.  As I said before, we were waiting for the result

20   of the ultrasound to complete that decision-making

21   process.

22   Q    Do you know when you had this discussion with Dr.

23   McManus on the -- on August 2nd of 2014?

24   A    Yes, sir.

25   Q    When?
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 109

1    A    It was about six p.m.  My arrival to the change of

2    shift is normally a little bit before six.  So I would go

3    straight to the doctor and start talking about the

4    situation.

5    Q    Do you know where the patient was --

6              When I say "the patient," Mr. Wright.  Do you

7    know where he was at six p.m. that evening?

8    A    Six p.m. he was still not in the emergency

9    department.

10    Q    He was still at the other facility?

11    A    Or en route back.

12    Q    Got it.  When did you first get the results from the

13    ultrasound?

14    A    It wasn't too long after he had returned.

15    Q    Do you recall when he returned from --

16    A    No, sir.

17    Q    How many patients did Dr. McManus hand off to you at

18    about six p.m. that evening?

19    A    My memory says just that one.

20    Q    How long was your communication with Dr. McManus?

21    A    It was typically brief but not more than five

22    minutes.

23    Q    Do you know how long Mr. Wright was at the hospital

24    on August 2nd of 2014 before he hit his head?

25    A    Yes, sir.

Exhibit 3 - 110

1   A   I don't know.  I don't recall.

2   Q   What is a hospitalist?

3   A   Well, he's typically an internist that's attends to

4   the in-patients day and night.

5   Q   Did Mr. -- or, Dr. Fickert [sic] ever play the role

6   of a hospitalist, to your knowledge, at the VA?

7   A   I don't recall.  I remember that PAs would

8   occasionally be the hospitalist.

9   Q   Do you know who the hospitalist was on August 2nd of

10  2014?

11  A   No, sir.

12  Q   Did you have any communication with a hospitalist on

13  August 2nd of 2014 before discharging Mr. Wright for the

14  last time that day?

15  A   No, sir.

16  Q   Do you have any understanding as to why the report --

17          Where it says "Consult requests" on page 29

18  of Exhibit 1, why this was sent to the attention of a PA,

19  Mark Fickert?

20          MR. O'HALLORAN:  Object to the form.  Asked

21  and answered.  But go ahead.

22  A   My memory is that to complete the form electronically

23  you have to enter a provider's name.  So that's the name

24  I entered.

25  Q   (By Mr. Howard)  Okay.  I'm a little confused.  What

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 111

1    is the significance of a consult request?  The document

2    is entitled "Consult request," correct, sir?

3    A   Yes, sir.

4    Q   What does that mean?

5    A   Well, it simply means you are requesting something in

6    a specialty, not the primary care's normal care provider

7    in the primary care office.

8    Q   So what was being requested in this form here, sir,

9    page 29 of Exhibit 1?

10   A   This was a request for an orthopedic evaluation.

11   Q   And you were the requesting provider, correct, sir?

12   A   Yes, sir.

13   Q   Because you're not an orthopedist, correct, sir?

14   A   Correct.

15   Q   And do you have an understanding as to what was the

16   outcome of this request?

17   A   Well, the electronic system received the request and

18   printed it in this format here, scheduled for August the

19   4th.

20   Q   So, in other words, based on this request, Mr. Wright

21   was going to be able to see an orthopedist on August 4th?

22   That's your understanding?

23   A   Yes.

24   Q   An the reason for the request, and this is something

25   you would have written, I assume, is pain, swelling, and

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 112

1   unable to bear weight after the fall; is that correct,

2   sir?

3   A   Yes, sir.

4   Q   And when we say "the fall" we're talking about the

5   fall onto his left knee on an earlier date, July 7th --

6   July 27th of 2014, correct?

7   A   Yes, sir.

8   Q   So you did have an understanding that on August 2nd

9   of 2014, due to that fall Mr. Wright was unable to bear

10  weight on his left leg; is that correct, sir?

11  A   That is correct.

12  Q   Did you ever make a request on August 2nd of 2014 for

13  Mr. Wright to see a neurologist or a neurosurgeon?

14  A   No, sir.

15  Q   Did you ever make a request to have Mr. Wright stay

16  overnight at the hospital?

17  A   No, sir.

18  Q   You had authority to make that determination on your

19  own, didn't you, sir, --

20          MR. O'HALLORAN:  Object to the form.

21  Q   (By Mr. Howard)  -- for Mr. Wright to stay at the

22  hospital overnight, or did you have to get authority from

23  the hospital to do that?

24  A   No, sir, it was not my authority.  I would have to

25  speak with the hospitalist about that.

509-624-6255
800-759-1564                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
                            www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 113

```
 1   Q   Do you know if you spoke to a hospitalist about
 2   allowing Mr. Wright to spend the night on August 2nd of
 3   2014?
 4   A   No, sir.
 5   Q   No, you didn't, or, no, you don't know if you did?
 6   A   No, sir, I did not speak to the hospitalist about him
 7   being admitted that night.
 8   Q   Did you have authority to order a CT on your own, or
 9   did you have to clear that with the hospitalist as well?
10   A   No, sir, I had authority.
11   Q   But you did not order one, correct?
12   A   Yes, sir.
13   Q   Okay.  I'm going to take you to page 46, the last
14   page.
15   A   (Complied).
16   Q   By the way, is there a difference at -- strike that.
17            In August of 2014, was there a difference at
18   the VA between discharge instructions or after-care
19   instructions?
20   A   No, sir.
21   Q   That would have meant the same thing?
22   A   Yes, sir.
23   Q   What were they called at the VA in those days?
24   A   My note says "Care Note."  I believe that was the
25   brand name of the instructions they were using.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

Exhibit 3 - 114

1    A    -- including a discussion.

2    Q    Your discussion took place after you took over from

3    Dr. McManus?

4    A    Correct.

5    Q    Okay.  Here's my question:  When you compare this

6    discussion you had with Mr. Wright to the discussion you

7    had with Mr. Wright after he fell and hit his head, was

8    his mental alertness any different?

9    A    No, sir.

10   Q    There was some discussion about the Care Note that

11   you instructed was given to him.

12   A    (Nods head).

13   Q    Do you know specifically, did you witness Mr. Wright

14   sign the Care Note?

15   A    No, sir.

16   Q    Were you the one who specifically gave it to him, or

17   could that have been nursing staff?

18   A    That would have been nursing staff.

19   Q    Okay.  When Mr. Wright was brought in after he fell

20   outside and hit his head, I think you indicated his

21   friend was with him?

22   A    My note -- I'm looking --

23              MR. O'HALLORAN:  This so page -- try page

24   nine.

25              THE WITNESS:  Oh.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com          Spokane, WA  99210

Exhibit 3 - 115

1  how many times did you interact with Mr. Wright before he

2  was discharged and then later fell?  In other words,

3  before eight p.m. on August 2nd?

4  A   My memory says I was in that room with him some time

5  evaluating his injury and his results, and there was no

6  other interaction.  Just that once.

7  Q   Just one time?

8  A   Yes, sir.

9  Q   And so it's your testimony that one time is close in

10  time to the discharge note that you prepared?

11  A   Yes, sir.

12  Q   Do you ordinarily keep track of the times you

13  interact with patients in some manner?

14  A   No, sir.

15  Q   I just have one last question for you.

16         Why did you not keep Mr. Wright for

17  observation that night after he fell and hit his head on

18  the ground and hit that bike rack?  Knowing what you knew

19  about his overall condition and circumstances, why did

20  you not keep him for observation then?

21  A   Yes, sir.

22         MR. O'HALLORAN:  Object to the form.  Asked

23  and answered.  But go ahead.  You can elaborate.

24  A   Yes, sir.  As according to my usual practice, I was

25  simply trying to exercise reasonable medical judgment at

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 116

```
 1   the time for this particular situation and this patient.
 2              He was stable and had no -- had normal vital
 3   signs and no concerning symptoms.  He had no pain
 4   problems.  And we had a workable plan, and we discussed
 5   the plan to some extent, the nurse, the friend, the
 6   patient, and myself.  So we were all comfortable with him
 7   not being in the hospital but going home.
 8   Q   (By Mr. Howard)  Who agreed with you that the patient
 9   should not remain in the hospital that night?
10   A   Well, there were at least four of us in the room as
11   we talked about that.
12   Q   Who?
13   A   Nurse Whitley, the friend, the patient, and myself.
14   Q   Was Whitley still on duty at the time of the
15   discharge?
16   A   Yes, sir.
17   Q   So Whitley, a friend, the patient, and yourself?
18   A   Yes, sir.
19   Q   And you informed the patient that it was your
20   reasonable medical judgment that it was -- that he should
21   go home and not stay overnight?
22   A   Yes, sir.
23   Q   And that reasonable medical judgment took into
24   consideration all the history you knew about the patient,
25   including all the meds that he was on, the anticoagulants
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com              Spokane, WA  99210

Exhibit 3 - 117

```
 1   --
 2              MR. O'HALLORAN:  Objection.  Asked and
 3   answered.
 4   Q   (By Mr. Howard) -- that he was on, --
 5              MR. O'HALLORAN:  Sorry.
 6   Q   (By Mr. Howard)  -- and the fact that he just hit his
 7   head and had a head bump, and reported himself back in
 8   the emergency room after hitting his head?
 9              MR. O'HALLORAN:  Object to the form.
10   Misstates the evidence and asked and answered to some
11   degree.  But go ahead.
12   A   Yes, sir.
13   Q   (By Mr. Howard)  Okay.  I have nothing further.
14              MR. O'HALLORAN:  I have nothing further.
15              MR. HOWARD:  Well, hold it.  I'm getting
16   smarter.  Hang on.
17              (Pause in proceedings.)
18   Q   (By Mr. Howard)  Sir, with respect to the care and
19   treatment of Mr. Wright, and the fact that your
20   privileges were suspended pending a peer review, is this
21   the only time in your career that's ever happened to you?
22   A   Yes, sir.
23   Q   And, lastly, do you know who ordered the Warfarin
24   that the -- both the subcutaneous injection and the
25   anticoagulant in the Warfarin at 15:35?  It was before
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com            Spokane, WA  99210

Exhibit 3 - 118

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 EASTERN DISTRICT OF WASHINGTON

 3    _____

 4    ERIC WRIGHT, INDIVIDUALLY AND IN
      HIS CAPACITY AS PERSONAL
 5    REPRESENTATIVE OF THE ESTATE OF
      STEVEN O. WRIGHT; and AMY SHARP,
 6    INDIVIDUALLY,

 7                          Plaintiffs,

 8       vs.                               No.  2:15-cv-00305-TOR

 9    THE UNITED STATES OF AMERICA,
      D.B.A. THE DEPARTMENT OF VETERANS
10    AFFAIRS; MEDFORD CASHION, M.D.,
      SHEA MCMANUS, M.D.; ESKRIDGE
11    ENTERPRISES, LLC; and DOES 1-5,
      Inclusive,

12                          Defendants.
13    _____

14               DEPOSITION OF JILL PALMER, R.N.
      _____

15

16              BE IT REMEMBERED that on the 4th day of

17    October 2016, at the hour of 8:50 a.m., the deposition

18    of JILL PALMER, R.N., was taken at the request of the

19    Plaintiffs, before Caryn E. Winters, RPR, CCR, CSR,

20    Washington CCR No. 2496, Idaho CSR No. 237, at 920 West

21    Riverside Avenue, Suite 304, Spokane, Washington,

22    pursuant to the Washington Rules of Civil Procedure.

23

24

25
```

EXHIBIT 4 - 119

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     FOR THE DEFENDANTS:
 7
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
 8   By:  Karin J. Mitchell
          Attorney at Law
 9   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
10
     UNITED STATES ATTORNEY'S OFFICE
11   By:  Rudy J. Verschoor
          Attorney at Law
12   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
13
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
14      SPILLANE
     By:  Scott M. O'Halloran
15        Attorney at Law
     1301 A Street, Suite 900
16   Tacoma, Washington 98402

17   ALSO PRESENT:

18   Sam McConas

19

20

21

22

23

24                        *  *  *  *  *
25
```

EXHIBIT 4 - 120

```
 1                    I N D E X

 2
      WITNESS:  JILL PALMER, R.N.
 3

 4    EXAMINATION:

 5    By Mr. Eymann - Page No. 4

 6    By Ms. Mitchell - Page No.

 7    By O'Halloran - Page No. 57

 8    By Mr. Eymann - Page No. 60

 9    EXHIBITS MARKED:

10    Exhibit No. 2 - Marked at Page No. 19
          Photo of outside smoking area at VA Hospital
11

12                        *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 4 - 121

1    that wrote that note.

