UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ERIC WRIGHT, INDIVIDUALLY AND IN HIS CAPACITY AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STEVEN O. WRIGHT; AND, AMY SHARP, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, MEDFORD CASHION, M.D.; STAFF CARE INC.,<br><br>Defendants. | No. 2:15-CV-0305-TOR<br><br>DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT |

I, Leanne Park, make the following declaration in lieu of affidavit pursuant to 28 U.S.C. § 1746 to the best of my knowledge and belief.

1. I am a registered nurse; licensed in Washington and Oregon. I earned my Associates Degree in Nursing (Rogue Community College; 2003) and began working full-time as a nurse. While working, I completed my Bachelors in Nursing (Linfield College, 2007) and obtained my law degree (Gonzaga School of Law; 2011). From 2003-2011, I engaged in active nursing practice at hospitals in Oregon and Washington. Early in my career, my practice focused on caring for adult cardiac patients and evolved into a supervisory role as a Nursing House Supervisor while in

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 1

216

law school. Since obtaining my J.D., I have worked in risk management and patient safety roles for leading health systems in Washington. My opinions are based on the facts and data included in the records reviewed, the deposition transcripts that I reviewed, as well as my education, experience, background, training, and knowledge of the pertinent medical literature. I am familiar with the standard of care of reasonable prudence applicable to RNs and LPNs working in an Emergency Department clinical setting in Washington state, which is the same or substantially similar to the VA setting in which this case occurred.

2. I reviewed certain VA medical records of Mr. Steven Wright (1997-2014). I have specifically reviewed records (Bates 1 through 3133) pertaining to the care provided to Mr. Wright at the Spokane VA Emergency Department on August 2, 2014. A portion of these were previously identified as Exhibit 1 in the depositions that I reviewed. In addition to the medical records, I have reviewed the deposition testimony provided to date. These include:

- Dr. Shea McManus, M.D.
- Dr. Medford Cashion, M.D.
- Dr. Kimberly Morris, M.D.
- Jill Palmer, RN.
- Elizabeth Ford, RN.
- Matt Haugen, RN.
- Robert Ready, RN.
- Karla Linton, LPN.

I have also reviewed several policies provided by Spokane VA Medical Center including:

- Plan for provision of Patient Care (2013)
- Standing Orders ED Triage Grid (undated)
- Discharge of Acute Care Patients (2013)

I also reviewed the following pleading:

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 2                              217

Plaintiffs' Second Amended Complaint for Medical Malpractice and Wrongful Death.

I also reviewed an autopsy report for Steven Wright.

3. According to the medical records and deposition testimony to date:

Plaintiffs' father, Steven Wright (patient) came to the VA hospital in Spokane, Washington on August 2, 2014 with complaints of pain and swelling in his left leg and knee which occurred after the patient fell at his home the week prior. Upon arrival to the Emergency Department, the patient was ambulating with crutches. Dr. McManus ordered diagnostic tests, including X-rays and an ultrasound to rule out deep vein thrombosis (DVT), a blood clot. Based upon his lab results and the concern regarding potential DVT, Dr. McManus ordered that an injection of Lovenox (a type of blood thinner) be given in the Emergency Department. The patient was on long-term Warfarin (Coumadin) therapy, a daily medication given to thin his blood. The VA arranged for transportation to take Mr. Wright to Holy Family Hospital for the ultrasound, and when completed, had him brought back to the VA hospital.

Based upon the ultrasound results, Mr. Wright was cleared for discharge home. Discharge diagnosis was "strain and contusion left knee" (Exhibit 1, page 16). Mr. Wright then waited in a room off the ER for his ride. Karla Linton, LPN at the VA offered twice to take Mr. Wright to his transportation in a wheelchair. Mr. Wright refused both times. Shortly after exiting the VA hospital Mr. Wright fell near a wheelchair return rack outside of the VA hospital, striking his head on the pavement. Immediately after falling, Steven Wright was readmitted to the Emergency Department and assessed by Dr. Cashion, who, after examining Mr. Wright, detected no significant injury. Dr. Cashion discussed his findings with Steven Wright and his friend and then discharged him home with instructions to return to the Urgent Care for a follow-up visit on August 4, 2014. Steven Wright was found deceased at his home the next morning.

