UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

ERIC WRIGHT, INDIVIDUALLY AND
IN HIS CAPACITY AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF STEVEN O. WRIGHT; AND, AMY
SHARP, INDIVIDUALLY,

                                    Plaintiffs,

                    vs.

UNITED STATES OF AMERICA,
MEDFORD CASHION, M.D.; STAFF
CARE INC.,

                                    Defendants.

No. 2:15-CV-0305-TOR

DECLARATION OF ALICE E.
DUPLER, RN, APRN-BC, JD IN
SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR
SUMMARY JUDGMENT

I, Alice E. Dupler, make the following declaration in lieu of affidavit pursuant to 28 U.S.C. § 1746 to the best of my knowledge and belief.

## I. Introduction

1.      I am over the age of 18 years, and I am serving as a nursing expert witness in this matter.  I am competent to testify to the matters herein and make this declaration based upon my education, training, and experience, and upon my review of the available records and evidence in this matter.

2.     A number of records have been made available to me and I have reviewed several documents in this case, including:

Plaintiffs' complaint and summons;

Plaintiffs' and Defendants' requests for and responses to RFPs and ROGs;

Medical records from VAMC-Spokane Bates # 00000001 - 00003133.

Photographs of the VAMC-Spokane Bates # 00003134 - 00003135.

Excerpts of medical records for Steven Wright, identified as Exhibit 1 in depositions.

Depositions of:

    RN J. Palmer (attending RN Admission #1)

    LPN Linton (attending LPN Admission #1)

    RN M. Haugen (RN accompanying Mr. Wright back to ER)

    RN Whitley-Ford (attending nurse Admission #2)

    RN R. Ready (ER nurse manager)

    Dr. S. McManus, (MD Admission #1)

    Dr. M. Cashion, (MD Admission #2)

    Dr. Morris (Acting Medical Director).

Mann-Grandstaff VAMC Numbered Memos, including but not limited to:

    Numbered Memo (NM) 111-12-13 Admission policy/procedure

    NM 111-11-15 Emergency care policy/procedure

    NM 122-03-16 Discharge planning – social work service (SWS)

    NM 11-01-13 Interdisciplinary care and discharge planning for inpatient acute care units (ACU)

    NM 00-08-15 Fall prevention policy/procedure

    NM 00-08-13 Fall prevention program

    NM 00-08-15 Patient care unit fire and safety inspection report

    NM 00-13-12 Pharmacy service

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT  - 2

NM 00-13-12 Patient care / Rehabilitation

NM 00-13-12 Social work service

NM 00-13-12 Clinical practice guidelines

NM 00-13-12 Implementing the pain as the 5th vital sign program

NM 00-13-12 Improving safety and quality of care

NM 00-13-13 Plan for provision of patient care

NM 00-13-13 Medicine service

NM 00-13-13 Diagnostic Imaging

NM 00-13-13 Pathology and laboratory medicine service

NM 00-13-13 Information technology

NM 00-13-13 Human resources

NM 00-13-13 Health care administration

NM 11-12-15 Plan for patients placed in temporary locations

Standing operating procedure 2016, 001 Mann-Grandstaff ED/UCC Standing Orders

Patient Advocate Tracking System Screen Shots

Computerized Patient Record System (CPRS) Screen Shots

3.      In addition, I reviewed the following statutes applicable in the State of Washington:

Chapter 70.41 RCW Hospital Licensing and Regulation

Chapter 18.79 RCW Nursing Care

WAC 246-320-141 (1) Patient Rights and Organizational Ethics

WAC 240-840-700 Standards of Nursing Conduct and Practice

4.       I spoke with a representative of The Joint Commission via telephone on 3/8/2016 at 8:30am PST.  Hospitals are required to meet Medicare Conditions of Participation, also known as certification, to receive reimbursement from the Centers for Medicare and Medicaid.  Section 1865 of the Social Security Act allows hospitals

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT  - 3

230

to demonstrate this compliance through accreditation by a CMS approved private, national accrediting organization (AO).  The Joint Commission is an approved AO. Centers for Medicare and Medicaid, 2016. The Mann-Grandstaff Veterans Administration Medical Center (VAMC) is accredited by The Joint Commission. This telephone call to The Joint Commission was made to confirm that there is no duty of care or standard of practice to escort a patient from a hospital to their transportation. 'There is no duty of care or standard of nursing practice that a nurse escort a patient from the hospital to their car.'

5.    I conducted a search of the literature including the Cochrane Library, PubMed, CINAHL and Google Scholar databases. I also searched guidelines.gov, nih.gov ninr.gov and The Joint Commission websites to retrieve and review pertinent evidence related to the emergency nursing care of patients and related subjects.

6.   I have not yet reviewed the deposition transcripts of the plaintiff's expert witnesses.  I reserve the right to revise my opinions as additional materials are provided to me and reviewed by me.

## II. Education and Experience

1.    I have worked or taught in nursing for 44 years.  In 1984, I received my masters in nursing, with a specialization in adult health and nursing administration.  In 1985, I became nationally certified and licensed in Washington State as a Nurse Practitioner. I am currently nationally certified as an Advanced Practice Registered Nurse (APRN) – Adult Nurse Practitioner.

