# Exhibit D

000039

**In the Matter Of:**

*ERIC WRIGHT vs*

*UNITED STATES*

---

*KARLA LINTON, LPN*

*October 04, 2016*

---

# SPOKANE REPORTING SERVICE, INC.

800-759-1564

*www.spokanereporting service.com*

000040

1    20:13, which is 8:13 p.m., correct?

2    A   Correct.

3    Q   Okay.  When you look back on page 17, that one is

4    indicated at 19:45.  So, actually, I'm correcting myself

5    here.

6              Your first entry into the records would have

7    been the one on page 17 at 7:45 p.m., correct?

8    A   That is when it was signed, yes.

9    Q   Is there any way of knowing --

10             Or, excuse me, that indicates at 7:30 an

11   addendum -- and I'm speaking from page 17 -- an addendum

12   was made concerning medication, and apparently a notation

13   about what Dr. Cashion wanted the veteran to take home;

14   is that correct?

15   A   Yes.

16   Q   Okay.  Did you discuss or do you have any independent

17   memory today for whether you had any discussion with Dr.

18   Cashion about the discharge of the patient to go home

19   that day?

20   A   Not to my recollection.

21   Q   Okay.  You see a lot of patients, correct?

22   A   Correct.

23   Q   And this is some time ago, correct?

24   A   Yes.

25   Q   So I just want to establish, you don't have any

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564          www.spokanereporting service.com        Spokane, WA  99210

000041

```
 1    importance of using ice and elevating, and reminding him

 2    that there was an ortho consult placed on his behalf for

 3    August 4th.

 4    Q    As you sit here today, do you have any -- do you have

 5    a memory of talking with him that evening?

 6    A    Yes.

 7    Q    Okay.  Tell me what you remember about Mr. Wright.

 8    A    I took his care from Jill Palmer when I came on duty.

 9    And he was in room 117 in the urgent care emergency room.

10    We were awaiting results from an outside facility's

11    imaging.

12    Q    Which is Holy Family?

13    A    Correct.

14    Q    Okay.

15    A    Once we got those results back, if they were negative

16    the vet would be discharged.

17              I had told him when his ride arrived to let

18    me know and I would offer him a wheelchair out.  He

19    acknowledged that.

20              I went back to the nurse's station.  And I

21    don't recall how long it was.  I saw him up and walking

22    past the nurse's station.  Offered to get him a

23    wheelchair.  He said his friend had arrived to take him

24    home.  He refused the wheelchair.

25              I offered a second time.  He again refused,
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com        Spokane, WA  99210

000042

1    and he ambulated out of the emergency department.

2            I made sure he understood his discharge

3    paperwork because he had it in his hand.

4            I don't recall if I'm the one that handed it

5    to him or if Dr. Cashion gave it to him.  I went over it

6    with him.

7            And he left using his own personal crutches,

8    taking his belongings, and ambulated out of the emergency

9    department area.

10   Q    When did you learn that he had passed away?

11   A    I don't recall.

12   Q    Well, was it the next day?

13   A    Probably a couple of days later, would be my guess.

14   But I honestly don't know the answer to that, an exact

15   date.

16   Q    Were you surprised that he had expired?

17   A    Yes.

18   Q    So it's your testimony that someone told you that Mr.

19   Wright had passed away in the past couple of days?

20   A    I'm unclear what you're asking me.  I'm sorry.

21   Q    Well, you just indicated that you learned you thought

22   within two days that he had passed away; is that correct?

23   A    Two days from the time he had left our emergency

24   department.

25   Q    Correct?

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com            Spokane, WA  99210

000043

1    117 to go smoke?

2    A    No.

3    Q    Were you aware that he was on a blood thinning

4    medication, Warfarin?

5    A    Yes.

6    Q    And what risks, if you know, arise from being on

7    Warfarin?

8    A    It's a blood thinner, so you can run the risk of

9    bleeding more easily than others.  Simple bumps and

10   bruises can cause excessive bleeding.

11   Q    And I understand you knew that when he was heading

12   out the door on his crutches; is that correct?

13   A    Yes.

14   Q    Have you on prior occasions with other patients

15   wheelchaired them to their vehicle?

16   A    Yes.

17   Q    Have you gone out into the parking lot area or toward

18   where the bus stops to bring patients back in who may

19   have fallen or had some other medical problem?

20   A    Not that I can think of immediately off the top of my

21   head.

22   Q    Okay.  Did you have any discussion with any doctor or

23   other nurse concerning whether he was going to be

24   admitted or not to the hospital?

25   A    No, not admitted.

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564               www.spokanereporting service.com          Spokane, WA  99210

000044

```
 1   Q   Did you have any communications at all with Dr.
 2   McManus?
 3   A   Not that I recall.
 4   Q   Did you have any communication or discussions with
 5   Dr. Cashion concerning this patient?
 6   A   Not that I can recall, but I would assume yes.
 7   Q   And why would you assume yes?
 8   A   Because there were orders written.  So we generally
 9   communicate with the doctors.  That way they would tell
10   us they were writing orders.
11   Q   Did anyone tell you that when you came on shift that
12   Mr. Wright was a fall risk?
13   A   Not that I recall.
14   Q   Is someone who is on crutches, are they considered a
15   fall risk just because they're on crutches?
16   A   Not necessarily, no.
17   Q   When they are on crutches, and they are in for a leg
18   injury, do you consider that to be a fall risk?
19   A   That could be, yes.
20   Q   That is a "yes"?
21   A   Yes.
22   Q   Were you aware that he was suspected to have a
23   possible DVT situation?
24   A   Yes.
25   Q   Did you ever examine his leg?
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com           Spokane, WA  99210

