# Exhibit H

000073

**In the Matter Of:**

*ERIC WRIGHT vs*

*UNITED STATES*

*MEDFORD CASHION, M.D.*

*October 10, 2016*

**SPOKANE REPORTING SERVICE, INC.**

800-759-1564

*www.spokanereporting service.com*

000074

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFFS:

 3   EYMANN, ALLISON, HUNTER & JONES
     By:  Richard C. Eymann
 4        Allen Schwenker
          Attorneys at Law
 5   2208 West Second Avenue
     Spokane, Washington 99201
 6
     LOWTHORP, RICHARDS, McMILLAN, MILLER & TEMPLEMAN
 7   By:  John H. Howard
          Attorney at Law
 8   300 East Esplanade Drive, Suite 850
     Oxnard, California 93036
 9
     FOR THE DEFENDANTS:
10
     JOHNSON, GRAFFE, KEAY, MONIZ & WICK
11   By:  Ketia Wick
          Attorney at Law
12   925 4th Avenue, Suite 2300
     Seattle, Washington 98104
13
     UNITED STATES ATTORNEY'S OFFICE
14   By:  Rudy J. Verschoor
          Attorney at Law
15   920 West Riverside Avenue, Suite 340
     Spokane, Washington 99201
16
     FAIN, ANDERSON, VANDERHOFF, ROSENDAHL, O'HALLORAN,
17      SPILLANE
     By:  Scott M. O'Halloran
18        Attorney at Law
     1301 A Street, Suite 900
19   Tacoma, Washington 98402

20

21

22

23

24                         * * * * *
25
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereportingservice.com              Spokane, WA  99210

000075

```
 1   Q   When you examined him, I take it he showed no signs
 2   of concussion, correct, sir?
 3   A   Yes, sir.
 4   Q   What history did you ask him about his memory of the
 5   fall and so forth?
 6   A   Well, one of the best ways to ask about memory is did
 7   he remember the fall, remember hitting his head, and he
 8   did.
 9   Q   Okay.  Did you ask him anything else about the -- the
10   history of his fall up to the time you were examining him
11   other than whether or not he recalled the fall?
12   A   Well, my normal practice would be to get all the
13   details that are relevant.  Why was he there in the first
14   place, was he using his crutches, did he trip on his
15   crutches, why did he trip, why did he fall, what exactly
16   was he doing outside the ER at that time.  All those
17   details would have been related to this.
18   Q   Okay.  Other than trying to determine the mechanism
19   of the fall and the whys and wherefores for him being at
20   the location of the fall and how much of the fall he
21   actually -- he remembers, did you ask him any other
22   questions, sir?
23   A   Well, I think -- well, I take a normal history and
24   physical for this visit, yes.  Yes, I go through the
25   whole checklist and history and physical.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com       Spokane, WA  99210

000076

```
 1   Q    Sure.  This is an individual that you had seen
 2   earlier in the evening, correct, sir?
 3   A    Yes, I did.
 4   Q    So did you go through his whole history again in
 5   terms of what medications --
 6             When you say "history," I assume you're
 7   talking about medications he's on?
 8   A    Correct.
 9   Q    Illnesses and injuries he's had in the past, correct,
10   sir?
11   A    That is correct.
12   Q    What else do you explore when you ask him -- when you
13   go over that history?
14   A    Well, the main points are what is the severity of the
15   injury and his response to the injury.  And also related,
16   what caused it.  Just a normal, reasonable history and
17   physical that I would normally do.
18   Q    Okay.  So, again, I'm just trying to understand.  You
19   did ask him a series of questions about why he was at
20   that location and the mechanism of his fall, right?
21   A    That is correct.
22   Q    You asked if him he recalled actually falling, and he
23   responded he did, correct?
24   A    That's correct.
25   Q    I'm sure you asked him if he hit his head on
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000077

1  anything, and he responded that he did, correct?
2  A   Yes, sir.
3  Q   What did he say he hit his head on?
4  A   He said he hit his head on the pavement.
5  Q   Did he indicate whether or not he also made contact
6  with a wheelchair rack?
7  A   He may have said that. He may have said that there
8  was a quick succession of falling and hitting his head,
9  hitting the rack, hitting the ground. I asked him in
10 detail about all those memories.
11 Q   When you say "quick succession," are you talking
12 about he fell quickly, hit his head on the rack, and then
13 hit his head on the ground? Is that what you're saying?
14 A   Yes, sir.
15 Q   Did he describe this quick succession in any other
16 way other than what I just said?
17 A   No, sir.
18 Q   Did he indicate to you how hard he hit the rack or
19 the ground?
20 A   Well, I would have tried to determine that from what
21 he told me, but he was able to say he hit the ground
22 without severe pain, without knocking himself out.
23 Q   Did he indicate to you whether or not he was able to
24 break his fall with any body part other than his head?
25 A   I asked him what came into play as he fell with his

