**JAMES M. NANIA, MD, FACEP**
1921 South Liberty Drive
Liberty Lake, WA 99019
(509) 255-9251

April 28, 2017

**Preliminary Report**
*Wright v. Cashion*

### a) Qualifications

I am a board certified emergency medicine physician. I have been practicing emergency medicine in Washington state for over 35 years, holding a position as an emergency medicine physician with Deaconess Medical Center in Spokane, Washington from 1979 to 2009. Currently, I am Medical Program Director for the Spokane County EMS and an Associate Medical Director for the Life Flight Network..

I obtained my medical degree from Loyola Stritch School of Medicine in Maywood, Illinois in 1976. I thereafter completed a one-year internal medicine internship with St. Francis Hospital in Evanston, Illinois, followed by an emergency medicine residency with Lutheran General Hospital in Park Ridge, Illinois from 1977 to 1979. I served as Chief Resident in 1979.

I am currently a member of the American College of Emergency Physicians, Spokane County Medical Society, Washington State Medical Society, Air Medical Physician Association, and National Association of EMS Physicians. I hold medical licenses in Washington, Idaho, Montana, and Oregon. Please see my attached curriculum vitae for additional qualifications and a list of my publications.

As a result of my education, training, and experience, I am familiar with the standard of care for emergency medicine physicians practicing in the state of Washington.

### b) Scope of Review

I have been asked to review Steven O. Wright's medical records to evaluate whether emergency medicine physician Dr. Medford Cashion complied with the standard of care. In formulating my opinions, I reviewed Mr. Wright's medical records from his two August 2, 2014 emergency department visits at the Spokane VA medical center, the death certificate and autopsy report, as well as Dr. Cashion's deposition testimony. I also relied upon my education, training, and experience. All of my conclusions set forth in this preliminary report are made on a more probable than not basis to a reasonable degree of medical certainty unless otherwise stated. I reserve the right to reassess my opinions based upon reviewing additional information. I also reserve the right to respond to any specific allegations articulated by other experts in their depositions.

### c) Summary of Relevant Facts

EXHIBIT 10 - p. 12

On August 2, 2014, Steven O. Wright was a 70 year-old man with multiple medical issues, including atrial fibrillation, Chronic Obstructive Pulmonary Disease (COPD), obstructive sleep apnea, hypertension, osteoarthritis, bipolar disorder, and Post-Traumatic Stress Disorder (PTSD). Mr. Wright had also recently been diagnosed with urethral cancer but had not yet received treatment. The records indicate that his medications included aspirin, budesonide, bupropion, digoxin, diltiazem, Lisinopril, simvastatin, tramadol, and warfarin.

Mr. Wright presented to the Spokane VA emergency department at approximately 11:00 with crutches and accompanied by a friend. He explained that he had fallen and injured his left knee and leg about a week earlier. He complained of pain, bruising and swelling in his leg. Another emergency department physician, Dr. Shea McManus, assessed Mr. Wright, and ordered diagnostic tests including labs. At 13:02, the lab results indicated that his INR was 1.5, which was subtherapeutic (below the therapeutic range) for someone like Mr. Wright, who was taking the anticoagulant warfarin to mitigate the risks of blood clots from his atrial fibrillation. Because of this, Dr. McManus ordered 5 mg warfarin and enoxaparin (another medication to prevent blood clots), both of which Mr. Wright received at 15:35.

Dr. McManus also ordered a lower extremity ultrasound to rule out deep vein thrombosis (DVT) from blood clots. Because the VA did not have ultrasound capabilities at that time, Mr. Wright needed to be sent to another facility for the ultrasound. While Mr. Wright was waiting for his transport to arrive, the records indicate that he was instructed to keep his leg elevated, but Mr. Wright refused to do so.

Ultimately, there were no concerning findings on the ultrasound. Mr. Wright was returned to the VA facility after the ultrasound was completed. Upon his return around 18:45, Dr. McManus had gone off shift, and Mr. Wright's care had been transferred to Dr. Medford Cashion. Dr. Cashion assessed Mr. Wright around 19:11, found him to be stable, and cleared him for discharge with instructions to follow up with an orthopedist in two days. Dr. Cashion documented that Mr. Wright had reasonable transportation and assist from a nearby friend. Dr. Cashion also charted that Mr. Wright reported that he was able to get to the bathroom and that he had been up in the ER walking with one crutch. Mr. Wright was discharged at approximately 20:05 with a follow up consult set for August 4.

While walking to his friend's car after discharge, Mr. Wright apparently tripped and fell into a BIKE rack. Mr. Wright returned to the emergency department sometime before 20:43, and was assessed by Dr. Cashion. Dr. Cashion documented that Mr. Wright reported he had lost his footing and fallen forward into a rack, hitting his head on the ground. He denied being "knocked out" and he remembered the fall event. Dr. Cashion documented that he a 3x4 cm abrasion and mild swelling to Mr. Wright's forehead, but that the bleeding was minimal.