2    Q    And so Craig is the one that did the EKG?

3    A    Yes.

4    Q    When it says "Handed to provider for review," does

5    that mean that it was handed over to the doctor who had

6    --

7    A    Yes.

8    Q    -- previously seen --

9    A    Yes.

10   Q    -- the patient?

11   A    Yes.

12   Q    The next note appears to be a different person than

13   yourself.  Is that person -- pronouncing it Carina [sic]

14   DeLeon?

15   A    Charina.

16   Q    Thank you.

17   A    Yes.

18   Q    And she's a nurse?

19   A    Yes.

20   Q    Is she a registered nurse?

21   A    Yes.

22   Q    She reports "Patient in waiting room.  Quote, I am

23   waiting for the ambulance, unquote.  Explained to patient

24   importance of staying in bed with leg elevated.  Patient

25   refused.  Stated, 'I am sorry to give you a hard time but

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 4 - 122

```
 1   I do not want to.'".
 2              Did you have any contact with the patient at
 3   any time that he was refusing to stay in the bed or on
 4   the stretcher?
 5   A   No, I don't remember that.
 6   Q   The next note would that be a note that you made at
 7   apparently 5:40 p.m.
 8   A   Yes.
 9   Q   Now at that point in time he had been there --
10              Would it be correct that he's been there over
11   six hours at the VA Hospital?
12   A   Yes.  11:04, yes.
13   Q   Your answer to that was "yes"?
14   A   Yes.
15   Q   Can you tell me, is there a protocol or policy with
16   regard to how a patient such as himself, when he's on a
17   stretcher, would then be transported to get to the
18   ambulance?
19   A   If the patient's on the stretcher then the ambulance
20   stretcher comes, and the patient either stands and moves
21   over, or if they can't stand they are helped over to the
22   ambulance stretcher.
23   Q   I know you don't have any independent recollection of
24   Mr. Wright and his being there that day.  So your last
25   answer is typically how it occurs?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 4 - 123

1   A   "IV discontinued, catheter intact.  And report was

2   given to Karla."  Because I was then leaving shift.

3   Q   Catheter, is that for urine output?

4   A   No, that's the IV catheter in his vein.

5   Q   All right.

6   A   And we just indicate that it's intact, that it's not

7   torn or there's nothing missing.

8   Q   In looking over the records, do you have -- is there

9   any information that would indicate what the plan was at

10  this point in time for Mr. Wright?

11  A   No.

12  Q   Dr. McManus testified yesterday that his plan was for

13  him to be admitted.

14  A   Okay.

15  Q   If a doctor has a plan that the patient be admitted,

16  is that information conveyed to a nurse such as yourself?

17  A   At times.  Not always.

18  Q   Okay.  When there's a plan to be admitted, what

19  process then would the patient go through to complete

20  that plan?

21  A   If the physician has -- wants the patient admitted,

22  he then has to contact the hospitalist, who agrees to

23  take care of that patient in the hospital.  And then if

24  the hospitalist agrees for that admission, then the

25  patient is admitted.

509-624-6255                  SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 4 - 124

1   Q   So I understand then that a doctor can simply

2   recommend admission?

3   A   Yes.

4   Q   But it has to be approved by the hospitalist?

5   A   Yes.

6   Q   Typically if a doctor recommends admission, have you

7   seen that overruled by a hospitalist on occasions?

8   A   Yes.

9   Q   Okay.  How is it -- is that typical?

10  A   It can be, yes.

11  Q   I hate to ask you about percentages, but if a doctor

12  recommends admission, can you tell me on a percentage

13  basis how often it's overruled by a hospitalist?

14  A   Well, --

15          MR. O'HALLORAN:  Object to the form.

16  A   -- that would depend on --

17          MR. O'HALLORAN:  Calls for speculation.

18          MS. MITCHELL:  Join.

19          MR. VERSCHOOR:  Join also.

20  Q   (By Mr. Eymann)  They get to make their objections.

21  A   Okay.  It would just depend on the patient and their

22  symptoms and their presentation.  And everybody's

23  different, so --

24  Q   Well, do you think that happens half the time that a

25  doctor recommends admission and it gets --

EXHIBIT 4 - 125

1    Q    Does it depend upon the circumstances concerning that

2    individual, their condition at the time, as to whether to

3    make that decision or not?

4    A    Yes.

5    Q    It take it you're well acquainted with the area

6    sounding the VA Hospital, correct?

7    A    Yes.

8    Q    Is there a bus stop outside the ER approximately

9    about a hundred feet away?

10    A    Yes.

11    Q    There's also parking, correct?

12    A    Correct.

13    Q    Correct?

14    A    Correct.

15    Q    Have you ever been told that it's against hospital

16    policy to use a wheelchair to transport a patient from

17    the hospital to a vehicle or to the bus?

18    A    No.

19    Q    Is there a place just outside the ER where a private

20    vehicle can almost drive right up to the door to pick

21    someone up?

22    A    Yes.

23    Q    As a registered nurse, and as someone who's worked in

24    the ER for a number of years at the VA Hospital, is it

25    the nurse who makes the decision on getting a patient to

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com              Spokane, WA  99210

EXHIBIT 4 - 126

1   the bus or private vehicle, or is it something that the

2   doctor needs to order?

3   A   No, it doesn't need to be ordered.  It's the nurse's

4   discretion or the physician's discretion.

5   Q   The last note I know was not something that you

6   authored, and it's signed at 8:13 by Karla S. Linton.

7   She's an LPN, correct?

8   A   Correct.

9   Q   Okay.  It states -- what is DCD?  Is that

10  discontinued?

11  A   Discharged.  Discharged.

12  Q   Okay.  "Veteran discharged."

13          My first question is, once they come into the

14  ER, do they go through any process administratively to be

15  discharged, as indicated in this particular note?

16  A   No.

17  Q   When it says "Discharged," does that mean somebody

18  can say to them "Okay.  You can go"?

19  A   No, the physician writes out their note.  And they're

20  discharged by the physician, not just a nurse.

21  Q   Okay.

22  A   The doctor has to authorize the discharge.

23  Q   Can we call that an administrative type of process of

24  discharge?  I'm just -- I mean, can a patient just get up

25  and walk out?

EXHIBIT 4 - 127

1    put on a stretcher, taken over to Holy Family, came back,

2    apparently, on a stretcher.  I think the records indicate

3    that.

4    A    (Nods head).

5    Q    Is there any way of knowing where he would be after

6    he comes back if he's on a stretcher?  I take it he would

7    be taken out in the waiting room, but --

8    A    No.

9    Q    -- if you have any information in that regard, could

10   you share it?

11            (Pause to Review Document.)

12   A    So on page 28 at 18:45 -- at 18:45 he was on a

13   stretcher in the room 117.

14   Q    And that's the note of Charina DeLeon?

15   A    Well, that's my note.

16   Q    Okay.  Excuse me.

17   A    At 18:45 he was "returned to ER via

18   stretcher/ambulance to ER room 117."  And there was a

19   stretcher.

20   Q    And is that a room with a door?

21   A    Yes.

22   Q    Now, he'd been there, it looks like, getting there

23   before noon, discharged some time around eight o'clock or

24   after eight o'clock.

25            Obviously a typical person would have to go

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 4 - 128

```
 1                   I mean, in other words, are you ever asked by

 2    the hospitalist your opinion with regard to whether

 3    someone should be admitted or not?

 4    A    No.

 5    Q    Have you ever been asked your opinion in that regard

 6    with regard to any patient, whether --

 7    A    No.

 8    Q    -- there's a question of whether they should be

 9    admitted or not?

10    A    No.  We'll state our opinion sometimes but usually

11    aren't asked.

12    Q    Were you aware that Dr. McManus wanted him admitted

13    after he came back from Holy Family?

14    A    No.

15                   MR. O'HALLORAN:  Object to form.

16                   MS. MITCHELL:  Join.

17                   MR. O'HALLORAN:  Misstates his testimony.

18    A    No, I wasn't aware of that.

19    Q    (By Mr. Eymann)  Would it be fair to state that if he

20    had been admitted he wouldn't have had the opportunity to

21    fall in the parking lot?

22                   MR. O'HALLORAN:  Object to the form.

23                   MS. MITCHELL:  Join.

24                   MR. VERSCHOOR:  Lack of foundation.

25                   MR. O'HALLORAN:  Calls for speculation.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                     www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 4 - 129

```
 1                UNITED STATES DISTRICT COURT FOR THE

 2                  EASTERN DISTRICT OF WASHINGTON

 3   _____

 4   ERIC WRIGHT, INDIVIDUALLY AND IN
     HIS CAPACITY AS PERSONAL
 5   REPRESENTATIVE OF THE ESTATE OF
     STEVEN O. WRIGHT; and AMY SHARP,
 6   INDIVIDUALLY,

 7                         Plaintiffs,

 8      vs.                              No.  2:15-cv-00305-TOR

 9   THE UNITED STATES OF AMERICA,
     D.B.A. THE DEPARTMENT OF VETERANS
10   AFFAIRS; MEDFORD CASHION, M.D.,
     SHEA MCMANUS, M.D.; ESKRIDGE
11   ENTERPRISES, LLC; and DOES 1-5,
     Inclusive,
12
                         Defendants.
13   _____

14            DEPOSITION OF KARLA LINTON, LPN
     _____
15

16            BE IT REMEMBERED that on the 4th day of

17   October 2016, at the hour of 11:07 a.m., the deposition

18   of KARLA LINTON, LPN, was taken at the request of the

19   Plaintiffs, before Caryn E. Winters, RPR, CCR, CSR,

20   Washington CCR No. 2496, Idaho CSR No. 237, at 920 West

21   Riverside Avenue, Suite 304, Spokane, Washington,

22   pursuant to the Washington Rules of Civil Procedure.

23

24

25
```

EXHIBIT 5 - 130

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     FOR THE DEFENDANTS:
 7
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
 8   By:  Karin J. Mitchell
          Attorney at Law
 9   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
10
     UNITED STATES ATTORNEY'S OFFICE
11   By:  Rudy J. Verschoor
          Attorney at Law
12   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
13
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
14      SPILLANE
     By:  Scott M. O'Halloran
15        Attorney at Law
     1301 A Street, Suite 900
16   Tacoma, Washington 98402

17   ALSO PRESENT:

18   Sam McConas

19

20

21

22

23

24                     * * * * *
25
```

EXHIBIT 5 - 131

```
 1                    I N D E X

 2
       WITNESS:  KARLA LINTON, LPN
 3

 4     EXAMINATION:

 5     By Mr. Eymann - Page No. 4

 6     By O'Halloran - Page No. 38

 7     By Mr. Verschoor - Page No. 46

 8     By Mr. Eymann - Page No. 47

 9     EXHIBITS MARKED:

10     None.

11
                        *  *  *  *  *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 132

Page 7

```
 1    Q    Okay.  Typically where is your work located?

 2    A    Currently I'm in what's called clinical telehealth.

 3    Q    Is that anywhere near the ER?

 4    A    No.

 5    Q    Okay.  You were in the ER on August 2nd, 2014; is

 6    that correct?

 7    A    If that's the day we're talking about in question,

 8    yes.

 9    Q    Okay.  Had that been a location in the hospital that

10    you had been at for some time?

11    A    Yes.

12    Q    Okay.  Do you know approximately what year you

13    started working in the ER at the Spokane Veterans

14    Administration Hospital?

15    A    2008.

16    Q    So you'd been in that particular area of the hospital

17    for six years at that time, approximately?

18    A    Yes.

19    Q    At that time did you have a particular shift that you

20    worked?

21    A    I was on night shift.

22    Q    And had you been on night shift since 2008?

23    A    For the most part, yes.  I did occasionally rotate.

24    Q    What are the hours of night shift?

25    A    7:00 p.m. to 7:30 a.m.
```

EXHIBIT 5 - 133

Page 14

1    importance of using ice and elevating, and reminding him

2    that there was an ortho consult placed on his behalf for

3    August 4th.

4    Q   As you sit here today, do you have any -- do you have

5    a memory of talking with him that evening?

6    A   Yes.

7    Q   Okay.  Tell me what you remember about Mr. Wright.

8    A   I took his care from Jill Palmer when I came on duty.

9    And he was in room 117 in the urgent care emergency room.

10   We were awaiting results from an outside facility's

11   imaging.

12   Q   Which is Holy Family?

13   A   Correct.

14   Q   Okay.

15   A   Once we got those results back, if they were negative

16   the vet would be discharged.

17            I had told him when his ride arrived to let

18   me know and I would offer him a wheelchair out.  He

19   acknowledged that.

20            I went back to the nurse's station.  And I

21   don't recall how long it was.  I saw him up and walking

22   past the nurse's station.  Offered to get him a

23   wheelchair.  He said his friend had arrived to take him

24   home.  He refused the wheelchair.

25            I offered a second time.  He again refused,

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 134

1   and he ambulated out of the emergency department.

2           I made sure he understood his discharge

3   paperwork because he had it in his hand.

4           I don't recall if I'm the one that handed it

5   to him or if Dr. Cashion gave it to him.  I went over it

6   with him.

7           And he left using his own personal crutches,

8   taking his belongings, and ambulated out of the emergency

9   department area.

10  Q   When did you learn that he had passed away?

11  A   I don't recall.

12  Q   Well, was it the next day?

13  A   Probably a couple of days later, would be my guess.

14  But I honestly don't know the answer to that, an exact

15  date.

16  Q   Were you surprised that he had expired?

17  A   Yes.

18  Q   So it's your testimony that someone told you that Mr.

19  Wright had passed away in the past couple of days?

20  A   I'm unclear what you're asking me.  I'm sorry.

21  Q   Well, you just indicated that you learned you thought

22  within two days that he had passed away; is that correct?

23  A   Two days from the time he had left our emergency

24  department.

25  Q   Correct?

509-624-6255               SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 135

```
 1   A   No.

 2   Q   Prior to him leaving, did you have the opportunity to

 3   watch him ambulate with his crutches?

 4   A   Yes.

 5   Q   And you specifically remember that day?

 6   A   Yes.

 7   Q   Okay.  Tell me where he started his ambulation and

 8   where the last time is that you saw him.

 9   A   I was sitting at the nurses' station.  He had come

10   out of 117, and I saw him ambulate around the front of

11   the nurses' station and out into the lobby.

12   Q   Did he appear to be ambulating okay to you?

13   A   Yes.

14   Q   If he was ambulating okay, why did you offer to have

15   him get into a wheelchair to be taken out to his vehicle?

16   A   Because he had been in for a possible DVT and was

17   complaining of leg pain.

18   Q   Did you have the authority to tell him that "For your

19   own safety, it's necessary that I put you in a wheelchair

20   to get you to your vehicle"?

21   A   I suppose, yes, I have authority to say that.

22   Q   But you didn't do that, correct?

23   A   No.

24   Q   You did have concern about you --

25           You did have concern that he was a fall risk,
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 5 - 136

```
 1   A   I'm sorry, can you read the question again?

 2           (Record read back as requested.)

 3   A   Yes.

 4   Q   (By Mr. Eymann)  Who provided that information to

 5   you?

 6   A   I believe it was Elizabeth Whitley.  Elizabeth

 7   Granger.

 8   Q   And what were you told?

 9   A   That it was negative.  The ultrasound was negative

10   and he would be being discharged.

11   Q   After he left, were you aware that he had fallen in

12   the parking lot?

13   A   Not until after he was brought back in.

14   Q   When he was brought back in, were you assigned to him

15   as an LPN?

16   A   No.

17   Q   Did you see him after he was brought back in?

18   A   Yes.

19   Q   Can you describe what you saw?

20   A   He had an obvious bump on the head.  That's really

21   all I saw.  I saw him as I walked past a room.