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 3

218

4. According to the plaintiffs' Second Amended Complaint (SAC), the allegations in this case are outlined below:

(a) Nurse Linton did not *insist* on escorting Mr. Wright to his transportation (SAC, ¶ 3.7);

(b) Nurse Ford did not report up the "chain of command" that Mr. Wright should get diagnostic testing or be admitted to the hospital (SAC, ¶ 3.14);

(c) all Defendants discharged Mr. Wright without assistance (SAC, ¶¶ 3.17; 4.3; 6.4);

(d) all Defendants failed to conduct diagnostic testing (SAC, ¶ 3.17);

(e) the nurses did not act as a patient advocate (presumably related to diagnostic testing and admission to the hospital (SAC, ¶¶ 3.17; 4.3; 6.4);

(f) all Defendants failed to retain Mr. Wright for overnight observation (SAC, ¶ 4.3); and

(g) all Defendants failed to obtain Informed Consent from Mr. Wright (SAC, ¶ 5.3). Each of these is addressed.

**a. Nurse Linton did not *insist* on escorting Mr. Wright to his transportation**.

**Plaintiffs' Position**: Plaintiffs allege that Ms. Linton, LPN breached a duty she owed Mr. Wright by failing to exercise her "full authority" as a nurse and "*insist*" on escorting Mr. Wright out of the Emergency Department via wheelchair.

**Expert Opinion**: Ms. Linton, LPN did not owe Mr. Wright any "duty to escort." Further, in the case of a patient with intact decisional capacity, Ms. Linton's nursing license does not grant any "authority" to overrule express patient wishes.

A nurse is obligated to provide safe nursing care to assigned patients. Nurses may have an independently occurring duty arising from a statutory mandate (i.e. mandatory reporting of abuse or neglect; RCW 74.34.035) or a nurse's employer or supervising physician may require the nurse to provide certain specific care (i.e.

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 4

219

facility policy [WAC[1] 246-320-226] or express physician order [RCW 18.79.260]). In this case, none of the above duties are present. No legal requirement, facility policy, or physician order required (or suggested) that Ms. Linton should escort Mr. Wright. Nor does the plaintiff cite any clearly articulated alternate basis for a duty or obligation to escort Mr. Wright from the Emergency Department via wheelchair.

In fact, despite not having any duty, Ms. Linton voluntarily offered wheelchair escort to Mr. Wright. Mr. Wright declined the offer twice. *Deposition Transcript Karla Linton, p. 15 l.17-25.* Despite Mr. Wright's declination, the plaintiffs assert that Ms. Linton breached a duty owed to Mr. Wright by failing to use her "authority" as a nurse to "*insist*" that Mr. Wright comply with a wheelchair escort from the Emergency Department. Healthcare Providers do not have the type of "authority" advocated by the plaintiffs in this argument. Per Justice Cardozo, "[e]very human being of adult years and sound mind has the right to determine what shall be done with his own body." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914); *Watkins v. Parpala*, 2 Wn. App. 484, 490-91, 469 P.2d 974, 978 (1970), *review denied* 78 Wn. *overruled on other grounds* in *Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, 163 N.Y.S.2d 3 (1957); and RCW 7.70.050. If Ms. Linton, LPN had attempted to force Mr. Wright to comply with her suggestion she may have been subject to discipline or prosecution for an intentional tort (such as assault).

Ms. Linton's nursing care met the expected standard of care of reasonable prudence applicable to LPNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred.

---

[1] Washington Administrative Code.

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 5

220

**b. Nurse Ford did not report up the "chain of command" that Mr. Wright should get diagnostic testing or be admitted to the hospital**.

**Plaintiffs' Position**: Plaintiffs alleged that Ms. Ford, RN breached a duty she owed Mr. Wright by failing to report up the "chain of command" regarding her concerns that Mr. Wright should get diagnostic testing or be admitted to the hospital.