2.    I have held several positions in nursing. From 1980 to 1985, I worked in acute care as a Registered Nurse in the cardiac step down, burn trauma, cancer, and renal transplant units. From 1985 to 1989, I worked in long-term care as a Nurse Practitioner, Administrator and/or Vice President of Operations at Unicare Health. From 1989 to 2001, I was a surveyor, licensor, complaint investigator, director and regional administrator for the Washington State Department of Social & Health

Services (DSHS).  In that capacity, I inspected health care facilities for their compliance with Federal certification standards and with Washington State's licensing requirements.  From 2001 to the present time, I was a Clinical Assistant and and/or an Associate Professor at the Washington State University (WSU) College of Nursing, Gonzaga University, Seattle University, and Texas Tech University Health Sciences Center.  At these nursing college/schools/departments, I educated nurses at all levels of preparation and settings — bachelors, masters, Ph. Ds and DNPs — with an emphasis on the clinical practice of nursing and care of older adults.

3.     In 2002, I entered law school at Gonzaga University and received my JD in 2005.  I am a member of the Washington State Bar and the US Supreme Court Bar, but do not actively practice law, except for occasional pro bono matters.

4.     I have also served as a member of several committees, workgroups and professional organizations.  Attached is a true and correct copy of my curriculum vitae, listing in greater detail and with reasonable accuracy, my qualifications, teaching, presentations, and publications.

### III. Nursing Scope and Standards of Practice

1.     Nursing is the protection, promotion and optimization of health, prevention of illness and injury, alleviation of suffering through the diagnosis and treatment of humans, and advocacy in the care of individuals, families, communities and populations.  ANA, 2010, Scope and Standards of Nursing Practice, p. 1 & 7; WAC 246-840-700 Standards of Nursing Conduct or Practice; Notice of Memorandum 00-13-13, p. 107-108.

2.     The scope of nursing practice describes who, what, where, when, and why Registered Nurses (RN) and Licensed Practical Nurses (LPN) provide care to their clients.  The nursing process (i.e., observe, assess, diagnose, implement and evaluate patients) is how nurses provide care to their clients.  The role of the RN and the LPN is more clearly delineated in the WAC 246-840-700 Standards of Nursing

Conduct or Practice, the ANA Scope and Standards of Nursing Practice, Standards of Professional Performance, and, the Code of Ethics for Nursing, and, in other authoritative evidence-based texts.

3.    Nursing care is evidence based.  This means that a patient's care is provided based on current scientific knowledge, a patient's preferences and values, and, the nurse's clinical judgement.  *Melnyk & Fineout-Overholt*, 2011, p. 7 and 242; *ANA*, 2010, Scope and Standards of Nursing Practice, p. 8;  Standards of Professional Practice, p.77; WAC 246-840-700; and Notice of Memorandum 00-13-13, p. 107-109.

5.    A Registered Nurse (RN) can observe, assess, diagnose and treat the patient a patient's nursing needs.  WAC 246-840-700.  But unlike an APRN or physician, the RN cannot diagnose a medical condition, or prescribe a medication or a medical treatment for that condition.

6.    A Licensed Practical Nurse (LPN) can observe and report observations to a RN.  Under limited circumstances and direct supervision of a RN, a LPN can assess the patient's nursing needs.  The LPN cannot independently conduct an assessment, and a LPN cannot determine a nursing diagnosis, develop a plan of care, or, evaluate either a medical or nursing outcome of care. WAC 246-840-700.

7.    The statutory authority and duty of care is set forth by the state's Nursing Commission.  The scope of practice and the nursing standards of practice are further delineated for a LPN and a RN by the state's Nursing Commission, the American Nurses Association publication Nurses: Scope and Standards of Practice, 2nd Ed. (2010), Standards of Professional Performance (2010), the Code of Ethics for Nursing (2001), by the board certifications attained by Registered Nurses, and, in other authoritative texts.

### IV. Mr. Stephen Wright's Care at Mann-Grandstaff VAMC

1.    Mr. Steven O. Wright was a 70 year-old veteran who resided in Rosalia, Washington; his primary source of companionship was his dog.  Bates # 00000046,

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 6

233

00000055, 000301, 0000406, and 0000493. Mr. Wright received his primary care and emergency care at the VAMC in Spokane. He relied on others to transport him to and from his VA appointments.

2.     Mr. Wright had 19 medical diagnoses, including but not limited to, Urethral cancer, Venous insufficiency, COPD, Hyperlipidemia, Atrial fibrillation, Long-term use of anticoagulants, Bipolar disorder, and Post-traumatic Stress Disorder. Exhibit 1 at 9. Mr. Wright received 21 medications to be taken by mouth or applied to his skin. Ex. 1 at 2-3.