000045

```
 1   A    No.

 2   Q    Were you told about the condition of his leg that he

 3   was complaining about when the shift changed?

 4   A    Yes.

 5   Q    And was that information transferred to you by the

 6   prior nurse who had been attending to him?

 7   A    Yes.

 8   Q    And who was that?

 9   A    Jill Palmer.

10   Q    Do you remember what she told you as you sit here

11   today?

12   A    No.

13   Q    Can you tell me how you approached the subject of

14   providing him with a wheelchair to go to his vehicle?

15   What you would have said to him, if you remember?

16   A    I don't recall exact words.

17   Q    You said he refused a wheelchair.

18   A    (Nods head).

19   Q    Do you remember what he -- what his exact words were?

20   A    No, I don't remember his exact words.

21   Q    Did you ask or inquire of Dr. Cashion, if you can

22   remember, how he should be -- whether he should be

23   allowed to go out on his crutches to his vehicle or not?

24   A    I don't recall.

25   Q    Did anyone order you to escort him to his vehicle?
```

```
 1   A    No.
 2   Q    Prior to him leaving, did you have the opportunity to
 3   watch him ambulate with his crutches?
 4   A    Yes.
 5   Q    And you specifically remember that day?
 6   A    Yes.
 7   Q    Okay.  Tell me where he started his ambulation and
 8   where the last time is that you saw him.
 9   A    I was sitting at the nurses' station.  He had come
10   out of 117, and I saw him ambulate around the front of
11   the nurses' station and out into the lobby.
12   Q    Did he appear to be ambulating okay to you?
13   A    Yes.
14   Q    If he was ambulating okay, why did you offer to have
15   him get into a wheelchair to be taken out to his vehicle?
16   A    Because he had been in for a possible DVT and was
17   complaining of leg pain.
18   Q    Did you have the authority to tell him that "For your
19   own safety, it's necessary that I put you in a wheelchair
20   to get you to your vehicle"?
21   A    I suppose, yes, I have authority to say that.
22   Q    But you didn't do that, correct?
23   A    No.
24   Q    You did have concern about you --
25        You did have concern that he was a fall risk,
```

509-624-6255                    SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                    www.spokanereporting service.com          Spokane, WA  99210

000047

```
 1   personal belongings."
 2              Given that particular statement, do you stick
 3   with your testimony now that you had seen him earlier
 4   with the friend but you're not sure that he was with the
 5   friend leaving the hospital out the door?
 6   A   He had told me his friend was picking him up.  I had
 7   seen the friend earlier, but I did not see the friend at
 8   the very time that the patient left the emergency
 9   department.
10   Q   Were you aware that Mr. Wright had been there for
11   over eight hours at the hospital when he was discharged?
12   A   I don't recall at this time.  I may have at that
13   time, yes.
14   Q   Did you know at the time that he was discharged that
15   Dr. McManus had anticipated earlier that he would be
16   admitted?
17   A   I don't --
18              MR. O'HALLORAN:  Object to the form.
19              MS. MITCHELL:  Join.
20   A   I don't recall.
21   Q   (By Mr. Eymann)  So are you saying you could have
22   known that but you don't remember?
23   A   Yes.
24   Q   Were you aware that he was due back a couple of days
25   later to see an orthopedic --
```

509-624-6255          SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564          www.spokanereporting service.com        Spokane, WA  99210

000048

```
 1   physician is taking action or not taking action that

 2   might harm or be unsafe for a patient, what are the

 3   nurse's responsibilities?

 4   A   To go through chain of command.

 5   Q   Okay.  And when you say "Go through chain of

 6   command," what does that mean?

 7   A   I -- you would go to your next person in command.  So

 8   I would have gone to Libby and voiced any concerns.

 9   Q   Okay.  And did you do that?

10   A   Yes.

11   Q   Okay.  Who is Libby?

12   A   I'm sorry, Elizabeth Whitley.

13   Q   So was Elizabeth Whitley the charge nurse that night?

14   A   Yes.

15   Q   And once you talked to Elizabeth Whitley, if Miss

16   Whitley felt there was any concern about the discharge,

17   what would be her responsibility?

18              MR. EYMANN:  Objection.  Calls for

19   speculation.

20   Q   (By Mr. O'Halloran)  As far as chain of command goes,

21   what would be her responsibility, if you know?

22   A   To the provider, or we have a nursing supervisor as

23   well.

24   Q   Okay.  Do you know if anyone contacted the nursing

25   supervisor that night?
```

000049

```
 1   A   I don't, no.

 2   Q   Okay.  When you raised the issue about a CT scan with

 3   nurse Whitley, did she indicate that she had any concern

 4   about the discharge?

 5   A   She did not.

 6   Q   Okay.  And she had been with Mr. Wright during the

 7   examination; is that correct?

 8   A   Yes.

 9   Q   Do you know how long Miss Whitley has worked in the

10   ER at the VA in Spokane?

11   A   I don't have an exact time, no.

12   Q   Was she working there at the time you started?

13   A   No.

14   Q   She came after?

15   A   Yes.

16   Q   Do you know where she'd worked prior to that?

17   A   I believe she was in float pool, but I don't know for

18   certain.

19   Q   Was she --

20           She was the charge nurse that night; is that

21   correct?

22   A   Yes.

23   Q   Okay.  Were you responsible in any way for the

24   discharge instructions the second time Mr. Wright left

25   that evening?
```