509-624-6255                SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com                Spokane, WA  99210

000078

```
 1   Q   My impression from your testimony is is that the
 2   patient wasn't clear about all aspects of his fall, that
 3   he wasn't able to give you a clear understanding of all
 4   aspects of his fall; is that correct?
 5   A   No, sir.  I asked him the details of his fall, and he
 6   gave me enough detail that I was satisfied he knew what
 7   happened at the time.
 8   Q   Okay.  Okay.  So other than obtaining as much detail
 9   as you could about the nature of the fall, and the fact
10   that he told you that he did not lose consciousness,
11   correct?
12   A   That's correct.
13   Q   I'm correct?  He told you that?
14   A   (Nods head).
15   Q   What else did he tell you about what his
16   recollections were of the fall and the aftermath of the
17   fall before presenting to you and nurse Whitley in the
18   ER?  What else did he tell you about the circumstances of
19   that fall and the -- and his reaction to the fall?
20   A   Uh-huh.  Well, as my note says, he wasn't knocked
21   out.  He didn't have a headache.  He had no neck or back
22   pain.  No pain at all.
23   Q   Did you ask him any other questions about his
24   physical or mental condition, other than whether he was
25   rendered unconscious or not, whether he had a headache or
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000079

```
 1   neck pain, did you ask him any other questions about his
 2   condition?
 3   A   My note says I asked him about any problems with his
 4   eyes, his ears, his breathing, his abdomen, and the other
 5   details of his fall.
 6   Q   And where are you reading from?
 7   A   I'm reading from page 11, "Review of Systems."
 8   Q   Okay.  The review of systems are happening while he's
 9   in the emergency room being examined by you, correct,
10   sir?
11   A   Correct.
12   Q   So when you're asking about his abdomen and his ears,
13   et cetera, you're asking that in the present tense as
14   he's sitting there in your emergency room, correct, sir?
15   A   Correct.
16   Q   I'm still interested in questions you asked him
17   relating to the fall and the aftermath of the fall
18   between the time he hit the ground and the time he
19   presented to you in the emergency room.
20             Did you ask him any other questions about his
21   either mental or physical condition other than what
22   you've already told us this morning?
23   A   No, sir.  My note pretty well covers my questions.  I
24   probably asked him related questions of -- and in various
25   ways to make sure I got consistent answers.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com           Spokane, WA  99210

000080

```
 1   Q    Well, let me first off ask you, do you have a
 2   recollection of asking him any other related questions
 3   other than what you've already told us today between the
 4   time he fell -- dealing with the time period from the
 5   moment he fell to the moment he presented to you in the
 6   emergency room?
 7   A    Yes, sir.  I remember asking him more than once about
 8   headaches, about any other pain, about how he felt, and
 9   so forth.
10   Q    Okay.  Headache and pain I got.  You say "how he
11   felt."  How he felt in what respect, sir?
12   A    Well, anything that he might want to offer or any
13   normal question that I might ask, simply beginning with
14   "How are you feeling?"
15   Q    Okay.  When you say "How are you feeling," that's a
16   present-tense question, correct, sir?
17   A    Yes, sir.  That would be my normal practice to ask
18   that question.
19   Q    Do you have a recollection of asking Mr. Wright any
20   of these normal questions other than what you've already
21   described to us now?  In other words, I'm not asking what
22   you normally do.  I'm asking you do you have a
23   recollection of asking Mr. Wright any other questions
24   about his physical or mental condition between the time
25   he fell and the time he presented himself to you?  Did
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com          Spokane, WA  99210

000081