Mr. Wright's pupils were equally round and reactive to light, and he was moving all his extremities well. His pulse, respirations and blood pressure were all normal, and very similar to the vitals taken earlier in the day. Mr. Wright denied any pain, or headache, and he was fully alert and oriented with normal mental status. He had no change in vision or hearing. His neck had good range of motion without tenderness. Dr. Cashion also asked Mr. Wright a series of

questions to thoroughly evaluate whether or not he felt that Mr. Wright had a concussion or had sustained any loss of consciousness in the fall. Based on his evaluation, Dr. Cashion concluded that Mr. Wright had not lost consciousness. Mr. Wright also had no signs of concussion.

Because Mr. Wright was requesting to go home and reporting that he simply had a scrape to his head, and because the examination had been negative, Dr. Cashion concluded that Mr. Wright could be discharged home if he followed up in two days with urgent care to ensure that he had not developed any problems. He discussed this with Mr. Wright and his friend, including the need to observe Mr. Wright for any signs or symptoms of concussion or other issues. Mr. Wright and his friend were comfortable with the home observation plan. Dr. Cashion accordingly ordered the abrasion cleaned and then authorized Mr. Wright's discharge. He documented that Mr. Wright was stable on discharge.

The next day, however, Mr. Wright was found dead in his home. An autopsy revealed a subdural hematoma. Other findings on the autopsy included severe pulmonary edema, hypertrophic cardiomyopathy, and moderately severe atherosclerosis.

### d) Opinions

It is my opinion that Dr. Medford Cashion complied with the standard of care in all of his interactions with Mr. Wright during each of the August 2, 2014 emergency department visits.

Regarding the first visit, after Dr. Cashion assumed care of Mr. Wright from Dr. McManus, Dr. Cashion performed his own assessment of Mr. Wright. His assessment, in conjunction with the information from Dr. McManus' earlier evaluation and diagnostics, led to Dr. Cashion appropriately determining that Mr. Wright was medically stable for discharge from the emergency department. Dr. Cashion instructed Mr. Wright to follow up in two days, which was within the standard of care. The standard of care did not require Dr. Cashion to insist that Mr. Wright be discharged in a wheelchair. Mr. Wright had demonstrated the ability to ambulate with crutches in the emergency department and his past use at home indicated his capacity to mobilize using crutches within his home as well. There is nothing in the notes during the first emergency department visit to suggest that Mr. Wright was not able to ambulate such that he needed to be discharged in a wheelchair.

Regarding the second visit, Dr. Cashion appropriately re-admitted Mr. Wright to the emergency department after his reported fall into the rack outside the ED. Dr. Cashion complied with the standard of care in re-evaluating Mr. Wright by taking a thorough history and conducting a thorough physical examination. Dr. Cashion testified that he questioned Mr. Wright closely about Mr. Wright's symptoms; the standard of care did not require Dr. Cashion to include every question and answer in his chart note, particularly where negative. Dr. Cashion's history taking was within the standard of care because he did document that Mr. Wright denied loss of consciousness, was fully alert and oriented, exhibited no mental status changes, or any other signs or symptoms concerning for concussion or neurologic injury. Mr. Wright himself denied headache, neck pain, or back pain. In fact, Mr. Wright reported no pain whatsoever and insisted that he had simply gotten a scrape to his head.

3

EXHIBIT 10 - p. 14
04/24/2017  12:37  5099277861  UPS STORE  PAGE 03/04

Mr. Wright's neurologic exam was entirely normal. Dr. Cashion was in a uniquely equipped position to assess Mr. Wright's cognition and mental status because he had evaluated him prior to the fall as well, so he was able to compare Mr. Wright's condition from before the fall to his post-fall condition. This condition was unchanged. The examination and history indicated that Mr. Wright had only sustained a minor superficial scrape and bump to his forehead.

All the evidence together, including the thorough examination and history taken by Dr. Cashion, indicated that Mr. Wright had not sustained a significant head injury in the fall. There was nothing in Mr. Wright's clinical examination to raise a suspicion about an intracranial bleed. Because there was no evidence to suggest that Mr. Wright had sustained more than a superficial scrape and bump, there was no indication for Dr. Cashion to order head imaging. Based on his evaluation of Mr. Wright and Mr. Wright's own reports, the standard of care did not require Dr. Cashion to order any diagnostics or keep Mr. Wright for observation. This is true even though Mr. Wright was a 70 year old receiving anticoagulation medication. Not every older patient who is on warfarin who has had a fall must undergo head imaging or be held for observation. Rather, there must be a clinical reason, such as loss of consciousness, neurologic impairment, a large visible injury, or at least pain, to warrant ordering head imaging or requiring a patient to remain in the hospital for observation. Dr. Cashion used reasonable medical judgment under the circumstances and complied with the standard of care.