22   Q   Do you know who was attending to him at that time?

23   A   I believe Dr. Cashion and Elizabeth Whitley were in

24   the room.

25   Q   Is Ms. Whitley still with the hospital?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com         Spokane, WA  99210

EXHIBIT 5 - 137

1   A    No.

2   Q    Do you know --

3   A    Maybe.  She might be part-time.  I'm not fully aware.

4   Q    Do you think she's still in Spokane?

5   A    No.

6   Q    Do you know where she is?

7   A    I believe she lives in Montana now.

8   Q    When you said you walked past the room, I presume

9   from that answer you did not go in and say something

10  like, "I told you I needed to take you in the wheelchair

11  out to the parking lot"?

12  A    Correct.  I did not say that.

13  Q    Did you see him being brought back into the hospital?

14  A    No.

15  Q    Were you aware that he was --

16           Were you aware at any time that evening that

17  he was discharged a second time?

18  A    Yes.

19  Q    Okay.  How do you know that?  From the records or

20  personal observation?

21  A    Personal observation.

22  Q    Tell me about your personal observation about him

23  being discharged a second time.

24  A    I was told by Miss Whitley -- and it may be Miss

25  Granger.  She was married and divorced, so I'm not sure

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com            Spokane, WA  99210

EXHIBIT 5 - 138

1    which name she was going by at the time.  Miss Granger

2    that Mr. Wright was being discharged to home.

3    Q    Anything more than that that she told you?

4    A    Not that I recall.

5    Q    You indicated it was obvious he had a bump on his

6    head.  When did you observe that?

7    A    Just as I walked past the room.

8    Q    Where was it on his head, if you can remember?

9    A    I don't recall, honestly.

10   Q    Did you ask where he had fallen or how he got the

11   bump on his head?

12   A    I'm sure I did, yes.

13   Q    Do you know who would have provided you with the

14   information in that regard as to where he fell?

15   A    More than likely, Elizabeth Whitley.

16   Q    Did she tell you anything more than that?  In other

17   words, did she talk about the condition of the bump on

18   his head or the scrape?

19   A    Not that I recall.

20            Can I take a quick break?

21   Q    Sure.  It's between questions, so you're allowed to

22   do that.

23            MR. VERSCHOOR:  That's fine.

24            THE WITNESS:  Just have a question for you,

25   actually.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

EXHIBIT 5 - 139

```
 1                    (Short Recess Taken.)

 2              MR. VERSCHOOR:  Miss Linton just has some

 3   additional information from a previous question you had

 4   asked.

 5   Q   (By Mr. Eymann)  As I indicated earlier -- you've

 6   taken a break here to meet with your counsel -- if

 7   something comes to mind from a question earlier, feel

 8   free to let me know about that.

 9              So go ahead and tell me what your additional

10   information is.

11   A   You had asked me a question regarding Miss Whitley

12   and what we had discussed with him -- with Mr. Wright

13   being discharged.

14              I believe at that time I had also asked her,

15   when she informed me that he was being discharged, if we

16   were going to do, or if we had done, a CAT scan, knowing

17   that he had been on blood thinners and had hit his head.

18   And she had at that time told me that, no, Dr. Cashion

19   had done a neuro exam and felt he was fine to go home.

20   Q   You were concerned about that?

21   A   Yes.

22   Q   Was she expressing -- discussing that with you?  Was

23   she expressing her concern about that?

24   A   Not that I recall, but I don't know what her feelings

25   were.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com       Spokane, WA  99210

EXHIBIT 5 - 140

 1   A    Yes.

 2   Q    Is the fact that he was on Warfarin, and the fact

 3   that he had fallen, and, as you said, had this bump on

 4   his head, did that concern you about whether he should

 5   have a CAT scan or not?

 6              MR. O'HALLORAN:   Object to the form.

 7   A    Yes.

 8   Q    (By Mr. Eymann)  I think you indicated earlier that

 9   you never saw him go outside to smoke, correct?

10   A    Correct.

11   Q    Who is the person that decides whether a patient is

12   going to be discharged or not?

13   A    The provider.

14   Q    And that would have been at this situation Dr.

15   Cashion?

16   A    Yes.

17   Q    For discharge instructions, is that something that is

18   standard, or do you get specific instructions from the

19   provider with regard to what you're to tell or speak with

20   a patient about?

21   A    The provider puts the instructions into the computer

22   for the discharge paperwork, and then either the doctor

23   or one of the nurses would give those to the patients and

24   go over them.

25   Q    We've talked about any conversations you had with Mr.

EXHIBIT 5 - 141

```
 1   disorder?

 2   A    The basics, yes.

 3   Q    And what are the basics?

 4   A    They can go -- they can be in a manic phase or in a

 5   depressed phase.

 6   Q    However, you were unaware of that prior diagnosis,

 7   correct?

 8   A    Correct.

 9   Q    So one of the conditions that arise out of a bipolar

10   disorder is that a person with that particular disorder

11   does not always make the correct decisions for their own

12   safety?

13              MR. VERSCHOOR:   Objection.   Foundation.

14              MR. O'HALLORAN:   Object to the form.

15   Foundation.

16              MS. MITCHELL:   Join.

17              MR. O'HALLORAN:   It's outside the scope of

18   her knowledge and expertise.

19   A    That's -- it's not something I am familiar and

20   comfortable with discussing.

21   Q    (By Mr. Eymann)  All right.   Fair enough.

22              Maybe I covered this before, but when he was

23   being discharged the first time, you were concerned about

24   his safety of getting to his vehicle, correct?

25   A    Correct.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com         Spokane, WA  99210

EXHIBIT 5 - 142

1  Q   And your concern about his safety was that he might

2  fall, correct?

3  A   That he had leg pain.

4  Q   And the leg pain could cause him to fall?

5  A   It could.  My concern was that he was in pain, and by

6  offering a wheelchair it would lessen his pain.

7  Q   In your LPN opinion, can leg pain make ambulation

8  more difficult?

9  A   Yes.

10  Q   His exit (indicating) is very timely.  I am through

11  with my questions, okay?  There may be questions from

12  counsel.

13             EXAMINATION

14  Q   (By Mr. O'Halloran)  Miss Linton, hi.  Scott

15  O'Halloran.  I have a few questions for you.  Is it okay

16  to proceed or did you want to take a break?

17  A   I'm okay.  Thank you.

18  Q   Okay.  Great.  When Mr. Wright returned to the

19  emergency room the second time that night after the fall,

20  did you notice whether his friend was with him?

21  A   Yes, his friend was with him.

22  Q   Okay.  And did his friend come into the ER with him?

23  A   Yes.

24  Q   Was his friend with him when they went back to the

25  room 118, which I believe is where he went?

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                 www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 143

1    A    To the best of my knowledge, yes, he was in there.

2    Q    Okay.  And then was his friend with him when Mr.

3    Wright left after being discharged that night?

4              MR. EYMANN:  Objection.  Lack of foundation.

5    Q    (By Mr. O'Halloran)  I'm just asking if you know?

6    A    I don't recall.

7    Q    Okay.  Did you see Mr. Wright being discharged that

8    night, or were you otherwise occupied?

9              MR. EYMANN:  You're saying the second time?

10   Q    (By Mr. O'Halloran)  Let me be clear here.

11             When Mr. Wright left after returning to the

12   ER the second time after the fall, he was discharged to

13   home.  Did you witness him leaving the ER that night?

14   A    I don't recall.

15   Q    Okay.  You did not perform any examination of Mr.

16   Wright when he returned to the ER after his fall; is that

17   correct?

18   A    Correct, yes.

19   Q    That examination was performed by nurse Whitley and

20   Dr. Cashion?

21   A    Yes.

22   Q    Were you a witness to any of that examination?

23   A    Just in passing.  Walking through the hallway, I saw

24   that -- that they were in there examining him.

25   Q    Okay.  So you witnessed them performing the exam?

509-624-6255                 SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                 www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 144

```
 1   A    Just briefly.

 2   Q    Okay.  Miss Whitley is a registered nurse?

 3   A    Yes.

 4   Q    Qualified to perform an examination and an assessment

 5   of a head injury, correct?

 6   A    Yes.

 7              MR. EYMANN:  Form.

 8   Q   (By Mr. O'Halloran)  In her note she indicates that

 9   it was  "A skin abrasion to the right forehead, no loss

10   of consciousness, minimal bleeding to the forehead."  She

11   describes it "Just a scrape to the head."

12              Do you have any reason to disagree with her

13   examination?

14              MR. EYMANN:  Form.  Lack of foundation.

15   A    No.

16   Q   (By Mr. O'Halloran)  Okay.  She also indicates that

17   there was no loss of consciousness and there was minimal

18   bleeding to the forehead.  Any reason to disagree with

19   that?

20              MR. EYMANN:  Same objection.

21   Q   (By Mr. O'Halloran)  I mean, based on what you

22   observed, do you have any reason to disagree with that?

23   A    No.

24   Q    Okay.  When a --

25              In general when a nurse feels like a
```

EXHIBIT 5 - 145

```
 1   physician is taking action or not taking action that

 2   might harm or be unsafe for a patient, what are the

 3   nurse's responsibilities?

 4   A   To go through chain of command.

 5   Q   Okay.  And when you say "Go through chain of

 6   command," what does that mean?

 7   A   I -- you would go to your next person in command.  So

 8   I would have gone to Libby and voiced any concerns.

 9   Q   Okay.  And did you do that?

10   A   Yes.

11   Q   Okay.  Who is Libby?

12   A   I'm sorry, Elizabeth Whitley.

13   Q   So was Elizabeth Whitley the charge nurse that night?

14   A   Yes.

15   Q   And once you talked to Elizabeth Whitley, if Miss

16   Whitley felt there was any concern about the discharge,

17   what would be her responsibility?

18              MR. EYMANN:  Objection.  Calls for

19   speculation.

20   Q   (By Mr. O'Halloran)  As far as chain of command goes,

21   what would be her responsibility, if you know?

22   A   To the provider, or we have a nursing supervisor as

23   well.

24   Q   Okay.  Do you know if anyone contacted the nursing

25   supervisor that night?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 146

Page 42

```
 1   A   I don't, no.

 2   Q   Okay.  When you raised the issue about a CT scan with

 3   nurse Whitley, did she indicate that she had any concern

 4   about the discharge?

 5   A   She did not.

 6   Q   Okay.  And she had been with Mr. Wright during the

 7   examination; is that correct?

 8   A   Yes.

 9   Q   Do you know how long Miss Whitley has worked in the

10   ER at the VA in Spokane?

11   A   I don't have an exact time, no.

12   Q   Was she working there at the time you started?

13   A   No.

14   Q   She came after?

15   A   Yes.

16   Q   Do you know where she'd worked prior to that?

17   A   I believe she was in float pool, but I don't know for

18   certain.

19   Q   Was she --

20           She was the charge nurse that night; is that

21   correct?

22   A   Yes.

23   Q   Okay.  Were you responsible in any way for the

24   discharge instructions the second time Mr. Wright left

25   that evening?
```

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564               www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 5 - 147

1    A    No.

2    Q    Was that Miss Whitley that would have discussed

3    discharge instructions with him?

4    A    Or Dr. Cashion.

5    Q    Okay.  And do you know whether it was Miss Whitley or

6    Dr. Cashion?

7    A    I do not know.

8    Q    When you talked to Miss Whitley about the CT scan,

9    did you -- had Mr. Wright already left or was he still in

10   the ER?

11   A    He was still present.

12   Q    Okay.  Are you qualified as an LPN to perform a neuro

13   exam?

14   A    Yes, in the state of Washington.  At the VA, no.

15   Q    Okay.  And why are you not qualified at the VA?

16   A    The VA goes by the most restrictive because you have

17   to have just a license somewhere in the United States to

18   work for the federal government.  So they choose the most

19   restrictive policies.

20   Q    And some states don't allow LPNs to perform a neuro

21   exam?

22   A    That is my assumption, yes.

23   Q    Okay.  Are you qualified to order a CT scan?

24   A    I can enter the order into the computer based on the

25   doctor's order, doctor's request.

EXHIBIT 5 - 148

```
 1   shift change?
 2            MR. EYMANN:  Form.
 3   A   Yes, I would expect that.
 4   Q   (By Mr. O'Halloran)  Okay.  And do you recall her
 5   telling you anything about him being admitted?
 6   A   I believe the patient was already back when I got
 7   report.
 8   Q   Okay.  But still during report you would have
 9   expected her to tell you that the plan was to -- for him
10   to be admitted, if that were the plan, correct?
11   A   Yes.
12   Q   Okay.  And do you recall who told you that?
13   A   I don't recall.
14   Q   You didn't document that that was the plan?
15   A   I did not.
16   Q   If that was the plan, is that something you would
17   typically document?
18   A   Not until either time of admittance or of discharge.
19   Q   Okay.  But did you document anywhere that that was
20   the plan, to admit the patient?
21   A   Not that I can recall, no.
22   Q   Okay.  And I think you testified earlier that you --
23   no one ever told you that was the plan; is that correct?
24   A   I believe that he was already back and we had results
25   back.  So we knew he was -- at that time when I got
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 5 - 149

1    report, that he was not being admitted.

2    Q   Okay.  At any time before that, did anyone tell you

3    that he was going to be admitted?

4            I guess you're saying that if the results

5    were positive that the plan might have changed?  Is that

6    what you're saying?

7    A   Correct.  If the results had come back that he did

8    have a DVT, they were going to admit him.  But because

9    they were negative, Dr. Cashion was going to send him

10   home.

11   Q   Okay.  Who told you that that was the plan?

12   A   I believe that was Jill.

13   Q   Okay.  That's all the questions I have.  Thanks.

14   A   Okay.

15           MS. MITCHELL:  I don't have questions.  Thank

16   you.

17           MR. VERSCHOOR:  I've got a couple really

18   quick.

19           EXAMINATION

20   Q   (By Mr. Verschoor)  Miss Linton, when Mr. Wright was

21   -- when you saw him as he was leaving the ER the first

22   time, and you had offered him a wheelchair, can you

23   recall what he said, why he knew he was leaving?