A nurse is required to serve as a "client advocate[s] in health maintenance and clinical care." (WAC 246-840-700 (3)(c)). Ms. Ford's actions clearly met this requirement. According to WAC 246-840-700 (3)(a-b) a nurse is required to document clinical findings and then clearly and promptly communicate those findings (particularly any significant changes) to the responsible treating provider. Her clinical assessment clearly addressed Mr. Wright's potential risks and she documented her clinical findings as well as the fact that Dr. Cashion was immediately at the bedside with her while examining Mr. Wright (Exhibit 1, pages 1-4).

Ms. Linton, LPN also testified that she saw Dr. Cashion and Ms. Ford at the bedside together examining Mr. Wright. *Deposition Transcript Karla Linton, p. 28, l.23.* Ms. Ford testified that she did discuss Mr. Wright's injuries with the physician and asked about possible further testing. *Deposition Transcript Elizabeth Ford*, p. 54, l. 21 to p. 55, l. 15. In response to the question "sometime that evening before Mr. Wright left the hospital did you advise Dr. Cashion in your opinion that this patient should have a CAT scan?" Nurse Ford responded "...I remember discussing injuries and asking about possible further testing, but not advising a physician." (*Deposition Transcript Elizabeth Ford*, p. 56, l. 3-11. There was no reason for Ms. Ford to question Dr. Cashion's apparently well-reasoned clinical decisions or the patient's expressed preference for discharge home. *Deposition Transcript Elizabeth Ford*, p. 56, l. 9-11.

The medical plan of care is the purview of the attending physician. Physicians receive specialized training, expertise, and have much more comprehensive practical diagnostic experience related to evaluating head trauma. When asked "Do you have an

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 6                                                                                     221

understanding as to why Mr. Wright did not have a CAT scan that night?" Nurse Ford responded, "He wanted to go home, and the physician assessed him and went over all the previous lab work and came to the conclusion that he could go home." *Id*, p. 57, l.23 - p.58, l. 2).  Indeed, it appears Dr. Cashion conducted a thorough examination of Mr. Wright. *Deposition Transcript of M. Cashion*, pp. 16-18, 20-24, 33-35, 48-50, 74. Nurse Ford testified there was nothing she could have done to make the patient get a CT scan. *Depo. Tr. E. Ford*, p. 72, l. 7 to p. 73, l. 7); *Depo. Tr. S. McManus*, p. 41, ll. 6-10).

The *Washington* Supreme Court has stated that medicine is an inexact science where the desired results cannot be guaranteed, and where professional judgment may reasonably differ as to what constitutes proper treatment.  *Watson v. Hockett*, 107 Wn.2d 158, 167, 727 P.2d 669 (1986) (*quoting* J. Perdue, Texas Medical Malpractice, ch. 2, "Standard of Care", 22 Hous. L. Rev. 47, 60 (1985)).

There is no facility policy, regulatory requirement, or nursing education that required Ms. Ford to dispute Dr. Cashion's medical decision-making, nor was she required to report Dr. Cashion's discharge decision to another physician provider.

Ms. Ford's, nursing care met the expected standard of care of reasonable prudence applicable to RNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred.

### c. **All Defendants discharged Mr. Wright Without Assistance**.

**Plaintiffs' Position**:  Plaintiffs claim Mr. Wright should not have been discharged from the Emergency Department without assistance. This allegation appears to be related to Mr. Wrights' <u>first discharge</u> from the ED and appears based on the fact that Mr. Wright was on crutches for his knee injury. Plaintiffs do not provide the precedent for this perceived obligation or duty nor do they name a specific alleged involved clinician.

**Expert Opinion**:  There is ample evidence that would lead a clinician to feel confident that Mr. Wright was comfortable safely ambulating with his crutches.  Mr.