3.     Mr. Wright had atrial fibrillation for which he was prescribed Warfarin to prevent blood clots. Ex. 1 at 2(21). Warfarin is a medication intended to thin the blood and prevent blood clots from traveling from the heart to the brain and causing a stroke.

a.     The International Normalized Ratio or INR is a laboratory test of the blood that measures how long it takes the blood to clot. It is critical that this test be routinely evaluated to assure that the dosage of Warfarin remains within normal limits. A result of 2-3 is considered within normal limits. Ex. 1 at 23 and 48. Results higher than 3.0 means that the blood is too thin and will take longer to clot; there is a higher risk of bleeding. Results lower than 2.0 means that the blood is too thick and will take less time to clot; there is a lower risk of bleeding.

b.     Mr. Wright was scheduled to meet with the pharmacist to evaluate his INR and to adjust his dosage of Warfarin 26 times in the 15 months prior to August, 2014. He routinely traveled to the VAMC to have his INR drawn in the lab; however, he failed to stay for his appointments to evaluate and adjust his dosage with the pharmacist 8 of 26 appointments. Of even more concern during this same time period, Mr. Wright's INR was not within therapeutic range 18 of 26 times (i.e., INR too high at 7 of 26 visits; INR too low at 11 of 26 visits).

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 7          234

c.    This means that Mr. Wright was not taking the right dosage of Warfarin 65% of the time (17 of 26 blood samples) in the fifteen months prior to his visits to the emergency room on 8/2/2014.  Because of missed appointments, the dosage of Warfarin was oftentimes not adjusted as it would have been.  Telephone follow-up calls were made by VAMC staff and when not answered, voice messages were left for Mr. Wright to call.  On some occasions he did; and, on some instances, he did not.  Bates #00000036 (8/2/14, INR 1.5),  # 00000043 (7/21/14, INR 3.9); 00000049 (7/7/14, 1.5); #00000112 (6/9/14, INR 2.6); #00000114 (6/3/14, INR1.8); #00000119 (5/20/14, INR 3.2); #00000139 (4/22/14, INR 2.2); #00000150 (3/18/14, INR 2.8); #00000159 (3/3/14, INR 2.4, no show); #00000173 (2/21/14, INR 1.5); #00000175 (2/11/14, INR 1.4, no show); #00000186 (1/22/14, INR 1.9); #00000190 (1/7/14, INR 4.4, no show); #00000195 (12/20/13, INR 4.2); #00000197 (12/13/13, INR 4.6, no show); #00000221 (11/15/13, INR 3.1, no show); #00000237 (10/25/13, INR 2.1, no show); #00000244 (10/4/13, INR 2.6, no show); #00000261 (9/23/13, INR 3.2); #00000263 (9/18/13, INR 2.5); #00000266 (9/10/13, INR 1.2); #00000272 (8/27/13, INR 1.7); #00000274 (8/6/13, INR 1.5); #00000277 (7/22/13, INR 1.7, telephone call); #00000290 (7/17/13, INR 1.3); #00000307 (6/19/13, INR 2.0, no show); #00000312 (5/21/13, INR 2.1).

4.    Behavioral assessments were completed with Mr. Wright to monitor his diagnoses of bipolar disease and post-traumatic stress disorder.  On 7/14/2014, Mr. Wright was described as 'alert, oriented, well groomed, cooperative,' and as having positive thoughts and making good eye contact by Dr. A. Hinkeldey, a psychiatrist who was conducting an initial evaluation related to his bipolar disease and post-traumatic stress disorder.  Bates 00000063-66.  Mr. Wright denied signs of either depression or elevation of his mood.  He was 'reasonably competent and confident' and his 'judgement and insight [were] mostly good, although he seemed not to be aware of his irritability.'  This assessment of Mr. Wright's mental status did not

appear to change over the next several weeks. Behavioral assessments were also completed during emergency room visits with Mr. Wright. Ex. 1 at 3, 21 and 27. While seemingly irritable, he maintained his ability to contribute to his care, assess both pros and cons regarding his care choices, and could maintain his activities of daily living while living in Rosalia. It appeared that being home to care for his dog was a significant factor in sustaining Mr. Wright's life style choices.

5.    On 7/14/2013, more than one year prior to his death, Mr. Wright reported to Dr. Sousley that he had been gardening at home, fell forward and hit his head on the concrete. Bates 00000297-298. In the ER, he had minimal bleeding, received care for a scalp laceration, and, as he did not exhibit symptoms of a head injury, was discharged to home without having a CAT scan. He received instructions prior to discharge instructing him to return if he became symptomatic. He did not stop taking Warfarin (long-term anticoagulant). His INR was 1.3 on 7/17/2013 and 1.7 on 7/22/2013. This means that his blood was thicker and more likely to clot. Mr. Wright's dosage of Warfarin was too low, or, Mr. Wright was not taking his medication as ordered. Other than recurrent pain in his knee, he recovered without incident from this fall.

6.    On or about 7/27/2014, one week prior to his death, Mr. Wright had a second fall at home. Ex. 1 at 16, 18 and 25. He fell forward approximately 2 feet from a deck to the ground. He did not seek immediate medical assistance. On 8/2/2014, he went to the ER due to unresolved knee pain. He reported that he had sustained the injury the week prior and had continued to take his Warfarin. He had no bleeding subsequent to that fall.

a.    Mr. Wright's INRs were fluctuating during this time period (i.e., less risk of bleeding at 1.5 on 7/7/2014 and higher risk of bleeding INR 3.9 on 7/21/2014).