```
 1   you ask him anymore questions about that?
 2   A   I'm sure I asked him many questions about his fall
 3   and how he felt.
 4   Q   What questions did you ask him other than what you've
 5   already told us today?
 6   A   Well, we had a reasonable diagnosis and plan.  We had
 7   written instructions that we discussed, was he able on
 8   use his crutches, was he able to get home without any
 9   difficulty.
10   Q   I'm sorry, sir.  My question probably wasn't clear to
11   you.  We're going to get into that later.  Because
12   clearly you asked him more questions while he was in the
13   ER room under your care and observation, up to the time
14   he was discharged.  I get that.
15               I just want to know if you discussed with Mr.
16   Wright any of his symptoms or complaints from the moment
17   he fell to the moment he entered the emergency room?
18               In other words, when you saw him in the
19   emergency room did you ask him about that time period
20   between the moment he fell and the moment he presented
21   himself in the emergency room?  Did you ask him any
22   questions about his condition other than whether he was
23   knocked out or not, whether he had a headache or not,
24   whether he had any neck pain?  Did you ask him any other
25   questions about his physical or mental status?
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA   99210

000082

```
 1              MR. O'HALLORAN:  Object to the form.
 2    A    Yes.
 3              MR. O'HALLORAN:  I don't think that was a
 4    complete list of the things he asked him about the fall.
 5    Q    (By Mr. Howard)  If I missed something, I apologize.
 6    And other than headaches, other than neck pain, other
 7    than loss of consciousness, did you ask him anything
 8    about his condition during the time period I'm interested
 9    in?
10              MR. O'HALLORAN:  He's just asking about
11    specifically between after the fall was over until he
12    came into the ER and you saw him.  And you've answered
13    that.  You don't have to repeat that.
14              But if there's anything that you remember
15    asking him about that specific period, you can tell him.
16    If you don't, if there was nothing else, then --
17    A    I have nothing else to add to the answer I've already
18    given.
19    Q    (By Mr. Howard)  Okay.  Do you know whether or not
20    for any period of time after Mr. Wright hit his head that
21    he was dazed or disoriented between the time he fell and
22    the time he presented himself to you in the emergency
23    room?
24    A    Well, my note says he wasn't knocked out.  My note
25    says no loss of consciousness.  So I would have asked him
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com         Spokane, WA  99210

000083

```
 1   details of was he dizzy, was he disoriented, was he
 2   altered like that at the time he fell or any time after
 3   he fell.
 4   Q   Did you ask him those questions?
 5   A   Yes, I did.
 6   Q   Is that reflected in your notes anywhere?
 7   A   Of course it is.  It's right there.
 8   Q   Where is it reflected in your notes you asked him
 9   about being disoriented or dazed?
10   A   When it says "knocked out," that implies I asked all
11   the ways one can be knocked out.  In other words, dizzy
12   or daze.
13             And no loss of consciousness too also implies
14   I'm probing him specifically for those symptoms.
15   Q   Are you equating loss of consciousness with being
16   dazed and disoriented?
17   A   Yes, I am.
18   Q   So, in other words, in your lexicon the words loss of
19   consciousness include diminution in the level of
20   consciousness?  Is that what you're saying?
21   A   Yes, sir.
22   Q   Is that your custom and practice?
23   A   Yes, sir.
24   Q   Is that what you've always done?
25   A   Always.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.   421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000084

```
 1   A    Yes.
 2   Q    And you go on to say "The plan is for him to follow
 3   up on August 4th for this head injury, correct, sir?
 4   A    Correct.
 5   Q    Why did you want him to follow up on August 4th?
 6   A    That was the next available office hours for the
 7   clinic to see the patient.
 8   Q    Is there a particular reason why you wanted the
 9   clinic to see this patient on August 4th?
10   A    Well, that was an appropriate plan, to follow up this
11   patient for his head injury.
12   Q    Why is it an appropriate plan to do that, sir?
13   A    Well, he was living alone.  He had a caregiver that
14   could look in on him or phone him.  But he simply was by
15   himself out in the country, and I felt he needed close
16   following.
17   Q    Why did you feel he needed close following?
18   A    As I said, he lived alone despite having a caregiver
19   nearby, and he had a set of written instructions about
20   what to do in case something went wrong.  But he was by
21   himself, and I felt he needed more help than just the
22   caregiver alone on that day.
23   Q    When you say something -- "in case something went
24   wrong," are you talking about with his afib, with his
25   bipolar condition, PTSD, or are we talking about with
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000085