*James M. Nania*

James M. Nania, MD, FACEP

Enclosures: CV; Fee Schedule; Testimony List

4

EXHIBIT 10 - p. 15

# CURRICULUM VITAE

# JAMES M. NANIA, MD, FACEP

**BUSINESS ADDRESS:**            1921 South Liberty Drive
                                 Liberty Lake, WA 99019
                                 (5090 255-9251

**HOME ADDRESS/PHONE:**          1921 South Liberty Drive
                                 Liberty Lake, WA 99019
                                 (509) 255-9251

**EDUCATION:**

1968-1972                        University of Wisconsin
                                 (Graduated with honors)
                                 Madison, Wisconsin
                                 B.S Zoology
                                 President Inter-Fraternity Council

1973-1976                        Loyola Stritch School of Medicine
                                 Maywood, Illinois
                                 Vice President Medical Class
                                 President Student Union

1976-1977                        Internal Medicine Internship
                                 St. Francis Hospital
                                 Evanston, Illinois

1977-1979                        Emergency Medicine Residency
                                 Lutheran General Hospital
                                 Park Ridge, Illinois
                                 Chief Resident 1979

**BOARD CERTIFICATIONS:**        Emergency Medicine 1981, recertification 1991, 2001, 2011

                                 Emergency medical services 2013

| | |
|---|---|
| **LICENSURE:** | Washington, Idaho, Oregon |

**WORK EXPERIENCE:**

| | |
|---|---|
| 1979-2009 | Emergency Physician<br>Deaconess Medical center<br>Spokane, WA 99204 |
| **ASSOCIATIONS:** | American College of Emergency Physicians<br>Spokane County Medical Society<br>Washington State Medical Society<br>National Association of EMS Physicians |
| **MEDICAL INTERESTS:** | Trauma, stroke and cardiac systems of care, cardio cerebral resuscitation, medical impact of volcanic eruptions, telemedicine |
| **PUBLICATIONS:** | Nania JM, Bruya T; In the Wake of Mount St. Helens; Ann of Emer Med, 11:184-191, April 1982<br><br>Esposito, T.J., Nania, J., et al; State Trauma System Evaluation, A Unique and Comprehensive Approach; Annals of Emerg Med; April 1992<br><br>Nania, James M., Garcia, Manual Rodrigues; In the Shadow of El Chichon: An Overview of the Medical Impact of the 28 March-4 April 1982 Eruptions of the Mexican Volcano; Prehospital & Disaster Medicine, Jan-Mar 1994, pp 58-66<br><br>Beyersdorf, S., Luna, G., Nania, J.; Community Medical Response to the Fairchild Mass Casualty Event; Amer Journal of Surgery, May 1996 |

**OTHER:**

| | |
|---|---|
| 1980-1993 | Chairman, Deaconess Medical Code 55 Committee |
| 1983-Present | Co-Medical Director Northwest MedStar Critical Care Transport Team |
| 1983-Present | American Heart Association ACLS Instructor |
| 1987-Present | Medical Program Director, Spokane County EMS |

2

EXHIBIT 10 - p. 17

| | |
|---|---|
| 1988-1999 | Chairman, Washington State Governor's Advisory Committee on Trauma |
| 1990-1996 | Chairman, Washington State EMS & Trauma Care Steering Committee |
| 1992-2009 | Medical Director, Emergency Department, Deaconess Medical Center |
| 1996-2003 | Member, Washington State EMS & Trauma Care Steering Committee |
| 2006-Present | Member, Washington State Emergency Cardiac & Stroke Technical Advisory Committee |
| 2000-Present | Medical Advisor, Spokane Chapter American Red Cross |
| 2006- 2015 | Clinical Instructor, University of Washington School of Medicine |
| 2010- 2012 | Member, Washington State EMS & Trauma Care Steering Committee |

**AWARDS/ACKNOWLEDGEMENTS:**

| | |
|---|---|
| 1986 | The Sky is the Limit Award<br>Lifebird Critical Care Air Transport Team |
| 1990 | Citizen Physician of the Year, Spokane County Medical Society |
| 1990 | Physician of the Year, Washington Fire Chiefs Association |
| 1995 | Washington Chapter of the American College of Emergency Physicians Special Award for EMS and Trauma System Development |
| 1995 | The Washington Governor's Award for Contributions to the Development of the State EMS and Trauma System |

Updated January, 2014

3

EXHIBIT 10 - p. 18

Depositions and Trials 2013 to Present

James M. Nania M.D., F.A.C.E.P.

1. Wilson v. Grant et. al.        May, 2013
2. Cuyle v. Hansen et. al.        April, 2014
3. Jones v. Kousa et. al.         November, 2014
4. Haaland v. Grant Public Hospital District No. 3 et. al.   February, 2015
5. Nelson v. Ekin                 August, 2015
6. Pereyra v. Heine               October, 2015
7. Ralkey v. Olympic Medical Center   March, 2017
8. Kilpatrick v. Samaritan Healthcare   April, 2017

EXHIBIT 10 - p. 19

**JAMES M. NANIA, MD, FACEP**
**1921 South Liberty Drive**
**Liberty Lake, WA 99019**
**(509) 255-9251**

MEDICAL- LEGAL FEE SCHEDULE

| | |
|---|---|
| Records Review and discussion | $350.00/hour |
| Written report | $350.00/hour |
| Phone consultation | $350.00/hour |
| Deposition | $500.00/hour |
| Trial appearance | $3000.00/ half day (1/2 day minimum) |
| Travel time | $150.00/hour |
| Mileage | $0.54/mile |

Expenses to be billed separately

EXHIBIT 10 - p. 20