24   A   I don't recall what he said.

25   Q   Well, do you recall if he'd had a phone conversation

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                      www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 150

1    or something alerting him that his ride was here?

2    A   I believe that, yes, that he'd gotten a phone call

3    that his ride was waiting for him.

4    Q   And was that just -- or, very soon before he left the

5    ER --

6    A   Yes.

7    Q   -- on his own?  Okay.  That's all I've got.

8                  EXAMINATION

9    Q   (By Mr. Eymann)  Do I understand correctly that you

10   can do a basic neuro exam in a non-VA Hospital?

11   A   I have in the past, yes.

12   Q   And where would you have done that kind of exam?

13   A   I worked at Deaconess Medical Center, and we would do

14   neuro exams on patients as a basic assessment at the

15   beginning of our shift.  Or any nursing homes as well.

16   Q   Listening to your testimony, I kind of get the idea

17   that you thought that he should have had a CAT scan done

18   that evening after his fall in the parking lot.  Am I

19   correct in that?

20                  MR. O'HALLORAN:  Object to the form.

21   Foundation.

22   A   Yes.

23   Q   (By Mr. Eymann)  That's all I have.

24                  MS. MITCHELL:  No.

25                  MR. VERSCHOOR:  I think we're done.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 5 - 151

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 EASTERN DISTRICT OF WASHINGTON

 3    _____

 4    ERIC WRIGHT, INDIVIDUALLY AND IN
      HIS CAPACITY AS PERSONAL
 5    REPRESENTATIVE OF THE ESTATE OF
      STEVEN O. WRIGHT; and AMY SHARP,
 6    INDIVIDUALLY,

 7                         Plaintiffs,

 8         vs.                            No.  2:15-cv-00305-TOR

 9    THE UNITED STATES OF AMERICA,
      D.B.A. THE DEPARTMENT OF VETERANS
10    AFFAIRS; MEDFORD CASHION, M.D.,
      SHEA MCMANUS, M.D.; ESKRIDGE
11    ENTERPRISES, LLC; and DOES 1-5,
      Inclusive,
12
                         Defendants.
13    _____
                           VIDEOTAPED
14         DEPOSITION OF ELIZABETH WHITLEY FORD, R.N.

15    _____

16              BE IT REMEMBERED that on the 24th day of

17    October 2016, at the hour of 1:33 p.m., the videotaped

18    deposition of ELIZABETH WHITLEY FORD, R.N., was taken at

19    the request of the Plaintiffs, before Caryn E. Winters,

20    RPR, CCR, CSR, Washington CCR No. 2496, Idaho CSR No.

21    237, at 920 West Riverside Avenue, Suite 340, Spokane,

22    Washington, pursuant to the Washington Rules of Civil

23    Procedure.

24

25
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 152

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     LOWTHORP, RICHARDS, McMILLAN, MILLER & TEMPLEMAN
 7   By:  John H. Howard
          Attorney at Law
 8   300 East Esplanade Drive, Suite 850
     Oxnard, California 93036
 9
     FOR THE DEFENDANTS:
10
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
11   By:  Ketia Wick
          Attorney at Law
12   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
13
     UNITED STATES ATTORNEY'S OFFICE
14   By:  Joseph Derrig
          Attorney at Law
15   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
16
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
17     SPILLANE
     By:  Elizabeth McAmis
18        Attorney at Law
     1301 A Street, Suite 900
19   Tacoma, Washington 98402

20   ALSO PRESENT:

21   Robert Guier, videographer
     Sam McConas
22

23

24                        *  *  *  *  *
25
```

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564              www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 153

```
 1                    I N D E X

 2
     WITNESS:  ELIZABETH WHITLEY FORD, R.N.
 3

 4   EXAMINATION:

 5   By Mr. Howard - Page No. 5

 6   By Ms. McAmis  - Page No. 69

 7   By Mr. Eymann - Page No. 77

 8   By Ms. McAmis - Page No. 79

 9   By Mr. Eymann - Page No. 82

10   EXHIBITS MARKED:

11   None.

12                    * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 154

 1  A   I was an officer in the Air Force.

 2  Q   And for how long were you that?

 3  A   For five years.

 4  Q   And then after the Air Force, what was your first

 5  full-time employment?

 6  A   Let me think.

 7         Probably when I moved back here to Spokane in

 8  2012.  For full-time employment.

 9  Q   Right.

10  A   (Nods head).

11  Q   And for whom did you work full-time in 2012?

12  A   I began with the VA.

13  Q   Okay.  And what was your first position with the VA?

14  A   I was split between the emergency room and the ACU,

15  or step-down unit.

16  Q   And in 2014 what was your position with the VA?

17  A   ER primarily.  Yeah.

18  Q   On August 2nd of 2014, do you know what your shift

19  was?

20  A   Night shift.

21  Q   Okay.  And the night shift was from when to when?

22  A   Seven to seven, if I recall correctly.

23  Q   Have you reviewed any documents in preparation for

24  this deposition?

25  A   I looked at the notes.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com         Spokane, WA  99210

EXHIBIT 6 - 155

1   Q   The chart notes?

2   A   Yes.

3   Q   Mr. Wright's chart?

4   A   Yes.

5   Q   Did you look at the entire chart, as far as you know?

6   A   Not the entire chart.

7   Q   Okay.  We put before you a document that's been

8   marked already to these depositions as Exhibit 1.  And

9   I'll represent to you that these are all the chart notes

10  we've been provided with on our side relating to Mr.

11  Wright, and it is my intent to go through these notes

12  with you, the notes that pertain to you somewhat.

13          But can you take a look at the first couple

14  of pages and tell me if that -- if those are the

15  documents or some of the documents that you reviewed in

16  preparation for the deposition?

17          (Pause to Review Document.)

18  A   Yes, I reviewed my notes and the note for that visit.

19  My shift.

20  Q   On August 2nd of 2014, were you the charge nurse that

21  night?

22  A   Yes.

23  Q   And what's a charge nurse?

24  A   Charge nurse is the nurse who's in charge of the flow

25  and care in the ER.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 156

Page 10

1   Q   Do you know how many nurses were working the floor in

2   the ER between 7:00 p.m. and 7:00 a.m.?

3   A   Karla and I are the only two that were scheduled for

4   that shift.

5   Q   And what's Karla's last name?

6   A   Linton.

7   Q   Have you discussed the Wright matter with Ms. Linton

8   in the last six months or so?

9   A   I told her I was having a deposition and asked her

10  how long hers was, stuff like that.

11  Q   Where do you work now?

12  A   I work at St. Peter's Hospital in Helena.

13  Q   I'm sorry, you told me that.

14  A   Yes.

15  Q   When did you start working there?

16  A   I moved there in May.

17  Q   When did you stop working for the VA here in Spokane?

18  A   I'm still an intermittent employee at the VA, but I

19  don't have any shifts.  I think I last worked in July in

20  the ER or --

21  Q   Filling in for people on vacation, things like that?

22  A   Yes.

23  Q   Okay.

24  A   But I don't really have any shifts because it's hard

25  to come back.

EXHIBIT 6 - 157

1    Q    What do you recall about his physique?

2    A    I don't really remember.

3    Q    Okay.  Can you --

4              Do you remember how old he was, or how old he

5    appeared to be?

6    A    I don't really remember.

7    Q    Do you recall how you first came into contact with

8    him on the night of August 2nd of 2014?

9    A    When he was brought back in from the parking lot.

10    Q    You're aware, I'm sure, that he did treat at the VA

11    earlier in the day for a knee-leg-related problem or

12    problems?

13    A    Yes.

14    Q    You're aware of that?

15    A    (Nods head).

16    Q    "Yes"?

17    A    Yes.

18    Q    Did you --

19              Were you involved at all in that care and

20    treatment?

21    A    I don't recall being involved in that care and

22    treatment.

23    Q    Okay.  So do you know how Mr. Wright came to be to

24    re-present himself in the emergency room the evening of

25    August 2nd, 2014?  In other words, how did he get in

EXHIBIT 6 - 158

```
 1   there?

 2   A   Can you say that again?

 3   Q   Yeah.  I didn't say that very well.

 4            Do you know how Mr. Wright came to be in the

 5   emergency room on August -- the night or the evening of

 6   August 2nd, 2014?

 7            In other words, did somebody escort him in

 8   the place?  Did he just walk in?

 9   A   When I began care for him?

10   Q   Yes, ma'am.

11   A   He was brought in from the parking lot in a

12   wheelchair.

13   Q   Did you see that happen?  Did you see somebody --

14   A   I don't recall seeing it.

15   Q   Do you know --

16   A   I recall seeing him in the room.

17   Q   Do you remember what room that was?

18   A   In my memory it was 118.

19   Q   I think the records will back you up on that.

20   A   Does it?

21   Q   Yeah, you're right.  I think you're right about that.

22            Is that the first time you saw Mr. Wright,

23   when he was in that room?  I'm talking about the evening

24   of August 2nd, 2014?

25   A   I believe so.  I don't recall.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                       www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 159

Page 24

```
 1   Q    So, in other words, he wasn't taken from 118 to be
 2   triaged somewhere else and then taken back?
 3   A    No.
 4   Q    You triaged him in 118, correct?
 5   A    Yes.
 6   Q    And can we tell from the chart here what time you
 7   began to triage Mr. Wright?
 8   A    20:50 from this note.  That was the time I made my
 9   entry at.
10   Q    Okay.  Why is the entry date different than the date
11   of note?  I don't mean -- I don't care about the date.
12   I'm looking at the times.
13              For the date of note time you have 20:50.
14   For the entry time you have 23:07.
15              Does that mean that you entered your
16   information into the computer at 23:07, but you related
17   back that the time of first seeing the patient was 20:50?
18   Is that what this means?
19   A    That's what this means.
20   Q    Got it.  Thank you.  We go down to the "Chief
21   Complaint" on page one.  Still on page one.
22              Did you draft the "Chief Complaint" or is
23   that information that came from another source?
24              MR. DERRIG:  I'm going to object to the form.
25   You can go ahead and answer, though.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210


EXHIBIT 6 - 160

1    Q    (By Mr. Howard)  Okay.  Is it your best recollection

2    you began to triage him within a few minutes of Matt

3    dropping him off and leaving him with you?

4    A    Yes.

5    Q    Okay.  So within a few minutes of Matt dropping off

6    Mr. Wright, you ascertained that Mr. Wright had

7    lacerations, skin abrasions, and a bump to the right

8    forehead; is that correct?

9    A    Yep.

10   Q    And did you determine the lacerations, abrasions, and

11   bump based upon what you observed?

12   A    Yes.

13   Q    You indicate --

14          And I don't want you to be embarrassed by

15   this.  It's not -- this isn't intended to be tricky.  But

16   I'll represent to you as we get deeper into this that Dr.

17   Cashion saw the same bump.  He referred to the left side

18   of the forehead.  Your note says right side of the

19   forehead.

20          Do you have a recollection of what side of

21   the forehead that bump was?

22   A    No.

23   Q    Okay.  Can you quantify for us what that bump looked

24   like to you when you first observed it?

25   A    No.

EXHIBIT 6 - 161

```
1   Q   Mr. Wright apparently informed you that he was

2   walking out to the POV to obtain a ride home.  Did he

3   tell you that?

4           MR. DERRIG:  I'm going to object to the form.

5   You can go ahead and answer.

6   A   He was walking out to his -- to -- with his ride home

7   to go home, to private vehicle to go home.

8   Q   (By Mr. Howard)  So how do you know he was walking

9   out with somebody?  I think that's what you --

10          Maybe I misunderstood.  Was it your

11  impression that when Mr. Wright walked out of the

12  hospital before he fell, and then came back and you

13  triaged him, but when he walked out of the hospital

14  earlier in the day, that he was walking out of the

15  hospital with somebody?

16  A   Yes.

17  Q   Do you see that in the report somewhere?  In the

18  chart, I mean?

19  A   It's not in my note.

20  Q   But you do have a recollection of that?

21  A   I do.

22  Q   Was that the same somebody that you were referring to

23  earlier?  That male who you -- you don't recall his name,

24  but you recall a male?

25  A   I don't recall.
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 162

```
 1   A   Yes.

 2   Q   Did you do any sort of neurological or test on him or

 3   any test to determine his level of orientation?

 4   A   Yes.

 5   Q   What did you do?

 6   A   I talked to him.

 7   Q   Did you ask him person, place, time?

 8   A   Let me review my note.

 9           I charted on page three "Alert and oriented

10   times three."  So that's oriented to person, place and

11   time.

12   Q   Was that typically what you do --

13           I've seen oriented times four, oriented times

14   five.  Are you typically an oriented times three type, or

15   do you usually ask more questions than person, place and

16   time?

17   A   It varies on the situation.

18   Q   And what do you mean by that?  In other words, --

19   A   Each patient is different.

20   Q   -- what determines if you're going to ask three

21   questions versus four questions or five questions?