Wright presented with his personal crutches which he had been using to ambulate at home for one week (*Exhibit 1, page 16*). He had previously used crutches in 2013 during a prolonged period of right knee pain (Bate #199-210[2]). Throughout Mr. Wright's several hours in the Emergency Department his use of crutches as an ambulatory aid was noted (Exhibit 1, pages 16 and 25), and his ability to safely mobilize was explicitly addressed by Dr. Cashion as part of his discharge conversation ("Can get to bathroom he says, and has been up in ER walking with one crutch." (Ex. 1 at 16). At the time of discharge, Ms. Linton, LPN noted, "Vet d/c'd [discharged] ambulatory using crutches to home via POV accompanied by friend with all personal belongings. NAD noted at time of dc. Verbalized understanding of all discharge instructions." (Ex. 1 at 25-28). Ms. Linton further testified that, prior to Mr. Wright leaving the Emergency Department she had the opportunity to observe him mobilize around the until using his crutches. *Deposition Transcript Karla Linton, p. 21 l.4.* She recalled that he appeared to be ambulating "okay" and her offer of a wheelchair was to assist him because he was experiencing leg pain. *Deposition Transcript Karla Linton, p. 21, l.12-17 and p.39, l. 1-6.* It was reasonable for an LPN staff member to rely upon Dr. Cashion's assessment that patient was safe to discharge home on crutches.

Ms. Linton's, nursing care met the expected standard of care of reasonable prudence applicable to RNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred.

Furthermore, Nurse Ford testified that she was not involved in the earlier treatment of Mr. Wright and that her first contact with Mr. Wright was after his fall outside the VA. *Depo. Tr. E. Ford*, p. 16, l. 7 to p. 17, l. 25. Therefore, Nurse Ford would not have violated any standard of care regarding discharging of Mr. Wright without assistance because she was not involved in that decision.

---

[2] The Bates numbers referred to here are those corresponding to the complete medical records provided to all parties in the United States Initial Disclosures.

**d. Failure to conduct diagnostic testing, and (f) Failure to retain overnight for observation**. This section addresses allegations (d) and (f) identified above.

**Plaintiffs' Position**: Plaintiffs claim that Ms. Linton, LPN or Ms. Ford, RN should have taken steps to ensure that Mr. Wright received diagnostic testing and overnight hospital admission after his fall.

**Expert Opinion:** Washington law clearly outlines the scope of authority granted to RNs and LPNs. This "scope of practice" provides guidance regarding the tasks that nurses are allowed to independently initiate and those which require the direction/order from a physician or other Licensed Independent Practitioner. "The registered nurse and the licensed practical nurse shall be responsible and accountable for his or her practice based upon *and limited to* the scope of his/her education, demonstrated competence, and nursing experience consistent with the scope of practice set forth in this document...." WAC 246-840-700(3)(b)(emphasis added). WAC 246-840-700 specifically discusses a nurse's' duty to perform a "nursing diagnosis" and provide "nursing care." But the WAC does not place responsibility on nurses to develop a medical diagnosis or a medical treatment plan of care, which is the sole responsibility of the physician. RCW 18.79.040(1)(e) ("Registered nursing practice" means…. The executing of medical regimen as prescribed by a licensed physician…"; RCW 18.79.270 ("A licensed practical nurse under his or her license may perform nursing care, as that term is usually understood, of the ill, injured, or infirm, and in the course thereof may, under the direction of a licensed physician…,").

Ordering diagnostic imaging and admitting a patient to the hospital are both actions that can only be performed by a licensed independent practitioner (such as a physician). *Deposition Transcript M. Cashion*, p. 67, ll. 8-10; *Deposition Transcript K. Morris*, p. 66, l. 23 to p. 67, l. 5. According to the WA state nursing scope of practice, neither the RN nor the LPN is permitted to initiate either of these functions. In fact, if a nurse did initiate these actions in the absence of a physician order, that nurse would be subject to disciplinary action. RCW 18.130.180(12) ("Practice

beyond the scope of practice as defined by law or rule."). Ms. Linton testified that these actions are outside her scope of authority. *Deposition Transcript Karla Linton, p. 42, ll. 23-25; 45, l.1-8.* Since these functions are completely outside a nurse's scope of practice, neither Ms. Linton, LPN nor Ms. Ford, RN should be expected to have taken the action demanded by the Plaintiffs.

The nursing care provided by Ms. Linton & Ms. Ford, met the expected standard of care of reasonable prudence applicable to LPNs & RNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred and neither nurse owed a duty to independently conduct further diagnostic testing or arrange hospital admission.

   e. **Failure to act as a patient advocate**.