7.    Emergency Room (ER) Visit #1 on 8/2/2014.

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 9

a. On arrival to the ER, patients are assessed by a Registered Nurse. A physical assessment including a chief complaint, history of the present illness, significant past history, allergies, systems review, vital signs, results of pertinent diagnostic tests and a physical examination was required. Numbered Memorandum 00-13-13, p.88-89.

b. Mr. Wright ambulated into the ER using crutches. Ex. 1 at 25. He was triaged by RN Palmer on 8/2/2014 at approximately 11:04 am. His primary concern was swelling and pain in his knee. Per RN Palmer, 'he arrives walking with crutches, transferred to wheelchair without difficulty.' Ex. 1 at 25. RN Palmer did not observe Mr. Wright having difficulty when walking with his crutches. RN Palmer completed a thorough assessment and developed a plan of care for his knee pain. Ex. 1 at 25-26.

c. On 8/2/2014 at 1:02pm, Mr. Wright's blood was drawn. His platelet count was within normal limits at 184 (150-400 normal finding). Ex. 1 at 45.

d. Mr. Wright's INR level was sub-therapeutic 1.5. Ex. 1 at 23 and 48. At this level, if he were injured, his blood was too thick and it was much more probable that his blood would clot, even though he was on Warfarin.

e. Based on the patient triage, a RN determines the team members immediately required to meet the patient's needs. This process is documented through the assignment of an ESI 1, ESI 2, ESI 3, ESI 4, or ESI 5 score. NM 111-11-15 (3) b. (1) (2) (3) (4). Mr. Wright was assigned an ESI 3. Ex. 1 at 26. This means that he did not require acute emergency care such as placement of an airway, did not demonstrate signs of a neurological deficit, and/or he did not need extensive assistance at that time from IV therapy or specialty consultations. As an ESI 3, his initial needs on admission were medical and nursing care, and, laboratory services. Numbered Memorandum 111-11-15, p. 3d(1). As a preventative measure, a chest x/ray and EKG were obtained. NM 00-13-13, p. 86-87; NM 111-11-15, p.

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 10          237

2b(1),(2)(3)(4).  RN Palmer accurately designated Mr. Wright as an ESI 3 patient as evidenced by his presenting complaints and initial care required to meet his needs.

      f.    Later that day, orders were received to transport Mr. Wright to Holy Family Hospital by ambulance for tests. *Deposition Transcript of S. McManus*, p. 25, 11. 12-17.

      g.    At approximately 4:35pm, Mr. Wright was observed in the waiting room by RN DeLeon.  Mr. Wright stated he was waiting for the ambulance.  RN DeLeon explained to him the importance of staying in the exam room with his leg elevated. Ex. 1 at 27.  Mr. Wright refused, stating, 'I am sorry to give you such a hard time but, I do not want to.'  Mr. Wright refused the nursing care typically offered to patients with suspected deep vein thrombosis. *Deposition Transcript of J. Palmer*, p. 21, 122 to p. 22, 1. 1; Ex. 1 at 27; and, Bates #00000040.

      h.    After returning from Holy Family Medical Center at approximately 7:11pm, MD Cashion recorded that Mr. Wright had been ambulating in the ER, walking with one crutch. Ex. 1 at 13 and 16.  Mr. Wright did not appear to have difficulty walking with one crutch. Results from the tests conducted at Holy Family Hospital indicated that he did not have a deep venous thrombosis.

      i.    At approximately 7:27pm, MD Cashion discharged Mr. Wright to home noting that he could ambulate to the bathroom and had assistance from friends living nearby.  Ex. 1 at 13 and 16.  He was instructed to use his knee immobilizer and crutches.  Ex. 1 at 16.

      j.    At 8:05pm or later, Mr. Wright left the ER.  LPN Linton recorded that Mr. Wright verified that he understood all discharge instructions.  Bates 00000041.  And, she recorded that Mr. Wright was ambulatory using his crutches on discharge from the emergency 'accompanied by friend.' *Deposition Transcript of K. Linton*, p.20, 11. 7-13; Bates 00000041.  She stated that she had offered Mr. Wright a wheelchair on three occasions. *Depo. Tr. K. Linton*, p. 14, 11. 15-19; and, p. 37, 1.22

1    to p. 38.  He refused assistance with a wheelchair three times. *Depo. Tr. K. Linton*,

2    p.14, 11. 20-24; and, p.14, 1. 25.  LPN Linton did not observe or report that Mr.

3    Wright had difficulty walking with crutches.  LPN Linton did not examine or provide

4    any other care for Mr. Wright on 8/2/2014.  *Depo. Tr. K. Linton*, p. 27, 11. 11-15; and,

5    p. 30, 11. 2-30.

6              k.     Mr. Wright left the ER, ambulated across the roadway, and

7    reportedly fell near a wheelchair return rack.  See photographs at Bates # 00003137,

8    00003140, 00003144.  According to one account, he hit his head either on the rack or

9    the cement walkway. Ex. 1 at 1.

10        8.     Emergency Room Visit # 2.

11             a.     At approximately 8:10pm or later, Mr. Wright was escorted by RN

12   Haugen back to the ER.  *Deposition Transcript of M. Haugen*, p. 12, 11. 9-20.  RN

13   Haugen stated that he had observed Mr. Wright standing and leaning on the

14   wheelchair rack.  *Depo. Tr. M. Haugen*, p. 11, 11. 16.  Mr. Wright did not say who

15   was there to pick him up; but did appear alert.  *Depo. Tr. M. Haugen*, p. 13, 11. 4.