```
 1   Q    Is that another typo or was he moving them?
 2   A    Well, that just simply refers that he had normal
 3   power in his extremities, and taking into consideration
 4   that the one was injured.
 5   Q    What do you mean "normal power" with respect to his
 6   left leg?  How did he have normal power with respect to
 7   that left leg?
 8   A    Well, I normally ask a person to either move their
 9   extremity for me or just actually watch it being used to
10   make sure it was moving normally.
11   Q    So, in other words, you had him walk so you could
12   watch him walk?
13   A    Well, I didn't watch him walk because he was limping
14   and in pain.  But I knew he was able to use crutches, and
15   so I simply observed how his extremities worked as he lay
16   on the stretcher.
17   Q    Okay.  Let's go to page 12, sir.
18   A    (Complied).
19   Q    Under your "Assessment and Plan," again you repeat
20   the abrasion and contusion of the forehead, correct?
21   A    Yes, sir.
22   Q    And, again, in your lexicon contusion includes the
23   concept of a bump; is that right?
24   A    Yes, sir.
25   Q    You said "Without concussion," correct?
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com                Spokane, WA  99210

000086

```
 1   observation."  So were you recommending that the patient
 2   go home?
 3   A    Yes, sir.
 4   Q    Okay.  Did the patient agree with that
 5   recommendation?
 6   A    Yes, he did.
 7   Q    He was comfortable with it?
 8   A    Yes, he was.
 9   Q    Did you recommend to him that he stay overnight for
10   observation?
11   A    No, sir.
12   Q    Did you recommend that he have a CT of his brain?
13   A    No, sir.
14   Q    Why did you not recommend that the patient stay
15   overnight?
16   A    It was a reasonable medical analysis of this
17   situation for this patient, that he was stable with
18   normal vital signs.  We had a reasonable plan that we all
19   agreed to.  We discussed the plan, and we were
20   comfortable with that situation.
21   Q    What time of day or night did you make that
22   recommendation that he go home, sir?
23   A    Well, the end of his visit was somewhere in the note
24   there.  I don't know where.  But it would have been
25   around 10:00 o'clock at night.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000087

```
 1   unable to bear weight after the fall; is that correct,
 2   sir?
 3   A    Yes, sir.
 4   Q    And when we say "the fall" we're talking about the
 5   fall onto his left knee on an earlier date, July 7th --
 6   July 27th of 2014, correct?
 7   A    Yes, sir.
 8   Q    So you did have an understanding that on August 2nd
 9   of 2014, due to that fall Mr. Wright was unable to bear
10   weight on his left leg; is that correct, sir?
11   A    That is correct.
12   Q    Did you ever make a request on August 2nd of 2014 for
13   Mr. Wright to see a neurologist or a neurosurgeon?
14   A    No, sir.
15   Q    Did you ever make a request to have Mr. Wright stay
16   overnight at the hospital?
17   A    No, sir.
18   Q    You had authority to make that determination on your
19   own, didn't you, sir, --
20              MR. O'HALLORAN:  Object to the form.
21   Q    (By Mr. Howard)  -- for Mr. Wright to stay at the
22   hospital overnight, or did you have to get authority from
23   the hospital to do that?
24   A    No, sir, it was not my authority.  I would have to
25   speak with the hospitalist about that.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com              Spokane, WA  99210

000088

```
1   Q   Do you know if you spoke to a hospitalist about
2   allowing Mr. Wright to spend the night on August 2nd of
3   2014?
4   A   No, sir.
5   Q   No, you didn't, or, no, you don't know if you did?
6   A   No, sir, I did not speak to the hospitalist about him
7   being admitted that night.
8   Q   Did you have authority to order a CT on your own, or
9   did you have to clear that with the hospitalist as well?
10  A   No, sir, I had authority.
11  Q   But you did not order one, correct?
12  A   Yes, sir.
13  Q   Okay.  I'm going to take you to page 46, the last
14  page.
15  A   (Complied).
16  Q   By the way, is there a difference at -- strike that.
17          In August of 2014, was there a difference at
18  the VA between discharge instructions or after-care
19  instructions?
20  A   No, sir.
21  Q   That would have meant the same thing?
22  A   Yes, sir.
23  Q   What were they called at the VA in those days?
24  A   My note says "Care Note."  I believe that was the
25  brand name of the instructions they were using.
```

509-624-6255                SPOKANE REPORTING SERVICE, INC.  421 W. Riverside Avenue, #1010
800-759-1564                www.spokanereporting service.com           Spokane, WA  99210

000089