22   A   Sometimes if I think a patient is making up an answer

23   I'll ask another one to just test them further.

24   Q   Can you quantify for us what percentage of the time

25   you go with three versus four versus five or some other
```

EXHIBIT 6 - 163

1  patient told you?

2  A   I don't remember.

3  Q   Okay.  And then "Requesting to go home now."  Do you

4  see that?

5  A   Yes.

6  Q   Now, this is something he was requesting within a few

7  minutes of him being presented into the ER, correct?

8  A   Yes.

9           MR. DERRIG:  Object to the form.  But go

10  ahead.

11  Q   (By Mr. Howard)  Just so I'm clear, this whole note

12  under "Chief Complaint," before we get to the vitals, all

13  of that was done within a few minutes of you taking on

14  the care of Mr. Wright, true?

15  A   This information was obtained when I first got --

16  took over care of Mr. Wright.

17  Q   Including "Requesting to go home now," correct?

18  A   Yes.

19  Q   Okay.  Do you recall Mr. Wright requesting to go home

20  now?

21  A   If I wrote it in my note, the patient requested to go

22  home now.

23  Q   Do you have an understanding as to why Mr. Wright

24  would have allowed himself to be presented to the

25  emergency room if he wanted to leave immediately?

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 164

```
 1              MR. DERRIG:  I'm going to object to the form.
 2   You can answer.
 3   A   Can you please say that again?
 4   Q   (By Mr. Howard)  Sure.  If this note was written
 5   right after Mr. Wright got into the emergency room, and
 6   he's requesting to leave, do you recall -- or, did you
 7   have an understanding as to why he was there in the first
 8   place if he wanted to leave immediately?
 9   A   I don't recall.
10   Q   The vitals, you took these vitals, I assume?
11   A   Yes.
12   Q   Okay.  Did you do the Outpatient Medication Summary?
13   A   These are medications that are listed in his
14   medication summary.
15   Q   Already in the system?
16   A   Yes.
17   Q   You didn't have to input it?
18   A   We do not reinput them.
19   Q   Right.  That makes sense.
20   A   We just check them.
21   Q   Got it.  Let me take you to page three.
22   A   (Complied).
23   Q   It says "ESI Level 4."  Do you see that?
24   A   Yes.
25   Q   What does that mean?
```

EXHIBIT 6 - 165

1   A   It's a triage level that determines how much -- how

2   many resources the patient may require during their stay

3   or how quickly they need to be seen by a provider.

4   Q   With respect to Mr. Wright, why was Mr. Wright

5   determined to be at a level 4?

6   A   In looking at his vital signs, they were stable.  He

7   was alert and oriented with the lacerations.  He wasn't

8   complaining of pain, and he had already previously been

9   treated and had lab work done.

10  Q   When you did interview Mr. Wright initially, did you

11  ask Mr. Wright any questions about how he felt

12  immediately after he fell?

13  A   I don't recall that.

14  Q   Did you ask Mr. Wright any questions about his mental

15  status immediately after he fell, as opposed to what it

16  was when he was presented into the emergency room?

17          MR. DERRIG:  I'm going to object to the form.

18  A   According to my triage note, I wrote "No LOC."

19  Q   (By Mr. Howard)  What is LOC?

20  A   Loss of consciousness.

21  Q   So you did ask him whether or not he completely lost

22  consciousness, correct?

23  A   As far as I can remember, according to my note, I

24  asked that of someone.

25  Q   You asked what?

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 166

Page 36

1   A   I asked that of someone.

2   Q   Whether they lost consciousness or not, correct?

3   A   (Nods head).  Yes.

4   Q   And loss of consciousness means black out, a period

5   of time where he's no longer --

6   A   Yes.

7   Q   -- aware of where he is, correct?

8   A   Yes.  Or it could mean "Do you remember falling?"

9   "Do you remember everything about what happened?"  "When

10  this happened?"

11  Q   Did you ask Mr. Wright if he remembered everything

12  about what happened?

13  A   I don't recall specifically what I asked Mr. Wright.

14  Q   Okay.  Did you ask Mr. Wright if he was dazed for any

15  periods of time after he fell and hit his head?

16  A   I don't recall.

17  Q   Is that a question you typically do ask?

18  A   When I ask a patient who's fallen a question about

19  level of consciousness, I ask them if they remember,

20  their vision, do they remember waking up, do they

21  remember being on the ground, a variety of questions

22  depending on the situation.

23  Q   Blurred vision, being on the ground?

24  A   Falling.

25  Q   The act of falling itself, correct?

EXHIBIT 6 - 167

 1   notified."  Do you see that?

 2   A   Yes.

 3   Q   Who wrote that?

 4   A   It's a box you click.

 5   Q   So some of that's already in there?

 6   A   Yes.

 7   Q   Is "Outpatient to be seen immediately" a box that you

 8   check or you click on?

 9   A   Yes.

10   Q   Okay.  But you were the charge nurse, correct?

11   A   Yes.

12   Q   So when it says "Charge nurse notified," you're just

13   informing the record that you, the charge nurse, was

14   notified of --

15   A   Yes.

16   Q   -- or are aware of this guy, or this patient,

17   correct?  That's all that means?

18   A   If someone else were to do it, yes.

19   Q   When it says "Outpatient to be seen immediately,"

20   that means by a physician; is that right?

21   A   Yes.

22   Q   Do you know if a physician did see this patient

23   immediately or shortly after you completed this note?

24   A   I don't recall specifically, the specific time frame.

25   Q   If we go down about halfway down the page, it says

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                       www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 168

1    "Dr. Cashion at bedside to assess patient."  Do you see

2    that?

3    A    Yes.

4    Q    Do we have any way in looking at these records to

5    determine when in time that happened?

6    A    No.

7    Q    Do you have a recollection of when in time Dr.

8    Cashion presented himself to room 118 to assess the

9    patient?

10   A    I don't recall specifically.

11   Q    Again, specifically, can you give us an estimate as

12   to whether it was within 10 minutes of you beginning your

13   triage?  A half an hour?  An hour?

14   A    I really can't because his note is the same as mine.

15   So that would be fairly quick.

16   Q    And we'll get to that in a second.  Again, the timing

17   on these --

18           Candidly, I'm sure this is more convenient

19   for you.  I like the old notes better, because they used

20   to put the times down, among other things.

21           MR. DERRIG:  I need to take a break.  I mean,

22   in a few minutes.  But, just, we've been going about an

23   hour.

24           MR. HOWARD:  We can take a break.

25           MR. DERRIG:  Is that okay with everybody?

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                          www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 169

1    Q    It's just a carryover from the original triage?

2    A    It's my assessment.

3    Q    Okay.

4    A    You chart it in this area again.

5    Q    It says "Extremities within normal limit.  Moves

6    against gravity, pulses, grip, pedal push all within

7    normal limits."  Do you see that?

8    A    Yes.

9    Q    Who determines that?

10   A    I did.

11   Q    How did you determine that with respect to Mr.

12   Wright?

13   A    I don't recall exactly what I did.

14   Q    Okay.  At the bottom of this --

15         And "this" again, still page four.  It says

16   signed by Nurse Whitley at 23:18.  Do you see that?

17   A    Yes.

18   Q    Again, is 23:18 when you inputted this information

19   into the computer?

20   A    That is when I signed my note.

21   Q    Is there a difference between when you input the data

22   and when you sign it?

23   A    Sometimes you can input the data and keep adding and

24   forget to sign your note until later.

25   Q    Do you know with respect to Mr. Wright if there was a

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 170

1   Q   After he fell and hit his head?

2           MR. DERRIG:  I'm going to object to the form.

3   You can go ahead and answer.

4   A   I don't recall specifically.

5   Q   (By Mr. Howard)  Do you recall the issue with Mr.

6   Wright having a CAT scan or not the evening of August

7   2nd, 2014?  Do you recall that issue ever being discussed

8   in your presence?

9   A   I don't recall.

10  Q   Do you recall if you made mention of whether he

11  should or shouldn't have a CAT scan on August 2nd, 2014?

12  A   I do not recall.

13  Q   As you sit here now, do you recall if you had an

14  opinion as to whether or not Mr. Wright should have a CAT

15  scan on August 2nd of 2014?

16  A   Can you clarify that question?

17  Q   Yeah.  Do you recall --

18          I'm asking you to think back to the evening

19  of 2014, and I'm asking you if you recall believing or

20  having an opinion that Mr. Wright should have a CAT scan

21  that night?

22  A   Yes.

23  Q   What was your opinion?

24  A   He should.

25  Q   Did you share that opinion with Dr. Cashion?

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 171

```
 1    A    I don't recall the conversation.

 2    Q    Do you consider your job as a nurse to be a patient

 3    advocate?

 4    A    Yes.

 5    Q    My impression sitting here today with you is you --

 6    strike that.  You take that responsibility seriously,

 7    being a patient advocate?

 8    A    Yes.

 9    Q    If you had an opinion on August 2nd of 2014 that Mr.

10    Wright should have a CAT scan, and if it came to your

11    attention that a CAT scan was not being ordered for Mr.

12    Wright that night, would you have advocated for Mr.

13    Wright?

14              In other words, would you have gone to Dr.

15    Cashion or the hospitalist or any -- or somebody to

16    advocate for that CAT scan?

17              MR. DERRIG:  Objection to form.

18              MS. MCAMIS:  Join.

19              MR. DERRIG:  You can go ahead and answer.

20    A    I would discuss it with the physician.

21    Q    (By Mr. Howard)  And this case it would have been Dr.

22    Cashion?

23    A    Yes.

24    Q    Is it your testimony, though, right now you don't

25    recall if you did that or not?
```

EXHIBIT 6 - 172

1    A    I don't remember a specific conversation.

2    Q    Do you have a general recollection, however, that

3    some time that evening before Mr. Wright left the

4    hospital you did advise Dr. Cashion in your opinion this

5    patient should have a CAT scan?

6              MS. MCAMIS:  Objection.

7              MR. DERRIG:  Objection to form.

8              MS. MCAMIS:  Join.

9    A    My recollection, to the best of my memory, I remember

10   discussing injuries and asking about possible further

11   testing, but not advising a physician.

12   Q    (By Mr. Howard)  When you say "discussing," this

13   would have been a discussion between yourself and Dr.

14   Cashion?

15   A    Yes.

16   Q    Okay.  Do you recall what Dr. Cashion's response was

17   during that discussion you had with him about Mr. Wright

18   having a CAT scan?

19   A    I don't --

20             MR. DERRIG:  I'm going to object to the form.

21   You can go ahead and answer.

22   A    I don't recall.

23   Q    (By Mr. Howard)  Why did you believe Mr. Wright

24   should have a CAT scan that night?

25             MS. MCAMIS:  Object to the form.  Lack of

EXHIBIT 6 - 173

1  foundation.

2          MR. DERRIG:  Yeah, I'm going to object as

3  well.  Go ahead.

4  Q   (By Mr. Howard)  That's what we do.  Now she's

5  getting in too.

6  A   He fell, hit his head, and he's on Coumadin.

7  Q   Were you aware that night that in addition to being

8  on the Warfarin he was taking aspirin?

9  A   Let me review his --

10          Well, it's on his med list, baby aspirin.

11  Q   So you would have been aware of it that night,

12  correct?

13  A   Reviewing his med list, yes.

14  Q   Were you aware that night that he also subcutaneously

15  was given an injection of Enoxaparin?

16  A   I don't recall that.

17  Q   Are you aware that Mr. Wright did not have a CAT scan

18  that night?

19  A   Yes.

20  Q   Do you know why Mr. Wright did not have a CAT scan

21  that night?

22  A   I don't recall.

23  Q   Do you have an understanding as to why Mr. Wright did

24  not have a CAT scan that night?

25  A   He wanted to go home, and the physician assessed him

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 6 - 174

```
1   and went over all the previous lab work and came to the
2   conclusion that he could go home.
3   Q   Did you read Dr. Cashion's deposition?
4   A   No.
5   Q   Do you -- at the time -- well, strike that.
6           Do you know if Mr. Wright had been in the
7   emergency room for more than a couple of hours when Dr.
8   Cashion released Mr. Wright that night?
9   A   Which visit are you talking about?
10  Q   That night, after he hit his head.
11  A   He was only in the -- according to these times, in
12  the ER after he hit his head a brief time period.
13  Q   Is that your recollection as you sit here now, he was
14  only in there a brief period?
15  A   Looking at -- I don't recall the exact amount of time
16  he was in the ER after hitting his head.
17  Q   Do you remember being so busy the night Mr. Wright
18  was there that you had to delay inputting into the
19  computer the information that's now in the chart?
20          MR. DERRIG:  I'm going to object to the form.
21  A   I don't recall specifically.
22  Q   (By Mr. Howard)  Do you know if it was Dr. Cashion's
23  suggestion that Mr. Wright go home or that it was at Mr.
24  Wright's request that he go home that night?
25  A   Mr. Wright requested but I don't know the entire
```

509-624-6255
800-759-1564          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
                      www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 175

1    conversation.

2    Q   Do you know if later after Mr. Wright presented

3    himself into the emergency room with Matt assisting him,

4    do you know if later that evening Dr. Cashion made a

5    determination that Mr. Wright should go home and advised

6    Mr. Wright to go home?  Do you know if that occurred?

7                MR. DERRIG:  Object.

8                MS. MCAMIS:  Object to the form.

9    A   I don't know.

10   Q   (By Mr. Howard)  And, again, you have no recollection

11   as to what Dr. Cashion's response was to you when you

12   discussed the issue of Mr. Wright having the CAT scan; is

13   that right?

14   A   I --

15                MR. DERRIG:  Objection to the form.  I'll put

16   my hand up like this (indicating).

17                THE WITNESS:  I'm so sorry.

18   A   I don't recall.

19   Q   (By Mr. Howard)  Let me take you to page 11, I think.

20   It's, unfortunately, on my copy it's obliterated

21   somewhat.

22                Page 11 has some data on it.  This is data

23   that you would have inputted?

24   A   This looks like it's an extension of Dr. Cashion's

25   note.

EXHIBIT 6 - 176

Page 62

```
 1   attempting to triage Mr. Wright?

 2              MR. DERRIG:  I object to the form.

 3   A   I don't recall.

 4   Q   (By Mr. Howard)  Okay.  I asked you earlier if you

 5   recall discussing Mr. Wright's care with Nurse Linton.

 6   And I think you told us you really don't recall

 7   discussing Mr. Wright's care on August 2nd of 2014; is

 8   that true?

 9   A   I don't recall.

10   Q   Do you recall if Nurse Linton or Dr. McManus or

11   anyone informed you that they thought Mr. Wright should

12   be retained overnight for observation on August 2nd of

13   2014?

14   A   I do not recall that.

15   Q   Did you have any -- an opinion as to whether or not

16   Mr. Wright should be retained overnight for observation

17   on August 2nd of 2014?

18              MS. MCAMIS:  Object to the form.  Lack of

19   foundation.

20              MR. DERRIG:  I'll join.  You can go ahead and

21   answer.