**Plaintiff allegation:** Plaintiffs claim that both Ms. Linton, LPN and Ms. Ford, RN failed to fulfill their obligation to act as a patient advocate. The exact nature of this allegation is not clear. In reading the pleadings, the plaintiffs only appear to raise the following specific "failures" to advocate:

- Ms. Linton: Failure to provide wheelchair escort from Emergency Department (related to Mr. Wright's first discharge).
- Ms. Ford: Failure to use the "chain of command" to ensure that Mr. Wright received diagnostic testing and overnight hospital admission after his fall (related to Mr. Wright's second visit on August 2, 2014).

**Expert Opinion:** My evaluation of these allegations is clearly outlined above in my response to Plaintiff's allegation (a), (b), (d), and (f).

With regard to allegation that Nurses Linton and Ford did not advocate for Mr. Wright's care, those allegations are also unfounded. Nurse Linton had no duty regarding advocating for Mr. Wright after his fall because she was not involved in his treatment. *Deposition Transcript Karla Linton*, p. 27, ll. 14-21. Because Nurse Linton was not providing care to Mr. Wright, she had no duty to advocate for imaging or admission to the hospital.

DECLARATION OF LEANNE PARK IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 10

225

Even without that duty, the evidence, acknowledged by Plaintiffs, shows otherwise. Plaintiffs alleged in paragraph 3.12 of the SAC that "Karla Linton, LPN made a verbal report within the "chain of command" to the charge nurse, Elizabeth Ford, RN, that Wright needed to receive diagnostic testing because he had suffered a head injury while on anticoagulant medication." Nurse Linton's deposition testimony confirms that she in fact brought her concern about the need for imaging to Nurse Whitley, the charge nurse. *Linton Depo. Tr.*, p. 30, ll. 2-30. As such, Nurse Linton did more than she was required to do.

Nurse Ford properly advocated for Mr. Wright regarding the need for imaging and admission to the hospital. Nurse Ford testified that if she had a concern that a patient needed a CAT scan, she would have discussed it with the physician. *Deposition Transcript Elizabeth Ford*, p. 54, ll. 9-20. Nurse Ford also testified that she did discuss Mr. Wright's injuries with the physician and *asked about possible further testing*. *Id.*, p. 54, l. 21 to p. 55, l. 15 (emphasis added). Also, Nurse Ford testified that there was nothing she could have done regarding further testing or admission to the hospital if the patient did not agree. *Id.*, p. 72, l. 15 to p. 73, l. 7; *see also, Deposition Transcript Shea McManus*, p. 41, ll. 6-10.

The nursing care provided by Ms. Linton & Ms. Ford, met the expected standard of care of reasonable prudence applicable to LPNs & RNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred and neither nurse violated any standard of care regarding the advocating of further diagnostic testing or hospital admission.

### g. All Defendants failed to obtain *informed consent* from Mr. Wright.

**Plaintiff Allegation:** Plaintiffs allege that unidentified defendants are liable for failing to obtain informed consent related to the decision to discharge Mr. Wright home after the type of fall that he experienced. I will address the above allegations only insofar as the allegation may relate to alleged breach of duty of care owed by Ms. Linton, LPN or Ms. Ford, RN.

**Expert Opinion**: Neither an RN nor an LPN have the training, experience, authority, or licensure scope to make the decision to discharge a patient from the Emergency Department. Since the decision to discharge is outside their scope of knowledge and control; they are not in a position to advise any patient on the risk and benefits associated with the discharge versus admission. Since this is a task that cannot be performed by an RN or LPN, neither Ms. Linton or Ms. Ford should be held liable for failure to obtain Informed Consent.

The nursing care provided by Ms. Linton and Ms. Ford met the expected standard of care of reasonable prudence applicable to LPNs and RNs working in an Emergency Department clinical setting the same or substantially similar to the VA setting in which this case occurred and neither nurse owed a duty to conduct an informed consent conversation of the type demanded by the plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of March, 2017.

*/s/ Leanne Park*
Leanne Park, RN, JD