16             b.     On arrival to the ER, RN Whitley-Ford completed a nursing

17   assessment of Mr. Wright.  Ex. 1 at 1-4; *Depo. Tr. E. Ford*, p. 26, 11. 1-9.  She

18   recorded that his vital signs were within normal limits, his reported pain level was 1 of

19   10, and, his oxygen level was within normal limits at 92%.  Ex. 1 at 1; *Depo. Tr. E.

20   Ford*, p. 32, 11. 14-17; and, p. 26, 11. 1-9.  At approximately 11:18pm, she entered

21   the remainder of the assessment that had been completed on arrival.  Mr. Wright had

22   not appeared distressed.  He was alert and oriented to time, person and place. Ex. 1 at

23   3-4;  *Depo. Tr. E. Ford*, p. 36, 11. 2-11; his pupils were equal and reactive to light; he

24   had an abrasion to his forehead, a bump underlying the abrasion; and, his extremities

25   were within normal limits.  Ex. 1 at 3-4; *Depo. Tr. E. Ford*, p. 26, 11. 1-9; and, p. 42,

26   1. 5-10.  Mr. Wright was able to move and push his extremities against gravity; his

27   pulses, including his pedal pulses were present; and, he was able to grip her hands

28

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT  - 12          239

1  with his hands with equal strength.  There was no evidence of head injury or trauma

2  other than the abrasion and bruise on Mr. Wright's forehead.  Ex. 1 at 3-4; *Depo. Tr.*

3  *E. Ford*, p. 26, 11. 1-9.

4          c.     As noted previously, on arrival to the ER, patients are assessed by

5  a Registered Nurse.  A physical assessment including a chief complaint, history of the

6  present illness, significant past history, allergies, systems review, vital signs, results of

7  pertinent diagnostic tests and a physical examination was required.  Numbered

8  Memorandum 00-13-13, p.88-89.  RN Whitley-Ford completed an accurate and timely

9  assessment of Mr. Wright that included these criteria on his second arrival to the

10  emergency room.  He was subsequently designated an ESI 4 patient meaning that he

11  did not require acute emergency care such as placement of an airway, did not

12  demonstrate signs of a neurological deficit, and/or, he did not need extensive

13  assistance from IV therapy or specialty consultations.  Ex. 1 at 3.  As an ESI 4, his

14  need on admission was medical and nursing care.  Ex. 1 at 3; Numbered

15  Memorandum 111-11-15, p. 3d(1).

16          d.     Mr. Wright repeatedly stated he wanted to go home.  *Depo. Tr. E.*

17  *Ford*, p. 33, 11. 3-22; and, p. 57, 1.22 to p. 58, 1.1.

18          e.     Dr. Cashion conducted an assessment of Mr. Wright. He recorded

19  Mr. Wright was oriented times three, had no decreased level of consciousness, and,

20  his extremities were within normal limits.  Ex. 1 at 9-12; Deposition Transcript of M.

21  Cashion, p. 16, 1. 18 to p. 17, 1.3; p. 35, 1. 19 to p. 36, 1. 5; p. 48, 11. 8-25; and, p. 21,

22  1. 16 to p. 23, 1.7.

23          f.     At approximately 8:43pm, Dr. Cashion completed his care of Mr.

24  Wright. A CAT scan was not ordered or done.  *Depo. Tr. M. Cashion*, p. 32, 11. 4-9;

25  p. 52, 1. 21 to p. 53, 1. 3.  He indicated that Mr. Wright received discharge

26  instructions.  Ex. 1 at 6 and 12; *Depo. Tr. M. Cashion*, p. 51, 11. 18-24.

27

28

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 13      240

g.    LPN Linton later stated, after hearing Mr. Wright would be discharged, that she reported to RN Whitley-Ford that she believed Mr. Wright required a CAT scan given he had fallen and was on anticoagulant therapy. *Depo. Tr. K. Linton*, p. 30, 11. 2-30.  It exceeds LPN Linton's scope of practice to assess, diagnose or evaluate a patient's need for a CAT scan.  LPN Linton cannot order a CAT scan.  *Depo. Tr. K. Linton*, p. 42, 11. 23-25.  And, LPN Linton had not cared for Mr. Wright after his fall or during his second visit to the emergency room.