22   A   My opinion?

23   Q   (By Mr. Howard)  Yes, ma'am.

24   A   I think he should have been just observed overnight.

25   Q   And I want to make sure I get the timing right.  I
```

EXHIBIT 6 - 177

1    understand in retrospect, everybody agrees on that, but

2    on August 2nd of 2014, was it your opinion that Mr.

3    Wright should be retained overnight for observation?

4                   MR. DERRIG:  Objection to the form.

5                   MS. MCAMIS:  Join.

6                   MR. DERRIG:  You can go ahead and answer.

7    A    My opinion, he really wanted to go home, in my --

8    from what I charted.  But my opinion was that he should

9    be watched.

10   Q    (By Mr. Howard)  Do you recall whether or not you

11   advised Mr. Wright to stay overnight and --

12                   In other words, to inform him that going home

13   was not a good idea?

14                   MR. DERRIG:  Object to the form.  Go ahead.

15   A    I do recall going over the risks of head bleed --

16   bleeding of the head.

17   Q    (By Mr. Howard)  Do you recall going over the care --

18   the care sheet with Mr. Wright along the -- you know, in

19   that context?

20   A    I don't recall that.

21   Q    Do you recall informing Mr. Wright that you felt he

22   should stay overnight at the hospital?

23   A    I don't recall that specifically.

24   Q    Do you recall telling Dr. Cashion that you felt that

25   Mr. Wright should be retained overnight for observation?

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                         www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 6 - 178

1    either stay overnight or that you thought he should get a

2    head CT?

3    A    It's not charted.

4    Q    Okay.  And you indicated that Mr. Wright expressed to

5    you that he wanted to go home; is that correct?

6    A    That's what I charted.

7    Q    Okay.  And even if a health care provider had said to

8    Mr. Wright "I think you should stay and get a CT" or "I

9    think you should stay overnight," there's nothing that

10   you could have done that would have made the patient stay

11   --

12              MR. EYMANN:  Form.

13   Q   (By Ms. McAmis)  -- or get a head CT?

14              MR. EYMANN:  Sorry.  Form.

15   A    You can't force a patient to get any test or stay if

16   they want to leave.

17              Can you repeat the question again?

18   Q   (By Ms. McAmis)  Maybe I can.

19              MS. MCAMIS:  Could you read it back?  And

20   then I'll see if I need to -- I can always ask it better.

21              (Record read back as requested.)

22              MR. EYMANN:  Same objection.

23   Q   (By Ms. McAmis)  Do you need to change your answer at

24   all?

25   A    There's nothing I could have done that would have

EXHIBIT 6 - 179

1    made the patient get that.

2    Q    Okay.  So it would be up to the patient whether or

3    not they wanted to stay either for observation or to stay

4    and get a head CT, if that recommendation had been made

5    to them?

6    A    The patient has the right to choose what kind of care

7    they want, yes.

8    Q    And you were aware that Dr. Cashion had seen the

9    patient earlier in the evening; is that correct?

10    A    I don't recall.

11    Q    Okay.  But Dr. Cashion did examine the patient, and

12    you indicate that he reviewed the labs and went over

13    them, correct?

14    A    I'd have to review the notes.  I charted that he was

15    at bedside to assess the patient.  And in his notes --

16              Let me review.  I think he -- he reviewed --

17              He has his medications, his problems, and he

18    has his INR on page 12 listed.

19    Q    Okay.  At the time that you provided care to Mr.

20    Wright, did you know what his INR had been earlier in the

21    day?

22    A    I don't recall.

23    Q    And the testimony you gave earlier about thinking

24    that the patient should either get a head CT and/or stay

25    overnight, is that based entirely on the fact that he was

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com            Spokane, WA  99210

EXHIBIT 6 - 180

1              UNITED STATES DISTRICT COURT FOR THE

2                 EASTERN DISTRICT OF WASHINGTON

3    _____

4    ERIC WRIGHT, INDIVIDUALLY AND IN
     HIS CAPACITY AS PERSONAL
5    REPRESENTATIVE OF THE ESTATE OF
     STEVEN O. WRIGHT; and AMY SHARP,
6    INDIVIDUALLY,

7                        Plaintiffs,

8       vs.                          No.  2:15-cv-00305-TOR

9    THE UNITED STATES OF AMERICA,
     D.B.A. THE DEPARTMENT OF VETERANS
10   AFFAIRS; MEDFORD CASHION, M.D.,
     SHEA MCMANUS, M.D.; ESKRIDGE
11   ENTERPRISES, LLC; and DOES 1-5,
     Inclusive,

12
                         Defendants.
13   _____

14             DEPOSITION OF MATTHEW HAUGEN, R.N.
     _____

15

16             BE IT REMEMBERED that on the 24th day of

17   October 2016, at the hour of 10:12 a.m., the deposition

18   of MATTHEW HAUGEN, R.N., was taken at the request of the

19   Plaintiffs, before Caryn E. Winters, RPR, CCR, CSR,

20   Washington CCR No. 2496, Idaho CSR No. 237, at 920 West

21   Riverside Avenue, Suite 304, Spokane, Washington,

22   pursuant to the Washington Rules of Civil Procedure.

23

24

25

EXHIBIT 7 - 181

Page 2

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     FOR THE DEFENDANTS:
 7
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
 8   By:  Ketia Wick
          Attorney at Law
 9   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
10
     UNITED STATES ATTORNEY'S OFFICE
11   By:  Joseph Derrig
          Attorney at Law
12   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
13
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
14      SPILLANE
     By:  Elizabeth McAmis     Attorney at Law
15   1301 A Street, Suite 900
     Tacoma, Washington 98402
16
     ALSO PRESENT:
17
     Sam McConas
18

19

20

21

22

23

24                    *  *  *  *  *

25
```

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564               www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 7 - 182

```
 1                    I N D E X

 2
     WITNESS:  MATTHEW HAUGEN, R.N.
 3

 4   EXAMINATION:

 5   By Mr. Eymann - Page No. 4

 6   By Mr. Howard - Page No. 27

 7   By Ms. McAmis - Page No. 39

 8
     EXHIBITS MARKED:
 9
     Exhibit Number 4 - Marked at Page No. 4
10        Photograph of entrance to VA Medical Center

11   Exhibit Number 5 - Marked at Page No. 4
          Google aerial view of VA parking lot
12
     Exhibit Number 6 - Marked at Page No. 4
13        Photograph of wheelchair rack

14   Exhibit Number 7 - Marked at Page No. 4
          Photograph of wheelchair rack
15
                         * * * * *
16

17

18

19

20

21

22

23

24

25
```

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564          www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 7 - 183

1   quite three now.

2   Q   Okay.  So on August 2nd, 2014, you would have been a

3   nurse in the ER at that time?

4   A   Correct.

5   Q   If you know, when did your shift begin on August 2nd,

6   2014, when Mr. Wright -- when you were involved with Mr.

7   Wright?  As I understand --

8   A   Yes, 7:00 in the morning.

9   Q   Until?

10   A   7:00 at night.

11   Q   Okay.  7:30?

12   A   Technically correct.  Technically 7:30 p.m. is when

13   my shift is over.

14   Q   At that time how many hours were you working per

15   week.

16           MR. DERRIG:  Object to the form.

17   Q   (By Mr. Eymann)  If you know.

18           MR. DERRIG:  What time?

19           MR. EYMANN:  At 20:14.

20   A   I'm sorry, the question again?

21   Q   (By Mr. Eymann)  How many hours were you working per

22   week in --

23   A   Oh, we worked --

24   Q   -- August of 2014?

25   A   -- 40 hours a week.

EXHIBIT 7 - 184

1    Q    Another little -- try to let me ask my question

2    before you start answering.

3    A    Sure.

4    Q    And I'll let you answer before I start asking another

5    question.  Okay?

6    A    Sure.

7    Q    All right.  Were you able --

8              Prior to today, were you able to speak with

9    anyone from the U.S. Attorney's office about why you were

10    being deposed or what you might be asked?

11    A    I spoke to this gentleman, Joe, this morning

12    (indicating).

13    Q    No one else?

14    A    No.

15    Q    We were provided some information earlier through

16    supplemental discovery that you were involved with Mr.

17    Wright insofar as taking a wheelchair out to go get him,

18    is that correct, when he was in the parking lot and had

19    fallen?

20    A    Right.  I can't --

21              MR. DERRIG:  Objection to the form.

22    Q    (By Mr. Eymann)  Go ahead.

23    A    Yeah, I can't remember if I took one out or there was

24    a wheelchair out there.

25    Q    Okay.  Prior to today, did you have any conversation

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                      www.spokanereporting service.com           Spokane, WA  99210

EXHIBIT 7 - 185

1   with any attorney, including the U.S. Attorney's office,

2   with regard to both -- that fact, --

3   A    No.

4   Q    -- either by phone call or in person?

5   A    No.

6   Q    Did you review any materials in preparation for this

7   deposition today?

8   A    No.

9   Q    Were you aware of Mr. Steven Wright before you were

10  involved with him out in the parking lot in any manner

11  whatsoever?

12  A    I think aware only in the fact that, you know, I'm

13  cognizant of other patients that are moving in and out of

14  the emergency room just as a general rule.  But past

15  that, it was -- it would have just been another patient

16  that was there.

17  Q    You were not directly assigned to him for any nursing

18  duties that particular day?

19  A    No.

20  Q    Okay.  Were you aware that he had been there several

21  hours before you encountered him in the parking lot?

22  A    I couldn't speculate on how long he'd been there.

23  Q    What brought you to be involved with him in the

24  parking lot?

25  A    So I was leaving from my shift, and I was probably

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 7 - 186

1    over the time that my shift had ended, and I was on my

2    way to the parking lot to get in my car and go home.

3    Q    Showing you Exhibit Number 4, did you leave by the

4    door that is shown in Exhibit Number 4, which is, if you

5    know, the entrance to the emergency at the VA?

6    A    Yeah.  I can indicate that, but there's a couple of

7    doors.  But this one right here, this is directly under

8    our ambulance entrance (indicating).

9    Q    And Exhibit Number 4 is, as far as you know, is a

10    decent picture of the front of the hospital showing the

11    entry into the ER; is that correct?

12    A    It's dated, but it's accurate.

13    Q    Okay.  Showing you Exhibit Number 5, this is an

14    overhead view of the parking lot.  Can you acquaint

15    yourself with Exhibit Number 5?

16    A    (Nods head).  Uh-huh.  Yes.

17    Q    All right.  Now, can you put an X where you would

18    have -- with my pen, put an X where you would have exited

19    the building, as far as you remember?

20    A    Sure.

21    Q    Okay.  And then where did you find Mr. Wright?

22    A    Another X?

23    Q    Make it a circle around an X.

24    A    (Complied).

25    Q    Okay.  And do you know what the distance is between

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                        www.spokanereporting service.com              Spokane, WA  99210

EXHIBIT 7 - 187

1  Q   At that time did he show you some cuts or bruises on

2  his head?

3  A   I did see some -- a bloody spot on his head.

4  Q   And as a nurse, did that concern you?

5  A   Yes.

6  Q   Okay.  Did he say anything about how he came to have

7  a bruise or a cut on his head?

8  A   He did not.

9  Q   What prompted you to -- or, what did you do next?

10  A   So this is not an untypical situation.  He had this

11  -- you know, it looked like a small laceration on his

12  head.  And I said, "Hey," you know, "are you going to be

13  all right with that?"

14          And he was -- he seemed unclear about his

15  situation.  I asked him who is there to pick him up.  And

16  he was kind of unable to articulate that, and he kind of

17  implied to me that he was driving.  And I said, "We

18  should probably just get that patched up."

19          So I put him in a wheelchair and took him

20  back inside.

21  Q   And you cannot remember whether there was a

22  wheelchair already there or you went to get one?

23  A   I can't remember.  I want to say there was, but I

24  can't honestly remember.

25  Q   What you seem to describe based upon your testimony

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 7 - 188

```
 1   Q    There wouldn't have been or you just don't remember?

 2   A    There wasn't anyone.

 3   Q    Did he, Mr. Wright, did he resist your request to

 4   take him back into the hospital?

 5   A    No.

 6              MR. DERRIG:  Objection to the form.

 7              Let -- give me a second to object before you

 8   answer.

 9              THE WITNESS:  Sure.

10   Q    (By Mr. Eymann)  That's okay.  Just go ahead and

11   answer.  Joe and I know each other from prior

12   depositions.

13              Can I assume that you felt, based upon your

14   observation of him, that he should be put into a

15   wheelchair to be taken back into the hospital?

16   A    No, I think the wheelchair was just for ease of -- I

17   don't know.  I think sometimes I do things out of -- to

18   expedite.  And if he's a slow walker, sometimes it's just

19   easier to put someone in a wheelchair.

20   Q    Well, did you observe him ambulating prior to putting

21   him in the wheelchair?

22   A    I did not.

23   Q    You did not see him fall; is that correct?

24   A    I did not.

25   Q    You were there that day.  How busy was the ER that
```

509-624-6255                     SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                     www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 7 - 189

```
 1

 2
                    UNITED STATES DISTRICT COURT
 3
                    EASTERN DISTRICT OF WASHINGTON
 4
       _____
 5
       ERIC WRIGHT, individually and
 6     in his capacity as personal
       representative of the ESTATE OF
 7     STEVEN O. WRIGHT; and AMY SHARP,
       individually,
 8
                        Plaintiffs,
 9
       vs.                              No. 2:15-cv-00305-TOR
10
       THE UNITED STATES OF AMERICA,
11     DBA THE DEPARTMENT OF VETERANS
       AFFAIRS; MEDFORD CASHION, M.D.;
12     SHEA MCMANUS, M.D.; ESKRIDGE
       ENTERPRISES, LLC; and DOES
13     1-5, inclusive,

14                        Defendants.

15     _____

16                 DEPOSITION OF ROBERT READY
       _____
17

18          BE IT REMEMBERED that on the 6th day of December

19     2016, at the hour of 10:13 a.m., the deposition of

20     ROBERT READY was taken at the request of the Plaintiffs,

21     before Terri Rosadovelazquez, CSR, RPR, a notary public

22     and court reporter, Washington CCR No. 3070, Idaho CSR No.

23     966, at 920 West Riverside Avenue, Suite 340, Spokane,

24     Washington, pursuant to the Federal Rules of Civil

25     Procedure.
        421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255
```