h.    RN Whitley-Ford stated that she had discussed whether a CAT scan should be done prior to Mr. Wright's discharge with Dr. Cashion but per her scope of practice, did not 'advise' or order him to obtain a CAT scan. *Depo. Tr. E. Ford*, p. 53, 1. 18-55.  Having had the discussion with Dr. Cashion, this concern appeared to have been resolved.  *Depo. Tr. K. Linton*, p. 41, 11. 15-23.  The VAMC did not have a protocol instructing nursing staff to 'go up the chain of command.' *Deposition Transcript of R. Ready*, p. 64, 11. 2-11.  RN Whitley-Ford did not pursue further reporting to her supervisor of this treatment option.  *Depo. Tr. K. Linton*, p. 42, 11. 2-8.  Rather, per practice at the VAMC, RN Whitley-Ford discussed and resolved this question with the doctor directly.  *Depo. Tr. R. Ready*, p. 88, 1. 3 to p.89, 1. 1. While she initially could not specifically remember having this discussion with Dr. Cashion, she stated that this was her routine practice, and then said the discussion with Dr. Cashion did include further testing.  *Depo. Tr. E. Ford*, p. 53, l. 18 to p. 55, l. 15. RN Whitley-Ford cannot order a CAT scan; it exceeds her scope of practice under Washington State law.  *Depo. Tr. E. Ford*, p. 72, 1. 7 to p. 73, 1. 7; *Depo. Tr. S. McManus*, p. 41, 11. 6-10; *Depo. Tr. M. Cashion*, p. 67, 11. 8-10; *Depo. Tr. K. Morris*, p. 66, 1. 23 to p. 67, 1. 5.

i.    MD Cashion stated that he had met with RN Whitley-Ford, Mr. Wright and his driver at the bedside.  *Depo. Tr. M. Cashion*, p. 79, 1. 16 to p. 80. 1. 18.  An agreement was reached that discharge to home was the appropriate plan of

care.  Ex. 1 at 25; *Depo. Tr. M. Cashion*, p. 34, 11. 4-9; *Depo. Tr. E. Ford*, p. 56, 1. 23, to p. 57, 1. 2.  Medical staff is required to provide discharge instructions to ESI #1 and ESI #2 patients.  Written instructions are not required for discharge of ESI #3, ESI #4 or ESI #5 patients by emergency room physicians.  Numbered Memorandum 111-11-15, p. 5 g (1).  Dr. Cashion recorded that instructions were discussed with Mr. Wright on his initial discharge.  And, instructions were again discussed with Mr. Wright and his friend prior to his second discharge after the fall in the parking lot.  Ex. 1 at 12; *Depo. Tr. M. Cashion*, p. 51, 11. 18-24; p. 79, 1. 16 to p. 81, 1.12.  Written instructions were given to Mr. Wright during his initial emergency room discharge.  Written instructions were not required by Dr. Cashion for either discharge.

j.      On 8/2/2014 at approximately 8:43pm, Mr. Wright left the VAMC in the care of his friend.  His vital signs, level of consciousness, oxygen levels, pupillary reaction time, bilateral use of his limbs, and lack of pain were all indicative of normal neurological function.  This was noted in Mr. Wright's initial nursing assessment; and, there was no deviation from his nursing assessment prior to his discharge.  Mr. Wright did not report a headache, was in no new pain, and appeared comfortable with the instruction that he have home observation.  Ex. 1 at 12.  He was reportedly found dead the following morning.  There is no indication whether he did or did not have someone observing him through the night.  The abrasion and the small bump on his forehead were the only external signs of injury to his head; there were no internal signs of injury to his head other than the subdural hematoma found on autopsy.  Regrettably, Mr. Wright expired the next day; his primary cause of death was a subdural hematoma affecting the frontoparietal region.  A superficial left frontal scalp abrasion (2 x 4cm) with minimal swelling was noted.  Bates 00001960.

9.      Registered Nurses triage patients, evaluate their pain, assess their risk for falling, and facilitate their discharge from health care settings.

a.      When triaging patients, Registered Nurses observe, assess and diagnose care needs of a patient.  They develop and implement plans of care including interventions to meet patients' needs.  Registered Nurses then re-evaluate whether the established plan of care successfully meets the patient's needs.  This process is based on current scientific evidence, the patients' personal values and preferences, and, the clinical judgement of the Registered Nurse.  In the emergency room at the Mann-Grandstaff VAMC, a designation of the immediate severity of needs is the basis on which the Registered Nurse identifies a patient as an ESI 1, ESI 2, EDI 3, ESI 4 or ESI 5.  In this instance, based on the objective findings of Mr. Wright's assessment, his personal preferences, the nurse's clinical judgment, RN Palmer accurately designated Mr. Wright as an ESI 3 during his first ER visit; and RN Whitley-Ford, accurately triaged him as an ESI 4 during his second ER visit.

b.      Evaluation and treatment of pain (the 5th vital sign) is conducted using a pain scoring tool ranging from 1, meaning little or no pain, to 10 meaning the most severe pain the patient has ever experienced.  NM 00-13-12, p. 147-148.  On initial arrival to the emergency room, Mr. Wright reported a score of 9 of 10 possible points due to knee pain; his pain decreased to a 1 prior to his first discharge.  On arrival a few minutes later and after his fall in the parking lot, Mr. Wright reported a score of 1 or less of 10 possible points; he indicated that he had no pain.  RNs Palmer and Whitley-Ford assessed Mr. Wright's pain as required and responded to his pain needs in a timely manner.

c.      Registered Nurses evaluate patients' risk for falls.  This includes observation and assessment of a patient's overall health and the patient's ability to move in place and to move from place to place.  The patient's mental capacity and ability to use assistive devices are also evaluated.  Patient vital signs, systems review, pain level, oxygen level, distress level and, level of consciousness are also assessed.  Based on the Registered Nurse's findings, a nursing diagnosis and plan of care to