EXHIBIT 8 - 190

```
 1                    A P P E A R A N C E S

 2

 3      FOR THE PLAINTIFFS:

 4      LAW OFFICE OF EYMANN, ALLISON, HUNTER & JONES, P.S.
        By:   Richard C. Eymann
 5            Attorney at Law
        2208 West Second Avenue
 6      Spokane, Washington 99201

 7

 8      LAW OFFICE OF LOWTHORP, RICHARDS, MCMILLAN,
        MILLER & TEMPLEMAN
 9      By:   John H. Howard
              Attorney at Law
10      300 Esplanade Drive, Suite 850
        Oxnard, California 93036
11

12
        FOR DEFENDANT UNITED STATES OF AMERICA:
13
        UNITED STATES DEPARTMENT OF JUSTICE
14      UNITED STATES ATTORNEY'S OFFICE
        By:   Rudy J. Verschoor
15            Assistant United States Attorney
        920 West Riverside Avenue, Suite 340
16      Post Office Box 1494
        Spokane, Washington 99210
17

18
        FOR DEFENDANT MEDFORD CASHION, M.D.:
19
        FAIN, ANDERSON, VANDERHOEF, ROSENDAHL, O'HALLORAN,
20      SPILLANE
        By:   Elizabeth L. McAmis
21            Attorney at Law
        1301 A Street, Suite 900
22      Tacoma, Washington 98402
        (Appeared telephonically)
23

24      ALSO PRESENT:

25      Sam McComas
        Allen Schwenker
    421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255
```

509-624-6255                   SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                   www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 191

```
 1                          I N D E X

 2
        WITNESS:    ROBERT READY
 3

 4      EXAMINATION:                                      PAGE

 5      By Mr. Eymann                                     4

 6      By Mr. Howard                                     77, 90

 7      By Ms. McAmis                                     89, 91

 8

 9      EXHIBITS MARKED:

10      8  Computerized Patient Record System Document    49

11      9  Notice of F.R.C.P. Rule 30(b)(6) Deposition     80

12

13

14

15

16

17

18

19

20

21

22

23

24

25
       421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 192

1    ten years ago I took employment at the VA.

2    Q.  When you were hired by the VA, what was your initial

3    position that you --

4    A.  My initial position was I -- nurse in the -- on the

5    patient -- primary care teams.

6    Q.  And as a nurse on the primary care team, is that after

7    patients have been admitted or is it prior to that?

8    A.  It's prior.  That is the outpatient side of the VA.

9    Q.  But that's not the same as the emergency room, correct?

10   A.  Correct.

11   Q.  Do you have a specialty within your position as a

12   registered nurse?  In other words, have you focused on any

13   particular area of nursing as opposed to other areas?

14   A.  My main focus has been emergency room.

15   Q.  After your initial position with the VA hospital here in

16   Spokane, what was the next position?  And if you can take me

17   through, up to the present time, the different areas you've

18   been in the hospital.

19        And I may be asking a question where there's much

20   overlap.  Just let me know.  But I'm just interested in what

21   your history's been with the VA hospital.

22   A.  At the VA hospital I started on the outpatient -- the

23   primary care teams.  I was there for a short amount of time.

24   I really don't know how long.  I then went to the emergency

25   department.  I worked night shift for approximately five

509-624-6255                 SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                 www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 8 - 193

1    years and then I became the manager of the emergency

2    department and -- I'd say for three years.

3           And then in January of this year after I completed a

4    master's degree in informatics, I moved to health information

5    management, where I am now the coding and documentation

6    improvement trainer.

7    Q.  As manager of the ER, can you describe what your duties

8    and responsibilities would have been in that position.

9    A.  In that position I mainly -- safe and efficient operation

10   of the emergency department.

11   Q.  As manager, did you have any supervisory duties over ER

12   doctors?

13   A.  None at all.

14   Q.  Did you have any supervisory duties over other staff,

15   such as nurses of any level?

16   A.  Yes.

17   Q.  Has the staffing at the ER department of the VA hospital

18   here in Spokane, has it changed in terms of numbers over the

19   years, from the time you started until the current time?

20   A.  I think the staffing has increased from the time I

21   started until the present time, as far as nurses.  I can't

22   speak for providers.

23   Q.  How would you define "providers"?

24   A.  A physician, nurse practitioner, or physician's

25   assistant.

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                        www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 194

1   Q.  Okay.  Having been in patient care, have you personally

2   been in that situation in which -- not necessarily with

3   regard to Mr. Wright but with regard to other patients, the

4   person that made the arrangements to get the technician in,

5   or is that something where you would simply call a radiology

6   department, and I think you said AOD, to make that request?

7   A.  The AOD would make the request.

8   Q.  Do you know who the AOD was -- I'm assuming there was

9   one, but if there were more than one, then maybe I'll have to

10  amend my question.  But do you know who the AOD was with the

11  radiology department at the time of Mr. Wright's passing?

12  A.  The AOD is for the facility.  It's the administrative

13  officer of the day.  It's not just their radiology

14  department.  And, no, I don't.

15  Q.  So as I understand it, when you said "24/7," a request

16  for a CT could be conducted any hour of the day on any day of

17  the week, correct?

18  A.  Correct.

19  Q.  Other than medical doctors, is there any other person who

20  is employed by the hospital that can order the imaging, in

21  this instance a CT?  In other words, can a physician's

22  assistant do it?  Is there any --

23  A.  A physician's assistant, a nurse practitioner, and a

24  physician can order the ...

25  Q.  In your experience, once the CT is ordered, from the time

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 195

Case 2:15-cv-00305-TOR    ECF No. 95-2    filed 04/17/17    PageID.1007   Page 180 of 199

Page 24

```
 1  vehicle?

 2  A.  Yes.

 3  Q.  Is that a frequent thing that you did or infrequent?

 4  A.  Infrequent.

 5  Q.  Which?

 6  A.  Infrequent.

 7  Q.  What determines whether or not a person should be

 8  escorted to their transportation, whether it be the bus or

 9  private car?

10  A.  Many variables.  The condition of the patient; the

11  steadiness of the patient; the physician, whether or not they

12  want them; the nurse's call; and ultimately the patient.

13  Q.  And can I presume that the determination of whether or

14  not that occurs ranges all the way from nursing level all the

15  way up to doctor level; is that correct?

16  A.  From patient level to doctor level.

17  Q.  Are some patients -- well, is there ever a determination

18  made of fall risk for a patient?

19  A.  In the emergency department?

20  Q.  Yes.

21  A.  All patients are considered a fall risk in the emergency

22  department.

23  Q.  Would it be correct that there's different categories of

24  fall risk from minor to serious?

25  A.  Yes.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com         Spokane, WA  99210

EXHIBIT 8 - 196

1   Q.  Okay.  Is that tracked anywhere or noted in medical

2   records?

3   A.  Not in the emergency department.

4   Q.  So it would be fair to state that a person could be a

5   serious fall risk, but it would not be noted in the medical

6   records?

7         MS. MCAMIS:  Object to the form.

8         THE WITNESS:  Correct.

9   BY MR. EYMANN:

10  Q.  Who decides if a patient should be kept overnight for

11  observation?

12  A.  That's a collaboration between the emergency department

13  physician and the VA hospital hospitalist.

14  Q.  When they're kept overnight for observation, what is the

15  procedure for making that determination?  Is it someone

16  contacting the hospitalist or -- just tell me how that

17  occurs.

18        MR. VERSCHOOR:  Object to foundation.  Answer if you

19  can.

20        MS. MCAMIS:  Join.

21        THE WITNESS:  The emergency room physician will

22  contact the hospitalist and collaborate and discuss the

23  patient and make a decision.

24  BY MR. EYMANN:

25  Q.  To your knowledge, is availability of a room for the

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 197

Page 64

```
 1  BY MR. EYMANN:
 2  Q.  Is there a protocol document in the hospital that
 3  provides nurses with examples of when they should go up the
 4  chain of command with regard to patient safety?
 5  A.  Not that I'm aware of.
 6  Q.  How would they then -- in the training arena, how would
 7  they know when they should do it and when they shouldn't?
 8  A.  By virtue of being nurses and following their patient
 9  advocacy, they would use -- go up the chain at that time, or
10  they would contact me through e-mail and I would see it the
11  following week.
12  Q.  Anytime you go up the chain of command, are you -- from a
13  nurse's point of view, are you risking your reputation with a
14  provider?
15       MS. MCAMIS:  Object to the form.
16       MR. VERSCHOOR:  Object to foundation.
17       MS. MCAMIS:  Overbroad and lack of foundation.
18       THE WITNESS:  I don't believe so.  We're beyond that.
19  BY MR. EYMANN:
20  Q.  Have you yourself gone up the chain of command as a
21  registered nurse at any facility?
22  A.  Yes.
23  Q.  And you, as I understand it, would expect your nurses to
24  do that if they felt that a provider was missing something or
25  not doing something they should do?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 8 - 198

1    push for that, but they -- I don't recall them telling me

2    that.

3    Q.  If a nurse wanted a patient to have a CT scan because of

4    concerns they have and the doctor was not inclined to order

5    one, were they trained as to some procedure to follow in

6    order to properly advocate for the patient's safety and care

7    needs?

8    A.  No.

9    Q.  So you didn't provide any training to the nurses as to

10   what to do in a circumstance like that, I guess?

11   A.  Not formal training, but through informal discussions,

12   they know that they can go to the nursing officer of the day

13   and the nursing officer of the day would take it forward.

14   Q.  When you were managing the nurses, did you encourage the

15   nurses that worked under you to do just that, if they

16   disagreed with a doctor's care and felt strongly that an MRI

17   or a CAT scan or something should be done for a patient that

18   the doctor was not inclined to want to order, did you

19   encourage the nurses to go up the chain of command and

20   express those concerns?

21   A.  I encourage the nurses --

22        MS. MCAMIS:  Object to form.

23        THE WITNESS:  -- to discuss it with the provider.

24   BY MR. HOWARD:

25   Q.  With the doctor himself?

509-624-6255            SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                  www.spokanereporting service.com            Spokane, WA  99210

EXHIBIT 8 - 199

1   A.  Correct.

2   Q.  Did you encourage the nurses to do more than that?

3   A.  Not that I recall.

4   Q.  Okay.  Were you ever trained to do more than that when

5   you were trained to be a nurse?

6   A.  No.

7           MR. HOWARD:  Elizabeth, I believe that's all I have.

8           MS. MCAMIS:  Okay.  Very briefly.

9           Just to clarify the record, earlier there was some

10  discussion about whether peer review protected -- questions

11  regarding who was involved in investigations in peer review.

12  And I believe RCW 70.41.200 sub (3) does prevent discovery of

13  inquiries into who's involved in peer review investigations.

14          So my objection stands.  I just want to clarify that

15  for the record.  Go ahead.  I'm sorry.

16          MR. HOWARD:  And -- okay.  Go ahead.  I'm sorry.

17          MS. MCAMIS:  Yeah.  And that's all.  I wanted to

18  clarify that because there were some questions and there was

19  actually disclosure of an individual involved in an

20  investigation.  So I do object to that.

21                          EXAMINATION

22  BY MS. MCAMIS:

23  Q.  So to the witness, you're not a physician, correct?

24  A.  That is correct.

25  Q.  And you have not had the education that a physician has

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 8 - 200

1

2
                    UNITED STATES DISTRICT COURT
3
                    EASTERN DISTRICT OF WASHINGTON
4
        _____
5
        ERIC WRIGHT, individually and
6       in his capacity as personal
        representative of the ESTATE OF
7       STEVEN O. WRIGHT; and AMY SHARP,
        individually,
8
                        Plaintiffs,
9
        vs.                              No. 2:15-cv-00305-TOR
10
        THE UNITED STATES OF AMERICA,
11      DBA THE DEPARTMENT OF VETERANS
        AFFAIRS; MEDFORD CASHION, M.D.;
12      SHEA MCMANUS, M.D.; ESKRIDGE
        ENTERPRISES, LLC; and DOES
13      1-5, inclusive,

14                      Defendants.

15      _____

16            DEPOSITION OF KIMBERLY MORRIS, M.D.
        _____
17

18          BE IT REMEMBERED that on the 6th day of December

19      2016, at the hour of 2:10 p.m., the deposition of KIMBERLY

20      MORRIS, M.D., was taken at the request of the Plaintiffs,

21      before Terri Rosadovelazquez, CSR, RPR, a notary public

22      and court reporter, Washington CCR No. 3070, Idaho CSR No.

23      966, at 920 West Riverside Avenue, Suite 340, Spokane,

24      Washington, pursuant to the Federal Rules of Civil

25      Procedure.
          421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255

EXHIBIT 9 - 201

```
 1                         A P P E A R A N C E S

 2

 3        FOR THE PLAINTIFFS:

 4        LAW OFFICE OF LOWTHORP, RICHARDS, MCMILLAN,
          MILLER & TEMPLEMAN
 5        By:    John H. Howard
                 Attorney at Law
 6        300 Esplanade Drive, Suite 850
          Oxnard, California 93036
 7

 8
          FOR DEFENDANT UNITED STATES OF AMERICA:
 9
          UNITED STATES DEPARTMENT OF JUSTICE
10        UNITED STATES ATTORNEY'S OFFICE
          By:    Rudy J. Verschoor
11               Assistant United States Attorney
          920 West Riverside Avenue, Suite 340
12        Post Office Box 1494
          Spokane, Washington 99210
13

14
          FOR DEFENDANT MEDFORD CASHION, M.D.:
15
          FAIN, ANDERSON, VANDERHOEF, ROSENDAHL, O'HALLORAN,
16        SPILLANE
          By:    Elizabeth L. McAmis
17               Attorney at Law
          1301 A Street, Suite 900
18        Tacoma, Washington 98402
          (Appeared telephonically)
19

20
          ALSO PRESENT:
21
          Sam McComas
22        Allen Schwenker

23

24

25
   421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 202

```
1                        I N D E X

2
        WITNESS:    KIMBERLY MORRIS, M.D.
3

4       EXAMINATION:                                  PAGE

5       By Mr. Howard                                 4

6       By Ms. McAmis                                 88

7

8       EXHIBITS MARKED:

9       10 Emergency Room Schedule, 8/2/2014          63

10      11 Patient Advocate Tracking System           70

11      12 Falls and Missing Patient Event Report     71
           Patient Safety Event Report
12         Medication Event Report

13

14

15

16

17

18

19

20

21

22

23

24

25
     421 W. Riverside Ave., Suite 1010, Spokane, WA  99201 (509)624-6255
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                     www.spokanereporting service.com              Spokane, WA  99210


EXHIBIT 9 - 203

```
 1  say "yes" and "no."  We can't get away with "mmm-mmm" and

 2  "uh-uh."  Did he tell you that?