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 16          243

attempt to protect a patient from falling may be developed.  This is a foundation of nursing practice and incorporated into the nursing process for patients.  Some health care institutions use a fall prevention program that is embedded into the electronic medical record.  At the VAMC, a fall prevention program, that utilizes a Morris Scale assessment tool, is used during admission of a patient as an inpatient. Numbered Memorandum 00-08-15.  It is not used in the emergency room.  In the ER, a nursing diagnosis for potential for falls is again determined by the clinical judgement of the Registered Nurse, the patient's health care assessment, and the patient's preferences and values.  RNs Palmer and Whitley-Ford completed a thorough and ongoing assessment of Mr. Wright and his risks for falls.  While in the emergency room he ambulated with one crutch against the advice of the nurses; and, he denied assistance of a wheelchair when it was offered three times prior to him leaving the emergency room. Mr. Wright did not fall in the emergency room; he fell after discharge from the ER in the parking lot.

   d. Physicians order a patient's discharge; however, nurses facilitate this process.  Nurses have no duty of care or standard of nursing practice that requires a nurse to accompany a patient to their transportation when the patient is discharged.  A nurse is not required to escort a patient to their awaiting transportation when leaving a clinic, hospital, or emergency room.  As noted in a review of applicable laws, regulations and clinical guidelines, a nurse's responsibility to the patient ends once the patient is discharged by the physician.  There is no Federal or Joint Commission requirement that the patient be accompanied from a health care setting.  As confirmed by telephone with a representative of The Joint Commission (TJC), if the facility policy requires that a staff member accompany a patient, TJC will require that it occur.  If the facility policy does not require or is silent regarding accompaniment of a patient to their transportation, TJC does not require it.  There is no VAMC policy related to this issue.  The VAMC does not require that a patient be accompanied on

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 17

244

discharge from the emergency room.  A patient is escorted to their transportation dependent on the patient's condition, ability to ambulate, the health care provider's clinical judgement, and most importantly, the patient themselves.  *Depo. Tr. R. Ready*, p. 24, 11. 7-16.  Mr. Wright's condition appeared stable when he was initially discharged and later when he was discharged after his fall in the parking lot.  No duty of care or standard of practice was violated by RN Palmer, LPN Linton or RN Whitley-Ford.

10.     Registered Nurses afford patients opportunities to exercise their rights, including but not limited to, their rights to make decisions regarding their care, witness patients when physicians provide informed consent, and when advocating on their behalf regarding their care needs.

a.     Patients must be afforded opportunities to exercise their rights in health care facilities. Hospitals must adopt and implement policies and procedures that define each patient's right to be involved in all aspects of their care, including the right to refuse care and treatment. WAC 246-320-141(1)(g)(i).  This does not mean that hospitals are required to adopt policies or procedures that delay a patient's discharge.  RCW Chapter 70.41.324; WAC 246-320-141.  Patient rights include respect for their personal freedoms in their care and treatment.  This includes participation in the development of their plan of care and discharge planning.  Patients retain access to the outdoors; and, they retain the responsibility to avoid unsafe acts that place others at risk for accidents or injuries.  If patients believe they are unable to follow the treatment plan, they have the responsibility to tell their treatment team.  Rights and responsibilities of VA patients and residents of community living centers (CLC), 2013.

b.     Nurses may witness the provision of medical informed consent to patients.  Physicians are required to provide informed consent to patients.  This includes determining patient capacity to make decisions, the risks and benefits of their

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT  - 18          245

decisions, and, the alternatives that are afforded them in lieu of recommendations from the physician.

        c.    Patients are the center of all decision making in health care and that decision making regarding their health care cannot be delegated to either nurses or physicians. Mr. Wright repeatedly exercised his statutorily protected rights regarding his care when in the emergency room. Mr. Wright demonstrated he had the capacity to make decisions regarding his rights; there was no indication in the record that Mr. Wright was dizzy, disoriented, or exhibiting any symptoms of exacerbation of either bipolar disease or post-traumatic stress disorder. For example, Mr. Wright knowingly did not meet with the pharmacist 8 of 26 appointments to regulate his Warfarin dosages prior to August 2014; his INR reflected that he was not within normal limits 17 of the scheduled 26 appointments. Mr. Wright knowingly continued to walk in the emergency room with one crutch even when advised that it was contraindicated when evaluating his risk for deep vein thrombosis. He was also asked to return to his exam room to elevate the leg which was the focus of his chief complaint of swelling and pain. He responded, 'I don't want to.' And, on initial discharge from the VAMC, Mr. Wright denied the use of assistance with a wheelchair three times; he knowingly walked out of the emergency room using one crutch. Regrettably, Mr. Wright fell several feet from the emergency room door, hit his head and subsequently developed a subdural hematoma for which no signs or symptoms were evidenced during his second ER visit. Mr. Wright had the capacity and right to exercise his judgment and free will to make decisions regarding his care, even when as in this case, those decisions contributed to his demise.

### V. Expert Opinions

My opinions in this matter, based on reasonable nursing certainty and on a more probable than not basis, include the following:

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 19      246

1      1.    Mr. Wright exercised his statutory right to make decisions regarding his

2   care, even when those decisions adversely affected him.  LPN Linton offered Mr.