 3  A.  Yes.  Correct.

 4  Q.  Okay.  So if you do that, one of us will probably correct

 5  you.  And it's not to --

 6  A.  No problem.

 7  Q.  It's to -- okay.

 8      So eight years ago, Asheville, North Carolina, the VA

 9  there?

10  A.  Correct.

11  Q.  And how long did you work there?

12  A.  Five years.

13  Q.  What was your first position there?

14  A.  I was chief of geriatrics and extended care.

15  Q.  The whole time you were there?

16  A.  The whole time.

17  Q.  Got it.  You didn't bring a C.V. with you, did you, by

18  any chance so I don't have to --

19  A.  (Witness shakes head from side to side.)

20  Q.  Okay.  And then where did you go after that?

21  A.  I went to the Spokane VA Medical Center three years ago

22  in September of 2013.

23  Q.  Okay.  And what was your initial position at the VA in

24  Spokane?

25  A.  Several.  Chief of medicine.
```

509-624-6255              SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                 www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 204

1    Q.   Okay.

2    A.   Sorry.

3    Q.   That's all right.

4    A.   CLC medical director.  That's our nursing home.

5    Q.   Right.

6    A.   And GME director.

7    Q.   GME?

8    A.   Graduate medical education director.

9    Q.   Okay.  When did you become chief of medicine?

10   A.   Upon entry to -- all of those positions I held at the

11   beginning of employment at Spokane VA.

12   Q.   And you still hold today?

13   A.   No.

14   Q.   No.  What are you today?

15   A.   So I held those positions for approximately two years,

16   and the last year I developed a new department of geriatrics,

17   rehabilitation, and extended care.

18   Q.   I'm getting an idea that you have a specialty in

19   geriatrics?

20   A.   I do.

21   Q.   Okay.  See how ...

22        And what did you call this program that you started?

23   A.   It's GREC.  So it's geriatrics, rehabilitation, and

24   extended care.  It's a mouthful.

25   Q.   Got it.  Got it.

509-624-6255                  SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                       www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 205

```
 1        Okay.  What are your job responsibilities with respect
 2   to GREC?
 3   A.  So I'm the chief of the department, and my department
 4   consists of audiology; home-based primary care, the
 5   providers, so the clinicians in the community living center;
 6   the physical medicine and rehab department; and I'm also in
 7   charge of graduate medical education and undergraduate
 8   medical education.  So any learner who rotates through our
 9   facility, I oversee that process.
10   Q.  "Any learner" meaning physicians --
11   A.  Nurses -- you know, any allied health, pharmacists.
12   Anybody who comes to our facility in a learner status, I
13   oversee that process.
14   Q.  Okay.  Make sure they get the proper training?
15   A.  Make sure that they're -- we're following procedures, you
16   know, that we have appropriate documentation, et cetera.
17   Q.  Got it.  Now, you know that this case is about events
18   that took place in the emergency department back in August of
19   2014?
20   A.  Correct.
21   Q.  You were employed in Spokane on that date, correct?
22   A.  Correct.
23   Q.  You were involved in those three original positions you
24   told me about --
25   A.  Correct.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 9 - 206

1    facility but an M.D. on call?

2    A.  They were both present at the facility.

3    Q.  Okay.  Why would you need a P.A. to fill the role of a

4    co-hospitalist, or whatever the title was, if an M.D. was

5    available to do that?

6    A.  They help with workload, but they're always supervised by

7    a physician.

8    Q.  Got it.

9    A.  However, nurse practitioners are independent -- you know,

10   licensed independent practitioners, so they could potentially

11   practice on their own, but that's not how we set things up.

12   Q.  I think I understand.

13        So on August 2nd of 2014, if a treating physician, one

14   of the contract doctors in this case, for example, working on

15   a patient in the emergency department needed to get

16   authorization for an overnight stay or something of that

17   sort, who would the physician talk to on a Saturday night or

18   a Saturday?

19   A.  It would be the hospitalist, the M.D. who was on for the

20   weekend.

21   Q.  Okay.

22   A.  Now, at the time we also had an MOD, so medical officer,

23   in the evening, so somebody who would cover the night shift

24   as well who was also an M.D.  So it wasn't just one physician

25   the whole weekend.

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                        www.spokanereporting service.com              Spokane, WA  99210

EXHIBIT 9 - 207

1    Q.  What days of the week were you typically on duty in the

2    August 2014 time period?

3    A.  Monday through Friday.

4    Q.  When we talk about weekends, when does the weekend begin

5    there at the hospital?

6    A.  Hmm.  Can you --

7    Q.  Yes.

8    A.  -- sort of specify what you're asking.

9    Q.  I will.  We've taken a few depositions already in this

10   case, and there have been -- there's been loose talk about,

11   on weekends it's this way and on weekdays it's that way.  And

12   I don't think we've ever clarified what we mean by that.

13        At some locations a weekend begins on Friday night and

14   ends Sunday -- Monday morning.  In some places it doesn't

15   start till Saturday.  I'm just trying to find out --

16   A.  I would say -- we're a 24/7 facility, so I would say 4:30

17   Friday evening till Monday morning at 8:00 would be the

18   weekend.

19   Q.  Thank you.

20        So, again, if the treating physician needed

21   authorization to do something on a weekend, he would go to

22   the hospitalist -- he or she would go to the hospitalist to

23   get the authority, correct?

24   A.  Correct.

25   Q.  Are you aware of what criteria the hospitalist would

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 208

 1   employ in order to make a determination as to whether or not

 2   whatever the physician was requesting should or shouldn't be

 3   approved?

 4   A.  There's InterQual criteria for admission.  So there's

 5   very specific criteria for each disease state.  And then

 6   there's also the art of medicine, you know, that comes into

 7   it.  Does the hospitalist feel -- you know, they use their

 8   clinical judgment, in corroboration with the ED physician, to

 9   determine disposition.

10   Q.  So the two issues in this particular case would involve

11   authorizing a CAT scan if one was requested.  I'm not

12   suggesting by my question that one was requested.  But a CAT

13   scan's at issue here, as well as overnight stay in the

14   hospital for observation.

15        If a treating physician wanted either of those two,

16   would they have to go through the hospitalist to get

17   authority to do that?

18   A.  To get the CT scan, no.  To admit the patient, yes.

19   Q.  And if the issue is to admit the patient for observation

20   due to a head injury and potential consequences evolving from

21   a head injury, you indicated that there's different criteria

22   for determining whether the authorization will be approved.

23   Do you know what the authorization would be -- or what the

24   criteria would be for keeping a person overnight for

25   observation relating to a head injury -- a head trauma?

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 9 - 209

1  A.  So this is where clinical judgment is really -- you know,

2  comes in.  And if the ED physician felt comfortable

3  discharging the patient home with instructions, that would be

4  appropriate.  If they had concerns, for example, if there was

5  a neurologic finding and they felt that the patient needed

6  further observation, it might be appropriate to admit them to

7  the inpatient unit for frequent neuro checks.

8  Q.  I apologize to you.  I wasn't so much interested in your

9  thoughts about what the physician's criteria would be, more

10  the hospitalist.

11  A.  Okay.

12  Q.  If the physician requested the overnight stay -- under my

13  hypothetical, it's a head injury --

14  A.  Yes.

15  Q.  -- concern about whether or not there possibly might be a

16  subdural hematoma or other damage, and the physician went to

17  the hospitalist and requested the overnight stay, what

18  criteria would the hospitalist employ?

19  A.  So the hospitalist would review the findings, any lab

20  tests, any, you know, physical exam findings, and they would

21  decide based on their clinical comfort level whether this

22  patient would be appropriate for admission for observation

23  or, you know, sending to a tertiary care center, depending on

24  the findings.

25  Q.  To your knowledge, back in August of 2014, were there any

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 9 - 210

1    written standards for determining whether or not an overnight

2    stay would be appropriate if the treating physician requested

3    it for purposes of observation with respect to a head trauma?

4    A.  This is a clinical judgment issue.  There's no written

5    protocols for determining that.

6    Q.  Were there any standards in place, to your knowledge, at

7    the VA here in Spokane, taking a look at various factors,

8    such as the age of the patient who suffered the head trauma,

9    anticoagulation that that person had -- is consuming, other

10   risk factors, weight, you know, height, ability or not to

11   ambulate well?  In other words, were there any standards or

12   criteria in place to guide a hospitalist in evaluating those

13   types of factors?

14   A.  This is the kind of thing you learn as a physician in

15   training, so it's very -- a neuro exam is something you learn

16   in medical school in residency.  So there's no written

17   protocols.  It's clinical -- it's a clinical practice that

18   anyone who has an M.D. should know how to delineate.

19   Q.  How about similar criteria -- let's talk about physicians

20   now, like you started to a moment ago.

21       How about criteria for determining whether or not a

22   CAT scan should be performed on an individual that suffered a

23   head trauma?  Any criteria in writing somewhere along those

24   lines?

25   A.  Not in writing.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 211

1    Q.  Okay.  Can you tell me who, by position or by name, would

2    be aware of this?

3    A.  Bob Ready would be, since he was the nurse manager.

4          MR. VERSCHOOR:  If you want to just send us an

5    interrogatory addressing that or request a -- to see if --

6          MR. HOWARD:  We'll do that.  We'll do a request for

7    production or something.

8          MR. SCHWENKER:  I think we're good.

9          MR. VERSCHOOR:  I think we came up with this, but I

10   can see you guys want more than this.

11         MR. HOWARD:  Yeah, it tells us when they started.

12   That helps.

13         MR. VERSCHOOR:  Let me make a note.  We'll continue to

14   look for that.

15         MR. HOWARD:  Thank you, Rudy.

16   BY MR. HOWARD:

17   Q.  Okay.  I want to go back to procedures in the emergency

18   room.  And I'm only interested in procedures and protocols

19   that you're aware of.  I don't want you to speculate or

20   guess.  If you don't know an answer to one of my questions,

21   just say so.

22   A.  Okay.

23   Q.  Okay.  Were there any procedures for requiring or

24   ordering a CT scan if a patient reported to the emergency

25   room with head trauma?

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

EXHIBIT 9 - 212

1    A.  It would be up to the physician's clinical judgment

2    whether they wanted to obtain a CT scan or not.

3    Q.  Is there any written criteria, guiding the physician in

4    making that determination, at the VA?

5    A.  No.

6    Q.  Okay.  Same question for keeping a patient overnight.  I

7    know we talked about this a little bit earlier, but I'm being

8    a little more specific right now.

9          Any criteria guiding a physician on making his or her

10   decision about whether or not a patient should be kept

11   overnight for observation purposes?

12   A.  No.

13   Q.  Okay.  Again, it's up to their training, background,

14   experience, and judgment?

15   A.  It's their experience, their training.

16   Q.  You talked earlier about the -- or we talked earlier

17   about the patient-safety evaluations, and part of the reason

18   for that is to evaluate or to encourage nurses and other

19   health care providers to, if they see something that they

20   don't think is completely accurate or in the best interests

21   of the patient, to speak up and say something.  And I'm

22   paraphrasing, but that's essentially what we talked about

23   earlier.  Do you recall that?

24   A.  Correct.

25   Q.  If a nurse believed that a doctor should perform a CAT

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

EXHIBIT 9 - 213

```
 1   A.  Oh, yeah.

 2   Q.  If a nurse didn't believe the doctor was providing the

 3   right health care, would you encourage the nurses to report

 4   that up the chain of command?

 5   A.  Yeah, we encourage a just culture.  So if somebody has a

 6   problem with what they see, then they're encouraged to

 7   discuss it.

 8   Q.  Are you aware of either -- any of the nurses reporting

 9   any concerns they had up the chain of command on the date in

10   question, which is August --

11   A.  I'm unaware.

12   Q.  Okay.  Dealing with procedures and protocols, if a

13   physician in your emergency room determines that they wanted

14   a patient retained overnight, they made that decision but

15   they still wanted some diagnostics done.  By the time the

16   diagnostics were completed, that physician was no longer

17   going to be on duty, he or she was going to pass it off to

18   the next shift.  Do you follow me on that?

19   A.  I follow you.

20   Q.  And I'll represent to you that's essentially what

21   happened here with Dr. McManus.  I think you understand that?

22   A.  I do.

23   Q.  Okay.  Assuming Dr. McManus made a determination that the

24   patient should be retained overnight, regardless of what the

25   ultrasound told him or anyone else about a possible DVT, what
```

EXHIBIT 9 - 214

1    procedure or protocol should Dr. McManus have followed to

2    assure that his desire was fulfilled?

3        MS. MCAMIS:  Object to the form.  Lack of foundation.

4        THE WITNESS:  So if he determined that the patient

5    should be admitted, regardless of the results of that

6    ultrasound, then there would have been a contact made with

7    the hospitalist who was on duty that day and there would have

8    been a discussion about why Dr. McManus felt that it deserved

9    an inpatient stay.

10   BY MR. HOWARD:

11   Q.  That's what I thought.

12       And my follow-up question to you on that is, if there

13   was such a discussion, if Dr. McManus had such a discussion

14   with a hospitalist along those lines, would that be

15   documented someplace?

16   A.  Ideally it should be documented.  And the expectation is

17   that it would be documented.

18   Q.  And how would that be documented?

19   A.  Spoke with hospitalist.  I, you know, feel that an

20   inpatient, you know, stay is warranted, you know, et cetera,

21   et cetera.

22   Q.  Where would we find -- in other words, it wouldn't be a

23   progress note, would it?  It would be -- when it's

24   documented, how is it documented?  And then if it's printed

25   up, where would we find it?

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com        Spokane, WA  99210

EXHIBIT 9 - 215