3   Wright the use of a wheelchair three times and three times he refused wheelchair

4   assistance on leaving the emergency room.  No one can 'insist' that a patient accept

5   assistance from a facility or from a health care provider.  Patients retain the right to

6   refuse care, even when those decisions may negatively affect their health and

7   contribute to their subsequent death.  RN Whitley-Ford reported up the chain of

8   command when informed by LPN Linton of her concern that Mr. Wright obtain a

9   CAT scan of his head.  RN Whitley discussed, but did not 'advise' Dr. Cashion of

10  Nurse Linton's concerns regarding Mr. Wright's head injury while on anticoagulant

11  therapy.  Based on the information known at that time, Dr. Cashion determined that a

12  CAT scan was not necessary.  RN Whitley-Ford did not disagree with him at that time

13  and no further report up the chain of command appeared to be warranted.  RN

14  Whitley-Ford did not have authority to either order a CAT scan or order Mr. Wright's

15  admission to an inpatient status.

16      2.    There is no statutory duty of care or standard of nursing practice

17  requiring that a patient be accompanied from a health care setting to their awaiting

18  transportation.  Mr. Wright was offered and refused assistance from the emergency

19  room to his transportation on three occasions.  Nurses did not have the authority to

20  require Mr. Wright to allow them to accompany him to his transportation.

21      3.    Registered nurses cannot order diagnostic imaging such as a CAT scan or

22  admission to an acute care hospital.  It exceeds their statutory scope of practice and

23  nursing standards of practice.

24      4.    RNs and LPNs are patient advocates as identified in the Code of Ethics in

25  Nursing.  RN DeLeon advocated for Mr. Wright's safety and improved care outcomes

26  when advising Mr. Wright to return to his exam room and elevate his leg to facilitate

27  resolution of the swelling in his leg.  RN Whitley-Ford advocated for Mr. Wright

28

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT
UNITED STATES' MOTION FOR SUMMARY JUDGMENT  - 20        247

when discussing the plan of care with Dr. Cashion, and, when participating in a discharge meeting with Mr. Wright, Dr. Cashion, and Mr. Wright's traveling companion.  LPN Linton advocated that Mr. Wright's safety when offering assistance with a wheelchair and expressing her concern to RN Ford regarding imaging.  While nurses advocate for patients, they may not replace the patient's decision making with their own.  To do so, would violate the patient's embedded right to make their own decisions regarding their care. Nurses are required to advocate for the patient and their decisions regarding care.  VAMC nurses repeatedly advocated for Mr. Wright and his choices regarding his care.

5.     RNs may not retain or admit patients for overnight observation.  In this instance, RN Whitley-Ford had no statutory authority to admit Mr. Wright as an inpatient.  To do so, Dr. Cashion was required to notify the administrative officer on duty who was then required to notify the hospitalist to consult with the ER physician.  There is no duty of care or standard of nursing practice that allows nurses to admit or retain patients.

6.     RNs reportedly did not obtain informed consent when providing care to Mr. Wright.  In Washington State, physicians are required to obtain informed consent regarding medical care, including discharge of patients from the emergency room.  There is no statutory duty of care or nursing standard of practice that nurses provide medical informed consent prior to, during or at discharge of the patient at the emergency room.

## VI. Conclusion

Mr. Steven O. Wright was a 70 year old veteran who lived with his dog in Rosalia, Washington.  He received his health care through the Mann-Grandstaff VAMC.  Nurses caring for Mr. Wright completed accurate nursing assessments and effective plans of care to address his nursing needs when he was a patient in the emergency room on two occasions on 8/2/2014.  They advocated for his care, and,

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 21

248

facilitated his ability to make decisions regarding his care.  They afforded him the ability to exercise his rights when ambulating in the ER, and when on discharge, he exited the facility without assistance of a wheelchair.  Nurses cannot substitute the patient's decisions with one's that they themselves would have made.  Nurses cannot 'insist' that a patient be escorted from the facility to their transportation on discharge. They can and do act as patient advocates when discussing possible plans of care with physicians; but, they cannot insist or order that a CAT scan or admission to the facility be done.  Nurses can and do provide information to patients regarding their nursing care; however, they cannot provide informed consent to patients regarding medical care.  Nurses observe, assess, diagnose nursing care needs, implement nursing interventions to address those needs, and evaluate the effectiveness of those interventions.  In this instance, nurses accurately, timely and effectively assessed Mr. Wright's triage status as an ESI # 3 and #4.  They intervened to assure Mr. Wright's care needs were met, including care to prevent him from falling in the ER and to provide for his safety on discharge.  Mr. Wright accepted some care from nurses, and refused some nursing care as was his right.  Regrettably, Mr. Wright's choices contributed to his death.  Mr. Wright's family members and those caring for Mr. Wright will always wonder about his decisions and the impact they had on his subsequent death.  However, nurses providing care to Mr. Wright met their duty of care and the standards of practice required to meet Mr. Wright's care needs as a patient in the emergency room at Mann-Grandstaff VAMC.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 29th day of March, 2017.

*Alice E. Dupler*

_____

Alice E. Dupler

DECLARATION OF ALICE E. DUPLER IN SUPPORT OF DEFENDANT UNITED STATES' MOTION FOR SUMMARY JUDGMENT - 22

249